UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>U.S. Attorney's Office<br>555 Fourth Street, NW<br>Washington, DC 20530,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>QUICKEN LOANS INC.,<br>1050 Woodward Avenue<br>Detroit, MI 48226,<br><br>　　　　　Defendant. | COMPLAINT FOR VIOLATIONS OF THE<br>FALSE CLAIMS ACT, 31 U.S.C. §§ 3729-<br>3733, AND COMMON LAW<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>Civil Action No. 15-0613 |

**<u>UNITED STATES' COMPLAINT AND JURY DEMAND</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE ......................................................................... 5

THE PARTIES .................................................................................................... 6

THE FALSE CLAIMS ACT .............................................................................. 6

FACTUAL BACKGROUND ............................................................................. 8

    I.     FHA Mortgage Insurance Program ....................................................... 8

          A.    FHA Relies On Lenders To Comply With Their Fiduciary
               Obligations. ............................................................................. 8

          B.    Lenders Must Submit Truthful Certifications. ......................... 10

          C.    Lenders Must Use Qualified Underwriters. ............................. 11

          D.    Lenders Must Perform Proper Due Diligence And Ensure
               Accuracy. ................................................................................ 12

          E.    Lenders Must Have A Quality Control Program, Report Material
               Deficiencies, And Correct The Problems. ............................... 18

          F.    Certifications And Endorsement For FHA Insurance .............. 21

          G.    Defaulted Loans Result In Losses To HUD. ............................ 24

          H.    Direct Endorsement Lenders Owe Duties To HUD By Virtue Of
               Their Authority To Endorse Loans For FHA Insurance And Their
               Responsibility To Ensure Accuracy ........................................ 25

    II.    Quicken's Participation In The FHA Program. ................................... 26

          A.    Quicken Directly Endorsed FHA Loans, Many Of Which Have
               Defaulted, Requiring FHA To Pay Substantial Insurance Claims ........... 26

          B.    Quicken Certified That It Complied With HUD Requirements To
               Gain And Maintain Eligibility In The Direct Endorsement Lender
               Program. ................................................................................. 27

    III.    Quicken Created Underwriting Processes And Practices That It Knew Or
          Should Have Known Would Result In The Submission Of False Claims ........... 28

          A.    Quicken's "Management Exception" Process Allowed Underwriters
               To Disregard FHA Requirements. ........................................... 29

B.    Quicken Inflated The Appraised Value Of Certain Homes, Leading To Larger Loans Than Allowed................................................................. 34

C.    Quicken Employees And Senior Management Regularly Manipulated And Miscalculated Income. .................................................. 43

D.    Quicken Pressured Underwriters To Quickly Approve Loans, And Incentivized Approvals Over Quality. ...................................................... 47

E.    Quicken Manipulated AUS Data In Order To Obtain A Total Accept/Approve Decision And Ignored Obvious Red Flags Indicating That A Borrower Would Not Be Able To Repay The Mortgage. ...................................................................................... 49

F.    Quicken Viewed FHA Insurance As Protection From The Consequences Of Making Lousy Loans. .................................................. 55

IV.    Quicken's Quality Control Process Underreported The Magnitude Of Underwriting Deficiencies, Failed To Adequately Assess Compliance With FHA Requirements, And Failed To Disclose Quicken's Underwriting Failures To FHA. ........................................................................... 56

V.    Quicken Submitted And Caused To Be Submitted False Claims For Payment To HUD ............................................................................ 62

COUNT I -- Violation of the False Claims Act
31 U.S.C. § 3729(a)(1) (2006) and 31 U.S.C. § 3729(a)(1)(A) (2010) ........................................ 63

COUNT II -- Violation of the False Claims Act
31 U.S.C. § 3729(a)(1)(B) (2010) (formerly 31 U.S.C. § 3729(a)(2) (2006)) ............................. 64

COUNT III -- Breach of Fiduciary Duty ..................................................... 64

COUNT IV -- Negligence ........................................................................... 65

PRAYER FOR RELIEF ............................................................................... 65

The United States of America hereby files this Complaint against Defendant Quicken Loans Inc. (Quicken) and alleges as follows:

## **INTRODUCTION**

1.      The United States brings this civil action against Quicken to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, and for damages under the common law for breach of fiduciary duty and negligence for harm sustained by the United States Department of Housing and Urban Development (HUD) in connection with Quicken's origination of residential mortgage loans underwritten and approved by Quicken and endorsed for Federal Housing Administration (FHA) insurance between September 1, 2007 and December 31, 2011 (relevant time period).

2.      During the relevant time period, Quicken, a lender approved by HUD to originate and underwrite single-family residential mortgage loans insured by FHA, knowingly approved loans that violated FHA rules while falsely certifying compliance with those rules.  Quicken's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages, while placing all the risk on FHA—a  risk that ultimately materialized into millions of dollars of losses to HUD.

3.      The FHA promotes American homeownership through its "Direct Endorsement Lender" program.  Under this program, the FHA insures loans so long as they satisfy certain requirements.  For these loans, the FHA guarantees that mortgage holders will suffer no loss if the borrower ultimately does not repay the loan.  This program encourages lenders to extend loans to creditworthy low- and moderate-income families as well as first-time homebuyers.

4.      Under this program, lenders known as Direct Endorsement Lenders are given the responsibility to determine whether loans satisfy the requirements for FHA insurance.  Because

Direct Endorsement Lenders are permitted to endorse loans for FHA insurance without prior HUD review, HUD requires these lenders to conduct due diligence on loans before endorsing them for FHA insurance, and relies on the truthfulness of their loan specific certifications in extending that insurance. As a result, the lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with HUD.

5.     Quicken failed to live up to its obligations. Quicken management instituted and encouraged practices that led underwriters to break HUD rules and to approve ineligible loans.

6.     These policies and practices included Quicken allowing "exceptions" to HUD's underwriting requirements, requesting inflated appraisals, manipulating key data, pressuring underwriters to approve loans faster, paying prohibited commissions to its underwriters for approved loans, and encouraging underwriters to disregard risks that were evident in the loan files.

7.     Quicken established a culture that valued getting a loan approved and endorsed for FHA insurance over complying with FHA's rules. Quicken's aim was to get loans insured by the United States and sold for a profit—even when Quicken could not truthfully certify to FHA that the loan qualified for FHA insurance.

8.     In this culture, Quicken endorsed loans for FHA insurance despite clear "red flags" that indicated the borrower would not be able to make the mortgage payment. In one case, for example, a borrower's bank account statement showed overdrafts in multiple months, and during the loan application process, the borrower requested a refund of the $400 mortgage application fee so that the borrower would be able to feed her family. Nevertheless, Quicken approved the loan. The borrower made only five payments before becoming delinquent, and as a result, HUD ultimately paid an FHA insurance claim of $93,955.19.

9.      Quicken's management allowed loans to be endorsed for FHA insurance despite known violations of FHA requirements.  In one example, Quicken became aware that it had knowingly approved and closed an FHA loan for a borrower who did not intend to occupy the property as his primary residence, in violation of FHA requirements.  Rather than stop the loan from being insured by FHA, Quicken's Operations Director, Mike Lyon, wrote: "The FHA loan closed on 4/29. Over a month ago. We can't unwind that.  My suggestion is to get it insured and out the door."  Quicken certified to FHA the loan was eligible for FHA insurance, and endorsed the loan for FHA insurance.  The borrower eventually defaulted and Quicken submitted a claim for $162,740, even though Quicken knew the loan was ineligible.  FHA paid Quicken the claim amount.

10.      Quicken also requested inflated appraisals in violation of HUD rules.  For example, in a cash-out refinance loan, Quicken originally received an appraised value of $180,000 for the underlying property, but because the borrower wanted to receive more cash, Quicken requested the appraiser to inflate the value by $5,000.  The appraiser provided Quicken's requested value of $185,000, even though the only difference between the two appraisals was the appraised value—the comparable sales analysis, and even the date of the appraiser's signature, remained the same.  Quicken used the inflated appraised value to approve the loan.  The borrower was delinquent on his first payment, and as a result, HUD ultimately paid an FHA insurance claim of $204,208.

11.      Quicken underwriters routinely miscalculated or misrepresented borrowers' credit characteristics in order to make the loans appear eligible for FHA insurance.  Quicken employees spoke of "fudging" a borrower's income in order to gain approval for FHA insurance.  In one instance, for example, Quicken approved a loan for FHA insurance based on what its Operations

Director and senior level executive, Mike Lyon, called "bastard income," which he explained was income that was "plausible to the investor even though we know its creation comes from something evil and horrible."

12.     As a result of this culture that elevated profits over compliance, Quicken chose not to take appropriate steps to remedy systemic problems of which it was aware, and implemented a quality control process that failed to adequately assess its compliance with FHA requirements.  In addition, Quicken repeatedly hid its underwriting problems from HUD rather than disclose them.  Despite having an obligation to report all materially defective loans to HUD, during the relevant time period, Quicken did not report a single underwriting deficiency to the agency.

13.     Quicken's conduct caused hundreds of improperly underwritten loans to be endorsed for FHA insurance where the loans did not satisfy HUD's requirements and where the borrowers ultimately did not repay the loans.

14.     Ineligible loans endorsed by Quicken have resulted in millions of dollars in existing losses to HUD and many additional loans are currently in default and will likely result in significant additional losses to the agency.

15.     HUD's underwriting requirements are designed not only to protect it and the taxpayers from improperly underwritten and unduly risky loans, but also to ensure that creditworthy borrowers are able to handle the monthly payments and to become lasting homeowners.  Quicken's underwriting of ineligible loans and false certifications of compliance with applicable requirements undermined these objectives, harming homeowners and the housing market.

## JURISDICTION AND VENUE

16.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733, and the common law.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

17.     This Court has personal jurisdiction over Quicken because Quicken can be found and transacts business within the District of Columbia.

18.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. §1395, and 31 U.S.C. § 3732(a), because Quicken can be found and transacts business within the District of Columbia.

19.     From September 1, 2007 to December 31, 2011, Quicken has underwritten and endorsed 134 FHA-insured mortgage loans, with original loan amounts totaling $43,019,750 for properties located in the District of Columbia.  Three of those properties had claims for FHA insurance, which Quicken caused to be submitted, totaling $634,467.

20.     HUD is headquartered in the District of Columbia.  The FHA program is also headquartered in the District of Columbia.

21.     Quicken's participation in FHA's Direct Endorsement Lender program was granted and is monitored by FHA headquarters in the District of Columbia.

22.     Quicken's annual certification, and the recertification process, is directed, monitored, and approved by FHA headquarters in the District of Columbia.

23.     When a loan is endorsed for FHA mortgage insurance, the endorsement is processed by FHA headquarters in the District of Columbia.

24.      When a claim is submitted for payment on an FHA insured mortgage, the claim is processed by FHA headquarters in the District of Columbia.

## THE PARTIES

25.     Plaintiff is the United States of America.

26.     Defendant Quicken is a corporation incorporated under the laws of the State of Michigan.  Quicken originates and underwrites residential mortgage loans for properties in all 50 states and the District of Columbia, and actively markets itself as a national lender through national marketing campaigns.

## THE FALSE CLAIMS ACT

27.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats false or fraudulent claims against the Government and protects federal funds.  The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

28.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1) (2006); 31 U.S.C. § 3729(a)(1)(A) (2010).

29.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2010).  The prior version of the false statements provision made liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (2006).

30.      The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(A) (2010).  The False Claims Act provides that no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2010).

31.      Before May 2009, the False Claims Act defined the term "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(c) (2006).

32.      Effective May 20, 2009, the False Claims Act now defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that– (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government– (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A) (2010).

33.      The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program

requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See Neifert-White Co.*, 390 U.S. at 232.

34.     Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

## FACTUAL BACKGROUND

### I.     FHA MORTGAGE INSURANCE PROGRAM

#### A.     FHA RELIES ON LENDERS TO COMPLY WITH THEIR FIDUCIARY OBLIGATIONS.

35.     HUD is a cabinet-level agency of the United States.  Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.  HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

36.     FHA is a part of HUD and is one of the largest mortgage insurers in the world. Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception.  Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family home buyers originated and held by approved lenders, or mortgagees.

37.     If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD.  HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default.  The mortgage holder therefore suffers no loss when a borrower is unable to repay an FHA-insured mortgage.  This no-loss guarantee

encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase. FHA mortgage insurance programs therefore help many creditworthy low- and moderate-income families as well as first-time homebuyers become homeowners.

38.    A lender must apply to be a Direct Endorsement Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf. This is an important responsibility because HUD "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a). Instead, the Direct Endorsement Lender underwrites mortgage loans on HUD's behalf and determines whether a borrower presents an acceptable credit risk for HUD. In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations." *Id*. The Direct Endorsement Lender must decide whether or not to approve the borrower for an FHA-insured mortgage loan.

39.    After the Direct Endorsement Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan. The Direct Endorsement Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

40.    Certain Direct Endorsement Lenders apply to, and participate in, the Lender Insurance program in which the mortgagees themselves endorse the mortgage for FHA insurance

and retain all documentation supporting the mortgage.  24 C.F.R. § 203.6.  The lender retains the

documents necessary to approve the loan (the FHA "case binder") and remits the documents to

HUD only upon request.  *See* Mortgagee Letter 2005-36.

41.     A Direct Endorsement Lender is expected and obligated to act with the utmost

good faith, honesty, and fairness in its dealings with HUD.  "Under the . . . civil case law the

mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business

relationship' has an affirmative duty 'to use due care in providing information and advice' to the

federal mortgage guarantor."  *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976)

(citing *1st Nat'l Bank, Henrietta v. Small Bus. Admin.*, 429 F.2d 280, 287 (5th Cir. 1970); *Mt.

Vernon Coop. Bank v. Gleason*, 367 F.2d 289, 293 (1st Cir. 1966)).  As a result, in addition to

the regulatory duties addressed below, the Direct Endorsement Lender owes both a fiduciary

duty and a duty of reasonable care to HUD.

**B.     LENDERS MUST SUBMIT TRUTHFUL CERTIFICATIONS.**

42.     The success of the Direct Endorsement Program depends upon proper

underwriting of loan files.  Participating lenders have to determine the eligibility of borrowers

and loans for FHA insurance, and ensure the integrity of the data relied upon to make such

determinations.

43.     Under the Direct Endorsement Program, HUD relies on the expertise and

knowledge of the lenders.

44.     HUD also relies on the truthfulness of the certification the lender completes on

each loan certifying that the loan is eligible for FHA insurance.  As HUD has explained, these

"certifications are important as HUD will rely upon them for purposes of endorsing the mortgage

loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to

endorsement."  Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

### C. LENDERS MUST USE QUALIFIED UNDERWRITERS.

45.     To obtain and maintain its status as a Direct Endorsement Lender, a lender must have qualified underwriters on staff.

46.     To qualify as a Direct Endorsement underwriter or "DE underwriter," an underwriter must satisfy several requirements.  The DE underwriter "must have a minimum of three years full-time recent experience (or equivalent experience) reviewing both credit applications and property appraisals."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.3; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.  The underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and "must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.1; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

47.     Lenders cannot offer underwriters improper incentives to approve loans.  Specifically, "[e]mployees who perform underwriting and loan servicing activities may not receive commissions." HUD Handbook 4060.1, REV-2, ch. 2-9.A.  Lenders are not allowed to provide bonuses based on the amount of loans an underwriter approves.

48.     These requirements are intended to ensure that FHA-insured loans are underwritten only by qualified individuals who are knowledgeable and experienced regarding FHA requirements, and that the decision to endorse the loan is based on the eligibility of the mortgage rather than the financial interest of the underwriter.

### D.   LENDERS MUST PERFORM PROPER DUE DILIGENCE AND ENSURE ACCURACY.

49.    A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.  That responsibility includes performing due diligence and ensuring accuracy.

50.    Proper due diligence is a critical component of the Direct Endorsement Program.  It is required by federal regulation and HUD Handbooks.  It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD.  *See* 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law.").  "The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found."  *Bernstein*, 533 F.2d at 797.

51.    A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties"; and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral."  HUD Handbook 4155.1, REV-5, ch. 2-1.  Proper due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.  *Id.*

52.    In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."  24 C.F.R § 203.5(c).

53.     HUD has established specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Direct Endorsement Lenders.  These requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply.  *Id.*

54.     HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C.  The Direct Endorsement underwriter must assume the following responsibilities:

> compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;
>
> the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;
>
> the decisions relating to the acceptability of the appraisal, the inspections, the buyer[']s capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;
>
> the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program; and
>
> awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

55.     The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and

- 13 -

render an underwriting decision in accordance with applicable regulations, policies and procedures."  24 C.F.R. § 203.5(d).

56.    In addition, the mortgagee must "have the property appraised in accordance with [the] standards and requirements" prescribed by HUD.  *Id.* at § 203.5(e).  "The mortgagee's underwriter is to review the appraisal to determine whether or not the appraiser's conclusions are acceptable.  If found to be acceptable, the property is eligible for HUD mortgage insurance." HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G; *see also* HUD Handbook 4155.2, ch. 4.1.b (May 9, 2009) ("Lenders are responsible for properly reviewing appraisals and determining if the appraised value used to determine the mortgage amount is accurate and adequately supports the value conclusion.").  The underwriter's review includes verification, as possible, that the factual information submitted is correctly reported, as well as determination of the plausibility and consistency of the conclusions based on the data presented in the appraisal.  *See* HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G.  The appraisal must include the appraiser's certification that, among other things, the appraisal was not based on a requested minimum value or a specific value.  HUD Handbook 4150.2, CHG-1, ch. 5-1.A.  A Direct Endorsement Lender "must accept responsibility, equally with the appraiser, for the integrity, accuracy, and thoroughness of the appraisal, and will be held accountable by HUD for the quality of the appraisal."  Mortgagee Letter 1994-54.

57.    The appraisal is important to the eligibility of the loan for FHA insurance because HUD places limits on the eligible loan amount based on the appraised value of the property.  The maximum eligible loan amount is determined by HUD's loan-to-value (LTV) limits, which compare the loan amount to the appraised value.

- 14 -

58.     FHA rules specifically provide that an appraisal cannot be "based on a requested minimum valuation, a specific valuation or range of values."  *See* Mortgagee Letter 1996-26. Appraiser independence from lenders has been a significant concern of the FHA, and as HUD reaffirmed in 2009, lenders are prohibited from providing to the appraiser "an anticipated, estimated, encouraged or desired value."  *See* Mortgagee Letter 2009-28.

59.     When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing HUD requirements, such as those set forth in HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to Four-Unit Mortgage Loans).  The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.  HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

60.     Direct Endorsement Lenders can underwrite an FHA-insured loan in one of two ways.  First, a DE underwriter can "manually underwrite" the loan, by making the credit decision whether to approve the borrower, in accordance with HUD underwriting rules.  Second, the Direct Endorsement Lender can use a HUD-approved Automated Underwriting System (AUS), a software system that makes the credit recommendation whether to approve the borrower.

61.     To "manually underwrite" an FHA-insured loan, there are numerous steps the DE underwriter must take.  At a minimum, the underwriter must:

- obtain and review the borrower's credit history;

- obtain adequate explanations for major derogatory credit, including collections, judgments, and other recent credit problems;

- • analyze the borrower's debt obligations;

- • reject documentation transmitted by unknown or interested parties;

- • inspect documents for proof of authenticity;

- • verify the borrower's employment history;

- • establish the borrower's income stability and make income projections;

- • ensure that the borrower has invested a minimum required amount of his or her own funds in the transaction;

- • document the source of funds invested in the transaction, including any gift funds;

- • calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and

- • consider and document any compensating factors permitting deviations from those fixed ratios.

*See* HUD Handbook 4155.1.

62. Beginning in July 2008, HUD required Direct Endorsement Lenders to electronically process eligible loan requests through an AUS. The AUS is a software program that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL." Using the data the lender inputs, HUD's "TOTAL" algorithm makes a credit determination and either: (i) provides an "Accept/Approve" decision, approving the loan subject to certain conditions; or (ii) provides a "Refer" decision, referring the loan back to the lender for manual underwriting. When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps. Many of these conditions relate to ensuring the data the lender entered is true, complete, and accurate.

63.     Numerous requirements promulgated by HUD explain how lenders must calculate each data point and what documentation they need to support each data point.

64.     For any loan approved through the use of an AUS, HUD requires the lender to certify to the integrity of the data it entered, which HUD defines as data that is true, complete, and accurate.  FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2. If the lender later receives or learns of information that materially differs from the information previously entered by the lender, the lender must re-submit a proposed loan to TOTAL through the AUS.

65.     The data entered into TOTAL is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage applicant based on the data supplied by the lender.  Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS are true, complete, properly documented, and accurate."  *See* FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  It is the Direct Endorsement Lender's responsibility to ensure the integrity of the data relied upon by TOTAL.  *See* Mortgagee Letter 2004-1.

66.     Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for an AUS approval and must be manually underwritten.  "A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve."  FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.  While a lender is not required to have a Direct Endorsement underwriter review the credit portion of an AUS approved

loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval.  *See id.*

68. To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "manipulating . . . application variables [in] TOTAL mortgage scorecard to obtain an accept/approve risk classification."  *See* Mortgagee Letter 2005-15.

68. If TOTAL does not approve a loan with an "Accept/Approve" decision, it returns a "Refer" decision, meaning the loan is referred back to the lender for manual underwriting. Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under FHA's manual underwriting requirements.  *See* 24 C.F.R § 203.255(b)(5)(i)(B).

**E.   LENDERS MUST HAVE A QUALITY CONTROL PROGRAM, REPORT MATERIAL DEFICIENCIES, AND CORRECT THE PROBLEMS.**

69. A Direct Endorsement Lender is required to maintain a quality control program to ensure the quality of its FHA-insured mortgages.  HUD requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions."  HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

70. The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action.  HUD Handbook 4060.1, REV-2, ch. 7-2.

71. To comply with HUD's quality control requirements, a Direct Endorsement Lender's quality control program must (among other things) conduct a full review of "all loans going into default [*i.e.,* 60 days or more past due] within the first six payments," which HUD

defines as "early payment defaults."  HUD Handbook 4060.1, REV-2, ch. 7-6.D; HUD Handbook 4700.2, REV-1, ch. 6-1.D.

72.     The quality control program also must review a sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines.  HUD Handbook 4060.1, REV-2, ch. 7-6.C; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.D.

73.     HUD prescribes how lenders must sample the loans.  The sample depends on the number of FHA loans the lender originates.  HUD Handbook 4060.1, REV-2, ch. 7-6.C.  Under the HUD requirements, a "mortgagee who originates and/or underwrites more than 3,500 FHA loans per year may review 10% of its loans or a statistical random sampling that provides a 95% confidence level with 2% precision."  *Id.*

74.     When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information.  For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification.  Examples of items that must be reverified include, but are not limited to, the mortgagor[']s employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds."  HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

75.     If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies.  "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed."  HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

76.     At the end of the quality control review, the lender is expected to assess the significance of any deficiencies.  The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month[']s sample to previous samples so the mortgagee may conduct trend analysis."  HUD Handbook 4060.1, REV-2, ch. 7-4.

77.     HUD recommends four types of ratings.  The ratings provided for this purpose are:

"Low Risk", *i.e.,* no problems or minor problems were identified with loan servicing or origination;

"Acceptable Risk," *i.e.,* the issues identified were not material to the "creditworthiness, collateral security or insurability of the loan";

"Moderate Risk," *i.e.,* a failure to address significant unresolved questions or missing documentation has created moderate risk for the mortgagee and the FHA; and

"Material Risk," *i.e.* the issues identified were "material violations of FHA or mortgagee requirements and represent an unacceptable level of risk."

*Id.*

78.     Examples of "material risk" are violations that include a "significant miscalculation of the insurable mortgage amount or the applicant[']s capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud."  HUD Handbook 4060.1, REV-2, ch. 7-4.D.

79.     These findings trigger mandatory reporting obligations.  Mortgagees "must report [Material Risk] loans, in writing," to HUD.   *Id.*

80.     A lender is also required to report to HUD "[f]indings of fraud or other serious violations" that are discovered "during the normal course of business and by quality control staff during review/audits of FHA loans."  HUD Handbook 4060.1, REV-2, ch. 7-3.J.  The lender must report these findings, along with the supporting documentation, within 60 days of when the

lender first discovers them. *Id.*; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices."). Since November 2005, Direct Endorsement Lenders such as Quicken have been required to make such reports through HUD's online Neighborhood Watch Early Warning System. Mortgagee Letter 2005-26.

81.    Internal reporting of findings is also required. Quality control review findings must "be reported to the mortgagee[']s senior management within one month of completion of the initial report." HUD Handbook 4060.1, REV-2, ch. 7-3.I.

82.    In addition to appropriate reporting, lenders must act to address the problems they identify. "Management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities." *Id*; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.F.

### F.    CERTIFICATIONS AND ENDORSEMENT FOR FHA INSURANCE

83.    HUD requires Direct Endorsement Lenders to certify their compliance with the foregoing due diligence, quality control, and reporting requirements.

84.    First, when a lender applies to participate in the Direct Endorsement Lender program and to endorse loans for FHA insurance on HUD's behalf, the lender must certify that it will fully comply with all HUD guidelines, regulations, and requirements:

> I certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 *et seq.*) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

- 21 -

This certification is submitted to HUD headquarters in the District of Columbia.

85.     If the lender is approved, the lender must re-certify, every year, that it is complying with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan. From 2007 to 2009, the lender was required to certify:

> I know or am in the position to know, whether the operations of the above-named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

This language was altered in 2010, requiring the lender to certify:

> I certify that I know, or am in the position to know, whether the operations of above-named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of the lender. I certify that the lender complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, the above-named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named lender is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for the above-named lender . . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

These certifications are submitted to HUD headquarters in the District of Columbia.

86. Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a Direct Endorsement Lender or to endorse loans for FHA insurance.

87. In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification—*i.e.*, a certification specific to an individual loan—that the individual mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A.

88. The "loan-level" certification differs depending on whether the lender used an AUS or manual underwriting. For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* For each loan that required manual underwriting, the lender must certify that the Direct Endorsement Underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage." *Id.*

89. For all loans, the mortgagee's representative must certify: "I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4."[1] *Id.* If the loan does not

---

[1] As of May 9, 2009, HUD Handbook 4000.4 was superseded by HUD Handbooks 4155.1 and 4155.2.

meet all applicable HUD requirements, it is not eligible for FHA insurance and cannot be certified for endorsement.

90.     Absent the applicable certifications for an individual loan as described in Paragraphs 87 - 89, the Direct Endorsement Lender cannot endorse that loan for FHA insurance.

91.     Each of the foregoing certifications is material to HUD's payment of any claim submitted under the Direct Endorsement Lender Program.  HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or to paying claims in the event of a default; instead, it relies on its lenders to comply with HUD requirements and to ensure that every loan is in fact eligible for FHA insurance.  The certifications are required for each lender to enter and remain in the program.  The certifications are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance.  The certifications are essential for a claim on a loan to be submitted for FHA insurance.  And the certifications are needed to protect HUD and the FHA insurance fund from undue risk and loss.

**G.     DEFAULTED LOANS RESULT IN LOSSES TO HUD.**

92.     Once a loan is endorsed by HUD or the Direct Endorsement Lender, it is insured by FHA on the basis that that the Direct Endorsement Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance.  Without those requirements being met, the lender could not endorse the loan for FHA insurance.  It is only because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.

93.     If the borrower defaults, the holder of the mortgage can submit a claim to HUD for any loss from the default.  The holder submits a claim for insurance by using HUD's electronic claim system.  The claim must include certain information.  Each loan that is endorsed

for FHA insurance has a unique FHA case number, and the claim must include the FHA case number.  If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.  The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

94.      FHA pays these insurance claims in two parts.  First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.  Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (*e.g.*, foreclosure costs), plus interest.  HUD Handbook 4330.4, REV-1, ch. 2-4.

95.      These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically. The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim.  After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

**H.      DIRECT ENDORSEMENT LENDERS OWE DUTIES TO HUD BY VIRTUE OF THEIR AUTHORITY TO ENDORSE LOANS FOR FHA INSURANCE AND THEIR RESPONSIBILITY TO ENSURE ACCURACY.**

96.      HUD grants Direct Endorsement Lenders responsibility for determining which loans qualify for FHA insurance.  In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.  HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

97.     As a result of this fiduciary relationship, the Direct Endorsement Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD.  These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

## II.     QUICKEN'S PARTICIPATION IN THE FHA PROGRAM.

### A.     QUICKEN DIRECTLY ENDORSED FHA LOANS, MANY OF WHICH HAVE DEFAULTED, REQUIRING FHA TO PAY SUBSTANTIAL INSURANCE CLAIMS.

98.     Quicken began participating in the Direct Endorsement Lender Program in August 1994 and in the Lender Insurance Program throughout the relevant time period. However, Quicken did not underwrite FHA mortgages between 2005 and September 2007. Quicken is an online lender.  It does not operate storefronts where it collects information from prospective borrowers, but rather gathers information from borrowers nationwide by phone, fax, email, and uploads to Quicken's website.  Quicken's underwriting is done at Quicken's headquarters or at other centralized locations.

99.     After endorsing a loan for FHA insurance, Quicken typically sold that loan to large institutional investors located throughout the United States.  Quicken and its investors considered FHA-insured loans to be less risky because the holder of the mortgage would be made whole by FHA in the event of a default.

100.     Quicken profited both by charging loan fees and by selling the FHA-insured loans.

- 26 -

101.    Between September 2007 and March 27, 2015, HUD paid claims on at least 3,885 mortgage loans endorsed by Quicken during the relevant time period, paying out over half a billion dollars.

102.    Many additional claims are expected on loans endorsed for FHA insurance by Quicken during the relevant time period.  As of April 20, 2015, over 8,329 additional mortgage loans underwritten by Quicken during the relevant time period, totaling an unpaid mortgage balance of $1,103,572,446, have become 60 days (or more) delinquent, but have not yet resulted in claims to HUD.

**B.    QUICKEN CERTIFIED THAT IT COMPLIED WITH HUD REQUIREMENTS TO GAIN AND MAINTAIN ELIGIBILITY IN THE DIRECT ENDORSEMENT LENDER PROGRAM.**

103.    To become and remain a HUD-approved Direct Endorsement Lender, and to receive payment on claims for defaulted FHA-insured loans that it held, Quicken was required to annually certify its compliance with HUD's requirements.

104.    On August 26, 2008, Patrick McInnis, President, certified to HUD for fiscal year 2008 that:

> I know, or am in the position to know, whether the operations of [Quicken] conform to HUD-FHA regulations, handbooks, and policies.
>
> I certify that to the best of my knowledge, [Quicken] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [Quicken] is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

105.    Bill Emerson, Chief Executive Officer, made similar certifications for fiscal years 2009 through 2012.

106.    The foregoing certifications in paragraphs 87 - 89 and 104 - 105 were knowingly false because, as discussed below, Quicken knew, deliberately ignored, or recklessly disregarded that it originated and underwrote loans that were not in compliance with HUD requirements.

## III.    QUICKEN CREATED UNDERWRITING PROCESSES AND PRACTICES THAT IT KNEW OR SHOULD HAVE KNOWN WOULD RESULT IN THE SUBMISSION OF FALSE CLAIMS.

107.    During the relevant time period, Quicken underwrote loans it knew did not comply with FHA loan requirements and knowingly and falsely certified to HUD that it (1) used due diligence in underwriting the loans; or (2) that the data it used to approve the loans for FHA insurance had integrity—and that the loans were eligible for FHA mortgage insurance.

108.    As described below, Quicken knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with FHA's underwriting requirements, and thus were not eligible for FHA mortgage insurance.

109.    Furthermore, Quicken established certain underwriting processes that it knew, deliberately ignored, or recklessly disregarded would result in Quicken endorsing materially defective loans for FHA mortgage insurance.

110.    Through its "management exception" process, Quicken permitted employees to request management approval for an exception to an FHA underwriting requirement that could not be met in order to approve loans.  This "management exception" process treated FHA requirements not as requirements, but as lines that could be crossed in order to approve a loan.

111.    Through its "value appeal" process, Quicken permitted employees to request specific inflated values from appraisers in order to make a loan eligible for FHA insurance.  Such a practice was specifically prohibited by the governing FHA requirements, which forbade lenders from requesting specific valuations from appraisers.  Quicken's "value appeal" process

led to appraisers increasing the appraised value of a property, often with no justification for the

increase, and allowed Quicken to maximize its profit by approving more and larger FHA-insured

loans than were otherwise approvable.

112. Quicken also regularly misrepresented or miscalculated a borrower's income,

pressured and incentivized underwriters to approve more loans, manipulated the data entered in

the AUS to gain a TOTAL Accept/Approve decision, and ignored obvious red flags that

indicated a borrower would not be able to repay the mortgage.

113. Quicken's aim was to approve more FHA loans, even if the loans did not meet all

of HUD's requirements to qualify for FHA insurance. Quicken viewed FHA insurance as the

upside to a bad loan. As a result of Quicken's deliberate conduct, HUD paid millions of dollars

in insurance claims on hundreds of defaulted mortgage loans that Quicken falsely certified as

eligible for FHA insurance.

### A.  QUICKEN'S "MANAGEMENT EXCEPTION" PROCESS ALLOWED UNDERWRITERS TO DISREGARD FHA REQUIREMENTS.

114. As discussed in paragraphs 87 - 89, lenders must adhere to FHA underwriting

requirements and certify to HUD that a mortgage endorsed for FHA insurance is eligible.

115. Quicken created a management exception process that allowed its underwriters to

request management approval for an exception to underwriting requirements that could not be

met. As part of this process, Quicken granted management exceptions to allow violations of

FHA underwriting requirements. Quicken certified that each loan complied with FHA

requirements, even when Quicken knew these loans did not.

116. Quicken senior management was aware of the management exception process,

and was often involved in the decision of whether to grant an exception requested by an

underwriter or loan originator.

117.    Quicken's formalized acceptance and approval of management exceptions caused underwriters to view FHA's rules and requirements as mere suggestions that could be disregarded in order to close a loan and earn a bonus, and led underwriters to grant additional exceptions that were not formally tracked and did not receive management approval.

118.    These informal underwriter exceptions were allowed by Quicken.  In sworn testimony, Quicken's Divisional Vice President for Underwriting, Clint Bonkowski, who is the second most senior executive in Quicken's Operations Department, testified that an underwriter's decision whether to seek a documented management exception or to provide the exception on his own "depends on what that [the] underwriter[']s comfortable with."

119.    Quicken's management was aware that its exception process allowed ineligible loans to be approved for FHA insurance through a freewheeling approach to underwriting FHA insured mortgages.  At one point, Mr. Bonkowski conducted a review of the exceptions Quicken had previously granted on FHA loans that defaulted in 2010 soon after loans were originated. He determined that 40 percent of the exceptions should not have been granted, adding "we make some really dumb decisions when it comes to client service exceptions.  Example, purchase loan we pulled new credit and the client stopped paying on almost everything and the scores fell by 100 points, we closed it."

120.    In the case of one management exception, the Operations Director of the FHA Team, Jeanine Taylor, granted an exception to HUD underwriting requirements concerning the documents needed by a non-U.S. Citizen to obtain an FHA-insured loan.  Ms. Taylor knew the borrower did not have the documents required by FHA but nonetheless granted the exception and allowed the loan to be endorsed for FHA insurance—writing in an email that the borrower "does not have the FHA required docs but we are going to go with it."

121.     In another case, Quicken's Operations Director, Mike Lyon, after obtaining "absolute confirmation" from FHA Product Manager, Bobbi MacPherson, that a particular loan as underwritten by Quicken with an impermissible prepayment fee on a secondary mortgage would "be uninsurable," granted an exception to FHA underwriting requirements, permitting the loan to be endorsed for FHA insurance.  Mr. Lyon knowingly violated the FHA underwriting requirements, writing in an email "whenever we bump into utterly stupid underwriting guidelines like this, we have to push back hard. . . . I'll put the exception in on this one."

122.     In yet another situation, Quicken became aware that it had approved and closed an FHA cash-out refinance for a borrower who did not intend to occupy the property as his primary residence, in violation of FHA requirements.  An internal document shared with senior Quicken management acknowledged that a Quicken employee "misrepresented [the borrower's] intent to take cash out and sell subject [property] to purchase a new primary residence."

123.     Rather than stop the loan from being insured by FHA, Quicken's Operations Director, Mike Lyon, wrote: "the FHA loan closed on 4/29.  Over a month ago.  We can't unwind that.  My suggestion is to get it insured and out the door."  Quicken certified to FHA the loan was eligible for FHA insurance, and endorsed the loan for FHA insurance.  The borrower eventually defaulted and Quicken submitted a claim for $162,740, even though Quicken knew the loan was ineligible.  FHA paid Quicken the claim amount.

124.     The following are additional representative examples of loans in which Quicken provided a management exception that violated HUD requirements, and which resulted in false claims paid by FHA.

125.     FHA Case Number 561-8742199 relates to a property in the State of Washington.

- 31 -

a.      Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance. The loan was a refinance of a conventional mortgage.  The mortgage closed on or about October 20, 2008.

b.      Contrary to Quicken's certifications, Quicken did not comply with HUD requirements in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

c.      Quicken did not comply with the AUS conditions for approval of the loan. The borrower was self-employed and condition 22 of the AUS certificate required Quicken to obtain signed tax returns or information directly from the IRS for the most recent two years.  Because the loan closed in October 2008, the most recent two years of tax returns were 2007 and 2006.

d.      Rather than obtain the documentation required by the AUS and HUD, a Quicken employee granted an exception to HUD's income verification requirements, and permitted the loan to proceed even though Quicken had not obtained the income documentation required by HUD.  Accordingly, in violation of HUD requirements, Quicken knowingly qualified the borrower based on income documentation that was more than twenty months old at the time the mortgage was endorsed.

     e.     The borrowers made only one payment before becoming delinquent, and a claim was filed thereafter.  As a result, HUD paid an FHA insurance claim of $487,010.33.

126.     FHA Case Number 201-3906181 relates to a property in the Commonwealth of Kentucky.

     a.     Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance.  The mortgage was a cash-out refinance in which the borrowers' existing mortgage was refinanced for an amount greater than the outstanding loan balance and the borrower received the difference in cash.  The mortgage closed on or about August 25, 2008.

     b.     Contrary to Quicken's certifications, Quicken did not comply with HUD rules in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

     c.     Quicken did not comply with the AUS conditions for approval of the loan as it did not properly document and verify the income it input into the AUS system to obtain approval for the loan.  Condition 22 of the AUS certificate required Quicken to obtain the most recent year-to-date pay stub for the co-borrower as well as a verification of employment.  The AUS certificate also

specified in condition 10 that all verification documents must be dated within 120 days of the closing date of the loan.

d.      Rather than obtain the documentation required by the AUS and HUD, Quicken's Operations Director Mike Lyon granted an exception to HUD's income verification requirements, and permitted the loan to proceed without obtaining a paystub for the co-borrower that complied with HUD's documentation requirements.  Instead, to document the co-borrower's income, Quicken knowingly used a stale paystub that was more than four months old at the time the loan closed, in clear violation of HUD requirements.

e.      The borrowers made only four payments before becoming delinquent, and a claim was filed thereafter.  As a result, HUD paid an FHA insurance claim of $238,295.32.

127.    Throughout the relevant time period, Quicken allowed employees and underwriters to request exceptions to underwriting requirements on loans that it endorsed for FHA insurance.  In creating and promoting the management exception process, Quicken knew, recklessly disregarded, or deliberately ignored the fact that these loans were not eligible for FHA insurance and falsely certified that they were eligible for FHA insurance.

### B.      QUICKEN INFLATED THE APPRAISED VALUE OF CERTAIN HOMES, LEADING TO LARGER LOANS THAN ALLOWED.

128.    Quicken engaged in a systemic process of inflating the appraised values on FHA loans from September 2007 through at least May 2009.  Quicken inflated appraisals through an improper process it called "value appeals," which often resulted in employees demanding and receiving a higher home appraisal value with no documentation or justification for the increased value of the home or the FHA loan.

129. As discussed in paragraph 56, lenders are responsible for the appraisal's quality, integrity, accuracy and thoroughness. Mortgagee Letter 1994-54; *see also* HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G; HUD Handbook 4155.2 ch. 4.1.b. HUD relies on the Direct Endorsement lender to "review the appraisal to determine whether or not the appraiser's conclusions are acceptable." HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G.

130. The appraised value directly affects the risk to FHA as FHA caps the maximum eligible loan amount by setting limits on the LTV ratio, which compares the loan amount to the appraised value. In order to protect the integrity of the appraisal, FHA rules specifically provide that an appraisal cannot be "based on a requested minimum valuation, a specific valuation or range of values." *See* Mortgagee Letter 1996-26. To preserve appraiser independence, FHA rules have continually prohibited a lender such as Quicken from requesting or providing to the appraiser "an anticipated, estimated, encouraged or desired value." *See* Mortgagee Letter 2009-28.

131. In violation of these rules, Quicken created a formal value appeal process that improperly requested from appraisers a specific and desired value. These improper requests caused inflated appraised values of the mortgaged property.

132. After receiving an appraised value that was too low to get the loan approved or satisfy the customer's demand for a certain amount of cash back on a refinance transaction, Quicken's underwriter or originator (known as a mortgage banker) would request a "value appeal." Value appeal requests were reviewed by value analysts at Quicken, whose sole responsibility was to review these value appeal requests. If the value analyst approved the request, the value analyst would send a request to the appraiser, through Quicken's appraisal management company, which requested a specific inflated value from the appraiser as a

"professional reconsideration."  This improper request often led to the appraiser increasing the appraised value, and, other than the inflated value, the inflated appraisal often was exactly the same as the original appraisal.

133.   The increase in appraised value sought by Quicken—and granted by appraisers without justification—was often for the explicit purpose of meeting FHA's loan-to-value requirements.  Value appeals frequently occurred on cash-out refinances, where a borrower can obtain a loan for up to 95 percent of the value of their home and receive cash.  Therefore, the value appeals often increased the amount of cash back to the borrower and served no other purpose.  By inflating the appraised value, Quicken caused the FHA fund to insure more than 95 percent of the value of a home, which could put the loan immediately "under water" (with a loan larger than the house value) if the value declined even slightly.

134.   Quicken aggressively pushed appraisers to inflate the appraised value, and knew the value appeal process encouraged inflated appraisals.  An email from Quicken's Operations Director responsible for appraisals, Darren Thomas, titled "Asking for the max increase available," instructed his employees to include a statement in the requests directed at the appraisers that "any additional value would be appreciated."  The additional value demanded by Quicken was often not supported by any additional information outside the initial appraisal.

135.   Quicken also knew its value appeal process was prohibited by HUD guidelines. In an email, the Divisional Vice President for Underwriting, Clint Bonkowski, wrote, "I don't think the media or any other mortgage company (FNMA, FHA, FMLC) would like the fact we have a team who is responsible to push back on appraisers."

136.   Quicken nonetheless engaged in a pattern of aggressively pushing back on appraised values, while at the same time concealing the practice from HUD.  In one instance,

David Lee, a Regional Vice President at Quicken, requested a value appeal that was denied by the appraiser. After receiving further pushback from Quicken, the appraiser responded by stating, "it appears someone is attempting to force an inflated value." Mr. Lee then asked for a second opinion appraisal, which was denied by the Operations Director responsible for appraisals, Darren Thomas, because "we cannot order a 2nd opinion appraisal as FHA will already be aware of this appraisal. We already have a couple of loans that are not insurable because of this situation."

137. Quicken's process of requesting inflated and unsupported appraised values on mortgages insured by the FHA led to Quicken endorsing loans for FHA insurance that it knew were not eligible for FHA insurance.

138. The following are representative examples of FHA loans in which Quicken requested value appeals in violation of HUD rules, falsely certified that the loan was eligible for FHA insurance, and caused a false claim to be submitted to the FHA.

139. FHA Case Number 261-9338143 relates to a $178,386 mortgage for a property in the State of Michigan.

    a. Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, that a Direct Endorsement Underwriter reviewed the appraisal, and that the loan complied with all HUD requirements and was eligible for FHA insurance. This mortgage was a 95% cash-out refinance in which the borrower's existing mortgage was refinanced for

- 37 -

an amount greater than the outstanding loan balance and the borrower received the difference in cash.  The mortgage closed on or about January 31, 2008.

b.      Contrary to Quicken's certifications, Quicken did not comply with HUD rules in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

c.      During the underwriting of the loan, Quicken received an appraisal valuing the property at $180,000.  A Quicken employee wrote in the loan journal notes that the borrower "is hoping for $115k back at close."  Based on the appraised value of $180,000, and the 95% LTV limit, the borrower would have received approximately $113,000 cash back at the closing of the loan.  Thus, Quicken submitted a value appeal for an additional $5,000, for a total appraised value of $185,000.

d.      Quicken received an inflated appraisal with its requested value of $185,000 from the appraiser, yet no additional market information was provided to support the increased value.  The only difference between the two appraisals was the appraised value–not even the date of the appraiser's signature changed— and the difference in value was exactly the amount requested by Quicken.  In approving the borrower for the FHA loan, Quicken used the inflated $185,000 appraised value.

e.      The borrower was delinquent in making his first payment, and a claim was filed thereafter.  As a result, HUD paid an FHA insurance claim of $204,208.

- 38 -

140.    FHA Case Number 372-3740397 relates to a $188,054 mortgage for a property in the State of New York.

a.    Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, that a Direct Endorsement Underwriter reviewed the appraisal, and that the loan complied with all HUD requirements and was eligible for FHA insurance.  This mortgage was a rate and term refinance of the borrower's conventional mortgage. The mortgage closed on or about February 28, 2008.

b.    Contrary to Quicken's certifications, Quicken did not comply with HUD rules in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

c.    During the underwriting of the loan, Quicken initially received an appraisal that valued the property at $188,000.  A Quicken employee requested a value appeal on the property, but the value appeal was denied because the "comps do not support a higher value."  Quicken then changed the loan product type, which required a second appraisal.  The second appraisal Quicken received valued the property at $196,000, using all the same comparable sales as the first appraisal.  Instead of questioning the unsubstantiated and unexplained increase in value between the first and second appraisal, Quicken requested a value appeal

for an additional $3,000 because, as a Quicken employee wrote in the loan journal notes, Quicken was "looking for a value of 199k".

    d.      The value appeal was approved and Quicken received an inflated appraisal valuing the property at $199,000—the exact value that Quicken had requested. However, the comparable sales used in the inflated appraisal were the same as those used in the first two appraisals, and no additional information supported the increase in value. The inflated appraisal even had the same date of the appraiser's signature as the second appraisal. In approving the borrower for the FHA loan, Quicken used the inflated $199,000 appraised value.

    e.      The borrower made only eight payments before becoming delinquent, and a claim was filed thereafter. As a result, HUD paid a claim of $57,786 following a pre-foreclosure sale.

141.    FHA Loan Number 261-9590979 relates to a $137,837 mortgage for a property in the State of Michigan.

    a.      Quicken underwrote the mortgage for this property using an AUS, reviewed and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all the AUS conditions had been satisfied, that a Direct Endorsement Underwriter reviewed the appraisal, and that the loan complied with all HUD requirements and was eligible for FHA mortgage insurance. The mortgage closed on or about September 2, 2008.

    b.      Contrary to Quicken's certifications, Quicken did not comply with HUD rules in reviewing and approving this mortgage for FHA insurance and did not

- 40 -

ensure that the information it entered into the AUS to obtain approval had integrity.

c.       During the underwriting of the loan, Quicken received an appraisal that valued the property at $136,000.  A Quicken employee wrote in the loan journal notes that the appraised value came in too low to meet the LTV limits, and the loan was suspended due to a "low appraised value."  Rather than deny the loan, Quicken ordered a value appeal for a requested value of $140,000.

d.       Quicken received an inflated appraisal with a value of $140,000—the exact value requested by Quicken—even though there were no new comparable sales or market data to support the increase in value; even the date of the appraiser's signature was the same.  Quicken approved the borrower for the FHA loan using the inflated appraised value of $140,000.

e.       The borrower made 10 payments on the loan before becoming delinquent, and a claim was filed thereafter.  As a result, HUD paid an FHA insurance claim of $146,701.

142.     FHA Loan Number 105-3814232 relates to a $300,846 mortgage for a property in the State of Georgia.

a.       Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, that a Direct Endorsement Underwriter reviewed the appraisal, and that the loan complied with all HUD requirements and was eligible for FHA insurance.  This mortgage was a 95%

cash-out refinance in which the borrower's existing mortgage was refinanced for an amount greater than the outstanding loan balance and the borrower received the difference in cash. The mortgage closed on or about June 24, 2008.

b.      Contrary to Quicken's certifications, Quicken did not comply with HUD rules in underwriting and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

c.      During the underwriting of the loan, Quicken received an appraisal that valued the property at $300,000. A Quicken employee wrote in the loan journal notes that the "value came in low" because they were "looking for a value of 312K." Quicken then ordered a value appeal for an "increase of $12,000."

d.      Quicken received an inflated appraisal with a value of $312,000—the exact value requested by Quicken—yet, there were no new comparable sales of market data to support the increase in value; even the date of the appraiser's signature was the same. Quicken approved the borrower for the FHA loan using the inflated appraisal value of $312,000.

e.      The borrowers made only 12 payments before becoming delinquent, and a claim was filed thereafter. As a result, HUD paid an FHA insurance claim of $107,324 after a pre-foreclosure sale.

143.    Quicken ceased requesting specific values as part of its value appeals process in 2009. However, during the time Quicken sought value appeals and requested specific values from appraisers, Quicken underwrote hundreds of FHA loans for which it requested a specific appraised value. In creating and maintaining the value appeals process, Quicken knew,

- 42 -

recklessly disregarded, or deliberately ignored the fact that false certifications would be and were made as to the eligibility of those loans for FHA insurance.

**C.   QUICKEN EMPLOYEES AND SENIOR MANAGEMENT REGULARLY MANIPULATED AND MISCALCULATED INCOME.**

144.    As discussed in paragraph 55, an underwriter must evaluate the "adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations." 24 C.F.R. § 203.5(d).  In order to adequately evaluate a borrower's income, the underwriter must be able to accurately calculate and document the income according to FHA requirements.

145.    Quicken treated a borrower's income as a number to be "fudged" and Quicken's management encouraged manipulating a borrower's income in order to gain an approval for FHA insurance.

146.    In an email discussing the borrower's income used to approve an FHA insured loan, Quicken's Operations Director, Mike Lyon, explained the loan was underwritten with "bastard income," which he defined as "trying to put some kind of income together that is plausible to the investor even though we know its creation comes from something evil and horrible."  Even though Mr. Lyon recognized that the income was "evil and horrible," Quicken certified the loan qualified for FHA insurance and endorsed this loan for FHA insurance, committing FHA to the risk of the borrower defaulting.

147.    In another email to other senior Quicken Management concerning a particular Quicken FHA loan, Mr. Lyon wrote, "I was able to fudge her job income and get that up a bit." In another email exchange concerning a different loan, Quicken's FHA Operations Director Jeanette Ahles wrote that she had "done all I can with this income," further stating that she "gave a little OT [overtime]," but that it was "still not enough to qualify."  Ultimately, Quicken approved and endorsed both loans for FHA insurance.

- 43 -

148.     The following are representative examples of Quicken improperly calculating or documenting a borrower's income, yet falsely certifying that the loan was eligible for FHA insurance, thereby causing false claims to be submitted for FHA insurance.

149.     FHA Case Number 061-3615629 relates to a property in the State of Connecticut.

a.     Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance.  This mortgage was a rate and term refinance of the borrowers' existing mortgage. The mortgage closed on or about September 10, 2009.

b.     Contrary to Quicken's certifications, Quicken did not comply with HUD rules in underwriting and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

c.     In obtaining AUS approval for the loan, Quicken overstated the income used to qualify the borrowers for the loan. Quicken used a monthly income of $3,293.33 for the borrower.  However, the documentation of the borrower's income for the previous two years did not support the amount used by Quicken. The borrower's year-to-date earnings only supported a monthly income of no more than $2,700.  Nevertheless, Quicken approved the loan based on an overstated monthly income.

    d.      The borrowers made only two payments before becoming delinquent, and a claim was filed thereafter.  As a result, HUD paid an FHA insurance claim of $182,747.35 after a pre-foreclosure sale.

150.    FHA Case Number 441-8292088 relates to a property in the Commonwealth of Pennsylvania.

    a.      Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance.  This mortgage was a cash-out refinance in which the borrower's existing mortgage was refinanced for an amount greater than the outstanding loan balance and the borrower received the difference in cash. The mortgage closed on or about May 30, 2008.

    b.      Contrary to Quicken's certifications, Quicken did not comply with HUD rules in underwriting and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

    c.      Quicken failed to properly document the non-occupying co-borrower's pension income, which was needed to qualify the loan.  Quicken used pension income of $9,381.33 to qualify the borrower for an FHA-insured mortgage. Condition 22 of the AUS certificate required verification of pension or retirement income from the source or from federal tax returns, and specified that if any benefit will expire within three years, the income may be used only as a

compensating factor.  Quicken failed to verify and document the continuance of the co-borrower's pension income for three years, but still used the income to qualify the borrower.

d.      Additionally, the loan application indicated the non-occupying co-borrowers lived in a condominium.  Quicken did not determine or document the non-occupying co-borrowers' monthly condominium fees, and such fees were not taken into consideration when calculating the debt-to-income ratio.

e.      Even more, the credit report for the non-occupying co-borrowers revealed a monthly payment of $2,042 toward a Bank of America real estate mortgage with a balance of $227,305.  The monthly payment of $2,042 to Bank of America was not included in the AUS calculation of monthly liabilities.

f.      The borrowers made only three payments before becoming delinquent, and a claim was filed thereafter.  As a result, HUD paid an FHA insurance claim of $98,243.25 following a pre-foreclosure sale.

151.    Quicken's management was aware that inaccurate calculation and documentation of borrowers' income was a problem that consistently plagued the company, yet did not take adequate steps to address this pervasive issue.

152.    In 2008, Quicken required certain underwriters to take the "Basic Income Calculations & Key Elements" test, to evaluate their proficiency in calculating and documenting a borrower's income.  Only 44% of the underwriters passed the test, leading Quicken's Operations Director, Mike Lyon, to remark in an email that it was clear a number of underwriters "need to go back to school."

153.    Problems with calculating income continued to plague Quicken, and Quicken's management continued to recognize the problems.  In 2009, the CEO of Quicken, Bill Emerson, in an email to members of the "Credit and Risk Management Group," recognized that "calculating income is our biggest buy back issue" and asked what Quicken could do to "make sure we don't screw up income?"  Again, in 2010, the "Credit Strategies Group" recognized Quicken's "recurring income calculation challenges."

154.    Despite recognizing income calculation and documentation as a problem in 2008, 2009, and 2010, Quicken failed to correct this recurring problem.  Accordingly, Quicken's problems with calculating and documenting income continued.

155.    In 2011, Quicken's Director of Capital Markets, Bill Banfield, emailed other senior managers, identifying the income problems as "pervasive in any one of the forums where we review for errors," and asking whether training was necessary.  Quicken's Divisional Vice President for Underwriting, Clint Bonkowski responded, "do we have issues with income yes, do 50% of our UW's have less than 12 months experience yes, do we need to do some training, absolutely."  Yet, he ultimately concluded that it would be a "waste of [underwriters'] time and loss of production just to say we trained them."  In sworn testimony, Mr. Bonkowski testified that he could not remember or identify any income training that took place after he sent the 2011 email.

**D.    QUICKEN PRESSURED UNDERWRITERS TO QUICKLY APPROVE LOANS, AND INCENTIVIZED APPROVALS OVER QUALITY.**

156.    Quicken established a compensation structure for its underwriters that improperly incentivized loan approval by paying underwriters prohibited commissions, including "speed bonuses," and by sanctioning underwriters who were not reviewing loans fast enough.

157.     Quicken required underwriters to meet certain production goals, and tracked the number of loans reviewed and approved through Daily Production Reports and other metrics.

158.     Underwriters who were not underwriting and approving enough loans were subject to discipline from Quicken.  Quicken's Divisional Vice President for Underwriting, Clint Bonkowski, noted in an email that if an underwriter "cant [sic] hit the production numbers" they would be warned.  If they "still cannot hit production numbers," the underwriter was subject to discipline, including termination.

159.     Even if the quality of an underwriter's work was poor, Quicken still demanded the underwriter increase the volume of his or her loan production.  In the case of one underwriter, Jeanine Taylor, an Operations Director of the FHA Team, acknowledged in an email that his "quality scares me," but pronounced that she still intended to "give him the same warning as I do regarding his numbers."  Thus, although an underwriter was producing FHA loans with poor quality, a Quicken manager nonetheless intended to pressure him to increase his loan production.

160.     Quicken's underwriting focus was clear—underwrite loans as quickly as possible, and approve as many as possible.  Quicken's CEO, Bill Emerson, recognized that Quicken prioritized quantity over quality, writing in an email to Quicken's Operations Director, "no offense but I don't think we mover [sic] underwriters out for quality."

161.     As discussed in paragraph 47, HUD prohibits lenders from paying underwriters commissions.  Nevertheless, Quicken paid Underwriters and Final Signoff Underwriters commissions based on the number of loans the underwriter approved for closing.

162.     Each Underwriter and Final Signoff Underwriter received a "Base Bonus Amount" based on the number of loans the underwriter approved for FHA insurance.  If the Underwriter or Final Signoff Underwriter rejected a loan, their work on that loan did not count

- 48 -

toward their bonus.  This program, therefore, incentivized approving, rather than analyzing, loans.

163.    Alongside the "Base Bonus Amount," Final Signoff Underwriters could receive an "Efficiency Bonus" that was calculated by taking the number of Final Signoff Units—each different loan product was worth a certain number of Final Signoff Units—earned by the underwriter based on the loans the underwriter approved, and dividing that by the number of hours the underwriter worked.  This bonus incentivized quick work rather than quality work.

164.    Quicken management recognized that it used pay and incentives to encourage speedy underwriting and approvals.  Quicken's Divisional Vice President for Underwriting, Clint Bonkowski, wrote in an email to other senior managers that "we used money to motivate in the past."  Quicken knew or recklessly disregarded the fact that this motivation would lead to unapprovable and ineligible loans being endorsed for FHA insurance.

165.    Under this system, Quicken's underwriters were expressly encouraged and compensated by management for pushing through as many loans as possible, with little regard for FHA requirements.  Thus, management created a culture where its employees were sufficiently incentivized to ignore FHA's requirements and improperly approve loans.

**E.      QUICKEN MANIPULATED AUS DATA IN ORDER TO OBTAIN A TOTAL ACCEPT/APPROVE DECISION AND IGNORED OBVIOUS RED FLAGS INDICATING THAT A BORROWER WOULD NOT BE ABLE TO REPAY THE MORTGAGE.**

166.    The pressure Quicken exerted on underwriters to approve more loans led to underwriters manipulating the data entered into the AUS in order to gain a TOTAL Accept/Approve decision, and ignoring obvious red flags that indicated a borrower would not be able to repay the mortgage.

167.    Quicken employees repeatedly took steps to circumvent the TOTAL system. They entered hypothetical data in order to determine the minimum amount of a given variable— for example, borrower assets or income—that TOTAL required in order to obtain an Approve/Accept decision.  Additionally, Quicken employees manipulated the way in which they verified data to obtain data that would be skewed.

168.    For example, Quicken would verify data points at a time when it was most favorable to obtaining an accept decision—*e.g.*, obtaining a bank statement at a time when the borrower had an inflated balance—in order to enter into the AUS the highest possible amount. In these instances, the account balance would be in excess of the average account balance, and Quicken employees knew the balances documented were not a full and complete representation of the borrower's financial situation.  Quicken employees were thus able to avoid a TOTAL Refer decision and the obligation to perform a manual underwrite.

169.    Once a TOTAL Approve/Accept decision was obtained, Quicken would often fail to analyze risk factors and red flags indicating the borrower would be unable to make the mortgage payments associated with their FHA insured mortgage.

170.    These risk factors and red flags—such as "Not Sufficient Funds" charges appearing on the borrower's bank statements and other indicia in the loan file that indicated the borrower would be unable to make the mortgage payments—were ignored.  Instead, Quicken relied completely on the TOTAL Approve/Accept decision as long as Quicken verified the data in a plausible, but improper, manner.

171.    Quicken's Quality Control Director, Gail Doyle, addressed the issue of red flags with Quicken's FHA Operations Director, Jeanette Ahles, in an email asking, if a loan is approved by TOTAL Mortgage Scorecard, "how much underwriting (additional thought) needs

to go into a file to determine if it is approvable." Quicken's Quality Control director then described the loan at issue, stating that the borrower's "debt was increasing at such a substantial amount and the [borrower] did not show their ability to manage money." Nevertheless, Ms. Ahles wrote "we would still approve" the loan making clear Quicken's policy of relying solely on a TOTAL Approve/Accept decision while ignoring obvious indicators that a borrower is not creditworthy.

172.    The following loans are representative examples of Quicken's practice of ignoring red flags and endorsing loans for FHA insurance using an AUS based on data that lacked integrity.

173.    FHA Case Number 271-9549503 relates to a property in the State of Minnesota.

a.    Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance. The mortgage closed on or about September 16, 2008.

b.    Contrary to Quicken's certifications, Quicken did not comply with HUD rules in reviewing and approving this mortgage for FHA insurance and did not ensure that the information it entered into the AUS to obtain approval had integrity.

c.    When underwriting the mortgage, Quicken ignored red flags indicating the borrower would be unable to repay the mortgage. For example, the borrower's bank account statement showed overdrafts on the borrower's bank account in

multiple months.  Quicken overlooked this indication that the borrower would not have the assets required to meet her monthly mortgage payment.  Likewise, Quicken's Loan Journal Notes reveal that, during the loan application process, the borrower requested a refund of the $400 mortgage application fee so that the borrower would be able to feed her family.  Quicken ignored the fact that the borrower did not have enough money for food, let alone the requisite mortgage payments, and blindly relied upon an AUS Accept decision to approve the loan for FHA insurance.

d.       Quicken also ignored risk factors when it manipulated the AUS in order to obtain an Accept decision.  Quicken's Loan Journal Notes reveal that a Quicken employee entered hypothetical data into the AUS to determine the amount of assets the borrower would need to obtain an Accept decision.  Quicken recognized that the borrower did not have this amount of assets, so it waited to verify assets on the day the borrower received her paycheck—and her account was maximized.  In requesting and accepting this inflated bank account balance, Quicken ignored the fact the borrower had multiple insufficient funds charges, indicating the borrower regularly overdrew on the account.  Additionally, Quicken failed to document the borrower's Earnest Money Deposit, allowing a $200 check from an unknown person to serve as the borrower's deposit, in violation of HUD requirements.

e.       Quicken also ignored that the transaction was not eligible for maximum financing.  The borrower was renting the subject property at the time the loan closed.  The borrower's latest paystub, from July 31, 2008, shows the subject

property was the borrower's address, and Quicken's Loan Journal Notes show that the borrower had been renting the subject property. Transactions that are sales from a landlord to a tenant are limited to 85% loan-to-value ratios unless there is written evidence that the borrower has been renting the property from the landlord for the six months immediately predating the sales contract. HUD Handbook 4155.1, REV-5, ch. 1-8.A. The file contained no written documentation that the borrower had been renting the subject property for at least six months. Therefore, the borrower was ineligible for the loan, which had a 95.40% loan-to value ratio.

f.      The borrower made only five payments before becoming delinquent, and a claim was filed thereafter. As a result, HUD paid an FHA insurance claim of $93,955.19.

174.    FHA Case Number 541-8389919 relates to a property in the Commonwealth of Virginia.

a.      Quicken underwrote the mortgage for this property using an AUS, approved and endorsed it for FHA insurance, and certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance. This mortgage was a 95% cash-out refinance in which the borrowers' existing mortgage was refinanced for an amount greater than the outstanding loan balance and the borrower received the difference in cash. The mortgage closed on or about March 20, 2009.

b.      Quicken failed to document the borrowers' eligibility for a 95% cash-out refinance. Borrowers are eligible for a 95% cash-out refinance only if, among

other requirements, they have made all their payments on their mortgage in the last 12 months within the month due (*i.e.*, no payment was made more than 30 days past due).  *See* Mortgagee Letter 2005-43.  Documentation in the file shows that the borrowers did not make the mortgage payment due February 1, 2009, until the month of March.  Quicken's Loan Journal Notes document that the borrower advised Quicken on March 2, 2009, that he had not yet made the February mortgage payment.  On March 6, 2009, the client reported to Quicken that he had made the payment due February 1, 2009, over 30 days late.

c.     Quicken's Loan Journal Notes reveal that the borrower indicated to Quicken that he was "almost to the point he needs to file bk [bankruptcy]."  Even more, later in the loan approval process, the borrower stated he was "ready to have his house foreclosed on."  Nevertheless, Quicken ignored these risk factors and red flags indicating the borrower was unable or unwilling to make his monthly mortgage payments, and endorsed the loan for FHA insurance.

d.     Even more, because the borrowers had a late payment within the previous 12 months, they were not eligible for a 95% cash-out refinance loan.  Quicken was aware the borrower had not made his mortgage payment timely—and therefore was ineligible for the FHA loan Quicken underwrote—yet approved the loan for FHA insurance.

e.     In addition, Quicken allowed the AUS to rely on inaccurate and incomplete data.  The credit report showed the borrower was liable for a secondary mortgage that had a balance of $27,008 and a monthly payment of $296.  The AUS system did not consider this monthly obligation when calculating

the borrowers' debt to income ratio and it was not listed on the final Uniform

Residential Loan Application (URLA).  Condition 22 on the AUS certificate

required Quicken to verify the monthly payment amount when a debt or

obligation was revealed that was not listed on the loan application and/or credit

report that was not considered by the AUS, and resubmit the loan to AUS with the

borrower's complete and accurate monthly debts entered.  Quicken did not

resubmit the loan with the true and accurate monthly debt amounts.

f.       The borrowers made only one payment before becoming delinquent and a

claim was filed thereafter.  As a result, HUD paid an FHA insurance claim of

$124,723.83.

## F.       QUICKEN VIEWED FHA INSURANCE AS PROTECTION FROM THE CONSEQUENCES OF MAKING LOUSY LOANS.

175.    Quicken approved loans for FHA insurance that it knew would perform poorly

because FHA, not Quicken, would suffer the losses.  Quicken saw FHA insurance as the

"upside" to a bad loan.  In an email to senior management Quicken's Operations Director, Mike

Lyon, explained that Quicken approved a loan that was made up of "lousy" parts that "when

added up as a whole . . . we would be hard pressed to lend this guy a dime out of our pocket."  In

responding to Quicken's CEO Bill Emerson's question "where is the upside on this one?" Mr.

Lyon responded that "the only upside here is we have FHA insurance."

176.    To Quicken, the only downside to an FHA loan was if FHA caught Quicken and

the loan was declared uninsurable.  In an email to Mr. Bonkowski and Mr. Lyon, Ms.

MacPherson wrote that a loan being underwritten by Quicken "would be uninsurable if they

[HUD] reviewed it prior to insuring.  Chances are not high that they would review it."  Quicken

took that chance and insured the loan, in clear violation of HUD requirements, hoping Quicken would not get caught.

177.    Rather than potentially reduce the millions of dollars in revenue earned on AUS approved loans by analyzing the borrower's ability to repay the mortgage and analyzing red flags indicating the borrower could not repay the mortgage, Quicken endorsed loans for FHA insurance that it believed would default—and lead to claims for FHA insurance.

178.    In one loan, Quicken's FHA Operations Director, Jeanette Ahles wrote to members of the FHA underwriting team that "I've done all I can do with this income . . . I've grossed up SSI [Social Security income], I gave a little OT [overtime income] . . . and this still is not enough to qualify."  Nevertheless, Quicken's Divisional Vice President for Underwriting, Clint Bonkowski, instructed Ms. Ahles to "go ahead and be the hero and approve [the loan]." When Ms. Ahles responded by writing, "I don't know what kind of hero I'm going to be when this guy doesn't have enough money to pay his mortgage," Mr. Bonkowski wrote back, "we can both look back on this day and say damn I knew it."

## IV.    QUICKEN'S QUALITY CONTROL PROCESS UNDERREPORTED THE MAGNITUDE OF UNDERWRITING DEFICIENCIES, FAILED TO ADEQUATELY ASSESS COMPLIANCE WITH FHA REQUIREMENTS, AND FAILED TO DISCLOSE QUICKEN'S UNDERWRITING FAILURES TO FHA.

179.    Direct Endorsement Lenders must maintain quality control processes that ensure that the FHA–insured loans they originate satisfy the requirements for FHA insurance and do not present undue risk of default.  The quality control processes must permit the Direct Endorsement Lender to meaningfully assess its FHA loan portfolio to determine whether loans in the portfolio have been properly underwritten and whether systemic problems exist with the lender's underwriting practices.

180.    As discussed in paragraphs 72 through 76, a Direct Endorsement Lender's quality control program must provide for a review of a representative sample of FHA loans and may include a risk assessment based on the severity of the violations found.

181.    Quicken's quality control process used three different risk ratings for violations that were identified through its quality control reviews: "unacceptable-significant," "acceptable-major," and "acceptable-minor."  According to its Quality Control Plan, Quicken's quality control process would rate a violation as "preliminarily deemed significant" for any loan in which:

- possible fraud has occurred;

- investor guidelines have not been adhered to and the file does not identify reasonably sufficient compensating factors to justify loan approval;

- there has been a deviation from investor program requirements which would unequivocally affect the eligibility of the loan;

- there has been a possible violation of law;

- there are material documentation discrepancies;

- there has been a material deviation from company policies and procedures;

- there are possible violations of fair lending laws;

- there are serious deficiencies or patterns of deficiencies in property appraisals; and/or

- the loan presents an unacceptable level of risk (based on HUD's suggested criteria).

182.    Quicken defined an "acceptable-major" violation to be one in which "the inaccuracy noted could have adversely affected the investment quality of the loan; however, the

file contained sufficient compensating factors to justify loan approval." Quicken defined an "acceptable-minor" violation to be one in which "the inaccuracy would not have adversely affected the overall quality of the loan."

183.    For all violations "preliminarily deemed significant," Quicken's underwriting personnel were required to provide a written rebuttal to the finding.

184.    After Quicken's underwriting personnel provided a written rebuttal to a "preliminarily deemed significant" violation, Quicken's quality control department made a final determination of whether the violation would be rated as "unacceptable-significant," or whether it would be downgraded to an "acceptable-major" or "acceptable-minor" rating.

185.    "Major" and "minor" findings were deemed "acceptable" by Quicken's quality control, and no written response or further action was required.

186.    Quicken's quality control process failed to accurately identify the risk level of FHA loans with material underwriting deficiencies.  Rather than properly identify material defects in loans it had underwritten, Quicken routinely rated FHA loans with material underwriting defects as "acceptable-major" instead of  "unacceptable-significant," as would be required by Quicken's Quality Control Plan.   By rating FHA loans with material underwriting deficiencies as "acceptable-major," Quicken was understating the seriousness of the defect and was failing to meet its obligation to protect FHA from unacceptable risk.

187.     The following are representative examples of FHA loans in which Quicken's quality control rated a material underwriting deficiency as "acceptable-major," thereby understating the seriousness of the defect and failing to meet its obligation to assure compliance with FHA's requirements.

a.    FHA Loan Number 381-8302623: Quicken's quality control reviewed FHA loan number 381-8302623 in January 2008 as part of a monthly audit of loans. Quicken's quality control determined that the gift funds that the borrower used toward purchasing the property were not properly documented according to HUD's requirements.  Despite this material underwriting deficiency, Quicken's quality control rated the violation as "acceptable-major."

b.    FHA Loan Number 264-0836703: Quicken's quality control reviewed FHA Loan Number 264-0836703 in April 2011 as part of a monthly audit of loans. Quicken's quality control determined that the borrower had a greater-than-6-month gap of employment in the previous two years, and that there was no explanation letter from the borrower to address the gap in employment, in violation of HUD's requirement.  Despite this material underwriting deficiency, Quicken's quality control rated the violation as "acceptable-major."

c.    FHA Number 372-3721845: Quicken's quality control reviewed FHA loan number 372-3721845 in January 2008 as part of a monthly audit of loans. Quicken's quality control determined that the loan file did not contain documentation verifying a full two-year employment history of the borrower, and did not contain the borrower's most recent paystub, in violation of HUD requirements.  Despite this material underwriting deficiency, Quicken's quality control rated this violation as "acceptable-major."

188.    Senior management at Quicken recognized that the ratings assigned to deficient loans by quality control often understated the seriousness of the defects.  In a 2008 email to underwriting managers, the CEO of Quicken, Bill Emerson, wrote that "the majors seem to be

- 59 -

as bad to me as the significants."  Despite recognizing that loans rated "major" represented serious deficiencies in underwriting, Mr. Emerson did not mandate any change to Quicken's quality control program.

189.    Again in 2008, Quicken's Operations Director, Mike Lyon, wrote in an email "quite honestly, I have only been focused on the significant findings."  However, he continued, "the 'majors' look like a goldmine of stupidity."  Nevertheless, Quicken's quality control process did not change.

190.    Between October 2007 and December 2011, Quicken's quality control monthly audits found that, on average, 61% of the loans reviewed had violations that were "unacceptable-significant" or "acceptable-major."  As discussed above, violations rated as "acceptable-major" were oftentimes material underwriting deficiencies that should have been rated "unacceptable-significant."

191.    As explained in paragraphs 79 - 80, Quicken was required to report to HUD loans that presented material risk and "[f]indings of fraud or other serious violations" that are discovered during the "normal course of business and by quality control staff during reviews/audits of FHA loans."  HUD Handbook 4060.1, REV-2, ch. 7-3.J, 7-4.D; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.").

192.    Quicken knew of its obligation to report such loans.  Quicken's quality control plans consistently recognized the duty to self-report, providing, "with respect to FHA loans, findings of fraud or other serious violation will be referred in writing (along with available supporting documentation) to the Director of the Quality Assurance Division in the HUD Home Ownership Center (HOC) having jurisdiction."

193.     Yet rather than report the deficient loans identified through its quality control reviews to HUD so that HUD could exercise its regulatory authority and insist that Quicken take corrective actions, Quicken systematically concealed the underwriting defects and ineligible loans it had approved for FHA insurance by only reporting suspected borrower fraud to HUD, but failing to report other deficient loans to HUD.

194.     When Quicken suspected that a potential borrower had committed fraud or made a misrepresentation, Quicken was quick to notify HUD.  However, Quicken failed to notify HUD of any loans with serious underwriting deficiencies committed by Quicken, even when it concluded internally that loan approval was not justified.

195.     From when it began underwriting FHA loans as early as September 2007 to the end of 2011, Quicken made 120 self-reports to FHA.  All of those 120 self-reports concerned potential borrower fraud or misrepresentation, and none of those 120 self-reports concerned Quicken's own errors in underwriting a mortgage loan.  During that same time frame, Quicken's quality control identified hundreds of loans that it rated as having significant or major underwriting deficiencies committed by Quicken that it did not self-report to HUD.

196.     For example, Quicken routinely self-reported FHA loans to HUD when it discovered that the borrower had falsified his or her amount of income.  Between 2008 and 2012, Quicken self-reported at least 78 FHA loans to HUD where it suspected the borrower had falsified income documentation.

197.     During this same timeframe, in January 2009, Quicken's quality control audited an FHA loan and found a significant underwriting deficiency related to the calculation of the borrower's income and debt-to-income ratio.  Quicken's quality control concluded, "It does not

appear loan approval was justified."  Nonetheless, despite this serious violation, Quicken did not self-report the loan to HUD.

198.    Quicken's senior management knew it was not self-reporting its own material underwriting deficiencies, and was only self-reporting borrower fraud.  In a 2011 email, Mr. Bonkowski described an FHA loan that was ineligible due to appraisal issues and asked, "do we need to notify FHA of issues uncovered on past FHA loans or do we just keep quiet until they ask us about them?"  Quicken's FHA Product Manager, Bobbi Macpherson, responded that the loan did not need to be self-reported.  In the same email, Ms. Macpherson stated that Quicken does, however, need to self-report "fraud."

## V.   QUICKEN SUBMITTED AND CAUSED TO BE SUBMITTED FALSE CLAIMS FOR PAYMENT TO HUD.

199.    The loans discussed in this complaint are representative examples of false claims that Quicken knowingly submitted or caused to be submitted to HUD.  The loans are emblematic of the loans Quicken falsely certified for FHA insurance, and are products of the systemic practices and procedures followed by Quicken that led to the submission of false statements and claims.

200.    HUD paid all of the claims associated with the loans discussed in this complaint. These claims were false because the loans were not eligible for FHA insurance, and Quicken falsely certified to the integrity of the data that was used to approve the loan for FHA insurance and its compliance with HUD requirements (for loans approved through the use of an AUS), or falsely certified that the loan was underwritten using due diligence in accordance with HUD guidelines (for manually-underwritten loans).  Quicken falsely certified that the statements made in the application for insurance were true and accurate and that all conditions had been satisfied. The mortgages did not qualify for FHA insurance because they were not underwritten in

accordance with HUD guidelines, Quicken had not used due diligence in underwriting them, Quicken entered data into the AUS that lacked integrity, and/or Quicken failed to satisfy the AUS conditions before closing and endorsing the mortgages for FHA insurance.  Quicken violated HUD requirements and falsely certified to compliance with those requirements. Quicken was therefore not authorized to endorse these mortgage loans for FHA insurance. Quicken's false certifications and violations of HUD requirements bore upon the likelihood of whether the borrower would make mortgage payments.

201.    Quicken submitted or caused the submission of hundreds of additional false claims.

202.    The official of the United States charged with responsibility to act in the circumstances did not know nor should have known the facts material to the cause of action set forth below any earlier than April 23, 2009.

## COUNT I
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1) (2006) and 31 U.S.C. § 3729(a)(1)(A) (2010)

203.    The United States repeats and realleges the allegations contained in Paragraphs 1 - 202 above, as if fully set forth herein.

204.    Quicken violated the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006) and 31 U.S.C. § 3729(a)(1)(A) (2010), by knowingly presenting and causing to be presented to HUD false and/or fraudulent claims for payment.

205.    The United States paid the false and/or fraudulent claims because of Quicken's acts and incurred damages as a result.

**COUNT II**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B) (2010) (formerly 31 U.S.C. § 3729(a)(2) (2006))**

206.     The United States repeats and realleges the allegations contained in Paragraphs 1 -
202 above, as if fully set forth herein.

207.     Quicken violated the provisions of the False Claims Act, 31 U.S.C.

§ 3729(a)(1)(B) (2010) (formerly 31 U.S.C. § 3729(a)(2) (2006)), by knowingly making, using,

or causing to be made or used, false records, or statements: (i) material to false or fraudulent

claims for payment to HUD; and/or (ii) in order to get false or fraudulent claims paid; and (iii)

which claims the United States did pay.

208.     The United States paid the false or fraudulent claims because of Quicken's acts

and incurred damages as a result.

**COUNT III**
**Breach of Fiduciary Duty**

209.     The United States repeats and realleges the allegations contained in Paragraphs 1 -
202 above, as if fully set forth herein.

210.     Quicken is a fiduciary of HUD and owes HUD fiduciary duties.

211.     As a fiduciary of HUD, Quicken has a duty to act for, and give advice to, HUD

for the benefit of HUD as to whether particular loans should be endorsed for FHA insurance

under the Direct Endorsement Lending Program.

212.     As a fiduciary of HUD, Quicken owes HUD a duty to act with good faith, candor,

honesty, integrity, fairness, and fidelity in their dealings with HUD.  These duties require, among

other things, that Quicken (1) refrain from making misrepresentations to HUD; (2) make full and

fair disclosures of all material facts to HUD; and (3) use reasonable care to avoid misleading

HUD or abusing HUD's trust.  Quicken must therefore exercise integrity, prudence, candor, and

- 64 -

due diligence on behalf of HUD when endorsing loans for FHA insurance, reviewing the loans for quality control purposes, and submitting claims.

213.    As set forth above, Quicken breached its fiduciary duties to the FHA and HUD.

214.    As a result of these breaches, HUD has paid insurance claims, and incurred losses, relating to hundreds of FHA-insured loans wrongfully endorsed by Quicken.

**COUNT IV**
**Negligence**

215.    The United States repeats and realleges the allegations contained in Paragraphs 1 - 202 above, as if fully set forth herein.

216.    Quicken owes HUD a duty of reasonable care.

217.    As set forth above, Quicken breached its duty to HUD.

218.    As a result of the negligence of Quicken, HUD has paid insurance claims, and incurred losses, relating to hundreds of FHA-insured loans wrongfully endorsed by Quicken.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff United States of America prays for judgment against the Defendant as follows:

A.    As to Counts I and II under the False Claims Act, 31 U.S.C. § 3729(a), against Defendant Quicken, for treble the amount of the United States' single damages to be proven at trial, plus civil penalties as are required by law in the amount of $5,500 to $11,000 per violation of the False Claims Act, post-judgment interest, costs, and such other relief as may be necessary and proper;

B.    As to Count III, the Government is entitled to compensatory damages;

C.    As to Count IV, the Government is entitled to compensatory damages; and

D.    Such other relief as the Court deems just and proper.

<u>THE UNITED STATES DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.</u>

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

VINCENT H. COHEN, JR., D.C. Bar #471489
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division, U.S. Attorney's Office


By:      */s/ Brian P. Hudak*
     BRIAN P. HUDAK
     Assistant United States Attorney
     555 Fourth Street, NW
     Washington, DC 20530
     (202) 252-2549

JAMIE L. MENDELSON
Special Assistant United States Attorney
1225 17th St, Suite 700
Denver, CO 80202
(303) 454-0100

MICHAEL D. GRANSTON
RENÉE BROOKER
SAMUEL J. BUFFONE
CHRISTOPHER R. B. REIMER
JOHN W. BLACK
DANIEL HUGO FRUCHTER
Attorneys, Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
(202) 616-2945

*Attorneys for the United States of America*