# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

       Plaintiff,

    v.

QUICKEN LOANS INC.,

       Defendant.

Civil Action No. 2:16-cv-14050-MAG-RSW

District Judge:  Mark A. Goldsmith

Magistrate Judge:  R. Steven Whalen

## DEFENDANT QUICKEN LOANS INC.'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>

Defendant Quicken Loans Inc. hereby moves to dismiss Plaintiff's Complaint, with prejudice, for failure to state a claim under Fed. R. Civ. P. 12(b)(6). The grounds for this motion are set forth in the accompanying memorandum of law.  Pursuant to Local Rule 7.1(a), undersigned counsel certifies that counsel, in connection with the motion as originally filed, personally spoke to counsel for Plaintiff, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel expressly denied concurrence. Prior to filing the instant renewed motion, undersigned counsel conferred by voicemail and electronic mail with counsel for Plaintiff, and opposing counsel again expressly denied concurrence.

Dated:  December 22, 2016               Respectfully submitted,

                                        QUICKEN LOANS INC.

                                        By its attorneys,

                                        /s/ Jeffrey B. Morganroth
Thomas M. Hefferon                      Jeffrey B. Morganroth
Sabrina M. Rose-Smith                   **MORGANROTH &**
W. Kyle Tayman                          **MORGANROTH, PLLC**
**GOODWIN PROCTER LLP**                 344 North Old Woodward Avenue
901 New York Avenue, NW                 Suite 200
Washington, DC  20001                   Birmingham, MI 48009
Tel.:  202.346.4000                     Tel.:  248.864.4000
Fax:  202.346.4444                      Fax:  248.864.4001
thefferon@goodwinlaw.com                jmorganroth@morganrothlaw.com
srose-smith@goodwinlaw.com              P41670
ktayman@goodwinlaw.com

1

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

       Plaintiff,

    v.

QUICKEN LOANS INC.,

       Defendant.

Civil Action No. 2:16-cv-14050-MAG-RSW

District Judge:  Mark A. Goldsmith

Magistrate Judge:  R. Steven Whalen

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT QUICKEN LOANS INC.'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ iii

ISSUES PRESENTED ................................................................ viii

PRINCIPAL CONTROLLING AUTHORITIES ...................................... x

INTRODUCTION ...................................................................... 1

BACKGROUND ........................................................................ 4

ARGUMENT ............................................................................ 6

I.   THE COMPLAINT FAILS TO MAKE OUT A CAUSE OF ACTION UNDER THE FCA. ............................................................... 6

    A.   The Complaint Fails to Allege Scienter for Any Cognizable Scheme. ....................................................................... 7

        1.   The Alleged Generalized Scheme Is Not Cognizable. ............... 7

            a.   FCA Scheme Allegations Are Limited to the Conduct in the Representative Examples. ...................................... 7

            b.   The Broad Scheme Allegation Is Unsupported in Any Event. .......................................................................... 10

            c.   The Government's Reliance on Two Other FCA Cases Does Not Support a Different Result. ............................... 12

        2.   The Complaint Fails to Allege Scienter as to Each Type of Allegedly-Fraudulent Conduct. ................................................ 13

            a.   Value Appeals Were at Least Arguably Permitted and, in Any Event, Involved Non-Actionable Opinions. ....... 13

            b.   The "Red Flags" and "Manipulating Data Allegations Do Not Involve Unambiguously Prohibited Conduct. ... 16

            c.   The Complaint Fails to Allege That Quicken Loans Intentionally Miscalculated Borrower Income. .............. 18

            d.   The "Management Exceptions" Claim Fails to Allege a Knowing Violation of Any FHA Requirement. .......... 20

            e.   The Three Allegations Unsupported by Any Representative Examples Cannot Stand on Their Own and Do Not Support the Other Allegations. ................... 22

i

B.    The Complaint Fails to Allege That Any Falsity Was Material. ........25

C.    The Complaint Fails to Allege Facts to Establish That the
       Purported False Statements Proximately Caused HUD's Losses. ......27

II.    THE COMPLAINT FAILS TO STATE A COMMON LAW CLAIM........30

A.    Count III Fails to State a Claim for Breach of Fiduciary Duty...........30

B.    Count IV Fails to State a Claim for Negligence. ................................32

C.    The Common Law Claims Fail for Lack of Proximate Causation. ....32

III.    MANY OF THE CLAIMS ARE UNTIMELY. ...........................................33

CONCLUSION .......................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>**:**

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
    824 F. Supp. 2d 1164 (C.D. Cal. 2011) ............................................................16

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
    501 F.3d 493 (6th Cir. 2007) .......................................................*passim*

*Brock v. Consol. Biomedical Labs.*,
    817 F.2d 24 (6th Cir. 1987) ...............................................................31

*Cataldo v. U.S. Steel Corp.*,
    676 F.3d 542 (6th Cir. 2012) ..............................................................33

*Chesbrough v. VPA, P.C*,
    655 F.3d 461 (6th Cir. 2011) ...............................................................7

*Delphi Auto. PLC v. Absmeier*,
    167 F. Supp. 3d 868 (E.D. Mich. 2016) .............................................30

*United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*,
    No. 15-5691, 2016 WL 731843 (6th Cir. Feb. 23, 2016)....................8

*Emmet v. Franco*,
    No. 16-1211, 2016 WL 4396059 (E.D. Mich. Aug. 18, 2016) .........31

*United States ex rel. Fago v. M&T Mort. Corp.*,
    518 F. Supp. 2d 120 (D.D.C. 2007)......................................27, 28, 29

*Glidden Co. v. Jandernoa*,
    5 F. Supp. 2d 541 (W.D. Mich. 1998) ...............................................30

*Graham v. Bank of Am., N.A.*,
    226 Cal. App. 4th 594 (2014) .............................................................16

*Hamilton Cnty. Emergency Commc'ns. Dist. v. Bells South
Telecomms., LLC*,
    154 F. Supp. 3d 666 (E.D. Tenn. 2016)..............................................15

*Morgan v. Church's Fried Chicken*,
  829 F.2d 10 (6th Cir. 1987) .............................................................................14

*United States ex rel. Morris v. Crist*,
  No. 97-1395, 2000 WL 432781 (S.D. Ohio 2000) ............................................19

*Mt. Vernon Cooperative Bank v. Gleason*,
  367 F.2d 289 (1st Cir. 1966).............................................................................30

*Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL–CIO*,
  451 U.S. 77 (1981)..............................................................................................31

*Petroleum Enhancer, LLC v. Woodward*,
  No. 07-12425, 2013 U.S. Dist. LEXIS 24180 (E.D. Mich. Feb. 22,
  2013) ..................................................................................................................32

*United States ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015)...........................................................................14

*Ridha v. Mortg. Elec. Registration Sys., Inc.*,
  No. 10-13824, 2010 WL 4867416 (E.D. Mich. Nov. 23, 2010) .......................16

*Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*,
  559 N.W.2d 647 (Mich. 1997)...........................................................................32

*United States ex rel. Roby v. Boeing Co.*,
  100 F. Supp. 2d 619 (S.D. Ohio 2000), *aff'd*, 302 F.3d 637 (6th
  Cir. 2002) .....................................................................................................15, 16

*United States ex rel. Roby v. Boeing Co.*,
  79 F. Supp. 2d 877 (S.D. Ohio 1999) ................................................................27

*Safeco Ins. Co. of America v. Burr*,
  551 U.S. 47 (2007)..............................................................................................13

*Sanderson v. HCA-The Healthcare Co.*,
  447 F.3d 873 (6th Cir. 2006) .............................................................................34

*United States ex rel. Scharff v. Camelot Counseling*,
  No. 13-3791, 2016 WL 5416494 (S.D.N.Y. Sept. 28, 2016)............................26

*United States ex rel. Shackelford v. Am. Mgmt., Inc.*,
  484 F. Supp. 2d 669 (E.D. Mich. 2007) ............................................................19

iv

*United States ex rel. Sheldon v. Kettering Health Network*,
    816 F.3d 399 (6th Cir. 2016) ...............................................................6

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
    214 F.3d 1372 (D.C. Cir. 2000)...........................................................15

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*,
    532 F.3d 496 (6th Cir. 2008) ...............................................................7

*Spengler v. ADT Sec. Servs., Inc.*,
    505 F.3d 456 (6th Cir. 2007) .............................................................31

*Sullivan v. Unum Life Ins. Co. of Am.*,
    No. 10-4076, 2011 WL 3837134 (D. Minn. Aug. 26, 2011)...............24

*United States ex rel. Swafford v. Borgess Med. Ctr.*,
    24 F. App'x 491 (6th Cir. 2001) ........................................................13

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    692 F. Supp. 2d 387 (S.D.N.Y. 2010) ...............................................16

*United States v. Americus Mortg. Corp.*,
    No. 12-02676, 2014 WL 4274279 (S.D. Tex. Aug. 29, 2014)...........12

*United States v. Bernstein*,
    533 F.2d 775 (2d Cir. 1976) ..............................................................30

*Wang ex rel. United States v. FMC Corp.*,
    975 F.2d 1412 (9th Cir. 1992) ...........................................................19

*United States v. Hibbs*,
    568 F.2d 347 (3d Cir. 1977) ........................................................28, 29

*United States v. N. Adult Daily Health Care Ctr.*,
    No. 13-4933, 2016 WL 4703653 (E.D.N.Y. Sept. 7, 2016)...............26

*United States v. SAIC*,
    626 F.3d 1257 (D.C. Cir. 2010).........................................................11

*United States v. Standard Oil Co. of Cal.*,
    332 U.S. 301 (1947)...........................................................................32

*United States v. Spicer,*
    57 F.3d 1152 (D.C. Cir. 1995).............................................................................28

*United States v. Wells Fargo Bank, N.A.,*
    972 F. Supp. 2d 593 (S.D.N.Y. 2013) ...............................................................12

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
    136 S. Ct. 1989 (2016)................................................................................*passim*

*Womack v. Mal-Mart Stores, Inc.,*
    No. 14-12615, 2016 U.S. Dist. LEXIS 42052 (E.D. Mich. Mar. 30,
    2016) ....................................................................................................................32

*Yatooma v. Zousmer,*
    No. 3025921, 2012 WL 1697004 (Mich. Ct. App. May 15, 2012)....................30

**Statutes, Regulations, and Rules:**

12 U.S.C. § 1715z-21(c) ............................................................................................32

28 U.S.C. § 2415(b) ...................................................................................................33

31 U.S.C. § 3731(b) .............................................................................................33, 34

24 C.F.R. § 203.255(e) ..............................................................................................31

24 C.F.R. § 203.255(b)(5).....................................................................................17, 31

24 C.F.R. § 203.255(g) ..............................................................................................31

24 C.F.R. § 203.255(g)(3)..........................................................................................32

24 C.F.R. § 203.257 .....................................................................................................5

24 C.F.R. § 203.4(c)...................................................................................................31

24 C.F.R. § 257 ..........................................................................................................31

Fed. R. Civ. P. 9(b) ........................................................................................7, 8, 9, 12

Local Rule 5.1(a)...........................................................................................................1

**Other Authorities:**

*Commission*, Black's Law Dictionary (10th ed. 2014)..............................................24

U.S. Dep't of Housing and Urban Development Neighborhood Watch
    Data for period ending October 31, 2016 (Sort Order by Compare
    Ratio in Ascending Order).................................................................... 3

U.S. Dep't of Housing and Urban Development Neighborhood Watch
    Data for period ending October 31, 2016 (Sort Order by Total
    Originations in Descending Order)....................................................... 3

U.S. Dep't of Housing and Urban Development, FHA TOTAL
    Mortgage Scorecard User Guide (Dec. 29, 2011) ............................. 17

U.S. Dep't of Housing and Urban Development Handbook 4000.4,
    REV-1, ch. 3-3.G ............................................................................. 14

U.S. Dep't of Housing and Urban Development Handbook 4155.2,
    ch. 2.A.4.a ........................................................................................ 19

U.S. Dep't of Housing and Urban Development Handbook 4060.1,
    REV-2, ch. 2-9.A .............................................................................. 24

U.S. Dep't of Housing and Urban Development Handbook 4000.1
    I.A.3.C.iv(B)(3)(b)(ii)........................................................................ 24

U.S. Dep't of Housing and Urban Development, Mortgagee Letter 96-
    26....................................................................................................... 14

U.S. Dep't of Housing and Urban Development, Mortgage Letter
    2009-28 ............................................................................................. 14

U.S. Dep't of Housing and Urban Development, Mortgagee Letter
    2005-15 ............................................................................................. 18

U.S. Dep't of Housing and Urban Development, Mortgagee Letter
    2013-41 ............................................................................................. 24

U.S. Dep't of Housing and Urban Development, Mortgage Letter
    2011-02 ............................................................................................. 30

## ISSUES PRESENTED

(1)     Does the Complaint fail to state a claim against Quicken Loans under the False Claims Act, to the extent it rests on an allegation that the company engaged in a broad scheme to violate any and all FHA guidelines in underwriting loans, where the alleged scope extends far beyond the specific allegedly false claims cited in the Complaint?

(2)     With respect to the four specific alleged violations of FHA guidelines for which representative examples of allegedly improper loans are cited, does the Complaint fail to sufficiently plead facts that, if proven, would establish the scienter element of an FCA claim?

(3)     Does the Complaint fail to plead facts that, if proven, would establish that Quicken Loans' alleged violations were material, under the standards recently articulated by the United States Supreme Court in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016)?

(4)     Does the Complaint fail to allege facts that, if proven, would establish that the alleged underwriting violations were the proximate cause of the defaults and resulting loss on the underlying mortgage loans, rather than as a result of unrelated events such as job loss, illness, or the Great Recession?

(5)     Does the Complaint fail to plead common law causes of action for breach of fiduciary duty and negligence?

(6)    Are certain of the Complaint's claims barred by the applicable statutes of limitations?

## PRINCIPAL CONTROLLING AUTHORITIES

1)   *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493 (6th Cir. 2007) (Issues 1 and 2)

2)   *United States v. SAIC*, 626 F.3d 1257 (D.C. Cir. 2010) (Issue 1)

3)   *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007) (Issue 2)

4)   *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) (Issue 3)

5)   *United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977) (Issue 4)

6)   *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542 (6th Cir. 2012) (Issue 6)

# **INTRODUCTION**

The United States' Complaint follows the kitchen sink approach to pleading. It accuses Quicken Loans of seven distinct and disparate practices in making residential mortgage loans insured under the FHA loan program during the period of 2007-2011, alleging that the United States unnecessarily paid insurance claims when the loans went into default. The Complaint posits that these unrelated practices must be considered together, to meet the government's burden of showing scienter, falsity, and the other elements of a False Claims Act ("FCA") cause of action, because they are but elements of a supposed grand scheme by Quicken Loans to defraud the government. To bolster its Complaint, the United States continues with its disjointed pleading strategy by throwing in selectively excerpted quotes from one-off emails, usually concerning particular loans that are not even at issue in the case. All this adds up, the United States claims, to a case that Quicken Loans knowingly or recklessly made "hundreds" of FHA loans during this period that in, some undefined and unpled fashion, allegedly violated FHA program or underwriting requirements and exposed the FHA program to losses.

These allegations fail for multiple different reasons. The United States' leading contention, that there was a company-wide scheme to knowingly defraud the FHA, wholly lacks the critical factual allegations necessary under the law in this Circuit. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493,

504-11 (6th Cir. 2007) ("*Bledsoe*").  The government's attempt to lump together multiple unrelated practices fails to supply proof of the overarching alleged scheme it tries to invent, and the scheme allegations themselves are inconsistent and implausible.

Putting aside the scheme, what remains in the Complaint also does not allege facts to establish the prerequisites for an FCA claim. The allegation that Quicken Loans made knowingly false statements rests on Quicken Loans' certifications that the loans complied with FHA underwriting rules when, according to the government, they did not.  But when the Court examines each of the allegedly impermissible underwriting practices that Quicken Loans is said to have followed—and the "representative examples" cited in the Complaint as illustrating them—it will see that the Complaint fails to make out a claim of knowing falsity.  This is so because both (1) the alleged practices were, at the very least, objectively reasonable or not plainly impermissible under the rules in effect at the time—thereby negating scienter and falsity as a matter of law—and (2) the Complaint cites no facts to establish that Quicken Loans did not believe that the alleged practices were allowed.

The Complaint also does not set forth facts to show that the supposed underwriting issues were material under the newly-strict FCA materiality standards set by the United States Supreme Court in June 2016.  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) ("*Escobar*").  Errors or

missteps that a party did not believe were significant transgressions of the contract rules do not implicate the FCA.  The Complaint also fails to make out a plausible assertion that the FHA's losses were caused by the underlying underwriting decisions at issue, rather than by unrelated events such as the borrower's job loss, illness, or the Great Recession.

The tagalong, common law claims add nothing to save the Complaint.  And many of the causes of action in the suit are also time-barred: all of the Complaint's common law claims, and its FCA claims relating to insurance coverage sought before April 23, 2009, are untimely on their face.

In a larger sense, the Complaint is fundamentally implausible because *Quicken Loans has, according to the FHA's own published statistics, the lowest rate of defaulted loans of any large FHA lender*.[1]  It is inherently incredible for the Complaint to assert that Quicken Loans had a sweeping scheme to make bad loans when, by the FHA's own account, it makes far better loans than all other FHA lenders.  The overheated rhetoric from the Complaint is all the more unbelievable when the Court considers that Quicken Loans makes the most FHA loans of any lender.[2]  That HUD chooses to work with Quicken Loans as its largest business partner, even while this suit proceeds, shows how little regard the agency itself has

---

[1] *See* Neighborhood Watch Data (Exhibit 1 hereto).  The Compare Ratio is a measure promulgated by the FHA itself, that compares the frequency of defaults between and among FHA lender participants.

[2] *See* Neighborhood Watch Data (Exhibit 2 hereto).

for the allegations in the suit.  The implausibility of the suit is not enhanced by the fact that some loans defaulted.  The FHA insurance program is specifically designed to provide home ownership opportunities to people with higher credit risk, hence defaults were inevitable—especially during a timespan encompassing a sharp recession and decline in the housing market.

For all of the reasons in this brief, the Complaint should be dismissed.

## <u>BACKGROUND</u>

Since 1934, the FHA insurance program has encouraged lenders to expand homeownership opportunities for under-served borrowers who do not qualify for conventional loans.  Compl. ¶¶ 35-37.  FHA insurance promotes homeownership by protecting lenders from certain credit risks if the borrower, for whatever reason, defaults on a loan and a loss results.  *Id.* ¶¶ 3, 37.  Borrowers pay the insurance premiums that the FHA collects, and those premiums fund the payment of losses through claims filed by  the note holder.  The payment of insurance claims like this is at the heart of this lawsuit.  *Id.* ¶ 37.

Although the government insured the loans at issue in this case, it was Quicken Loans that made them.  As a so-called Direct Endorsement ("DE") Lender, Quicken Loans was authorized by HUD to do so in accordance with FHA's underwriting guidelines and program requirements, and to submit those loans to FHA for insurance.  *Id.* ¶¶ 3, 38-39.  The Mortgage Insurance Certificate

for every FHA-insured loan creates a "contract of insurance" between the lender and HUD, which incorporates HUD's regulatory requirements and binds both parties "with the same force and to the same extent as if a separate contract had been executed relating to the insured mortgage." 24 C.F.R. § 203.257.

This case focuses on Quicken Loans' underwriting of FHA loans, which entailed an evaluation of credit risk and application of FHA guidelines to determine an applicant's eligibility. Compl. ¶¶ 42, 51, 55, 59. To do so, Quicken Loans collected and evaluated a variety of information about the borrower's credit and the property that would secure the loan, assessed the importance and effect of the information on the risk the loan presented, applied underwriting standards, and made a judgment about whether the loan should be made. *Id.* ¶¶ 51, 55, 61. For nearly the entire period at issue, loans were approved electronically (in part) by FHA's underwriting software called TOTAL, which "evaluates the overall credit-worthiness of a mortgage applicant." *Id.* ¶¶ 62, 65. At the end of the process, as part of the insuring steps, the underwriters (who were FHA-certified) made loan-specific certifications that, in the underwriter's opinion, the data used had "integrity" and the loan was "eligible for HUD mortgage insurance." *Id.* ¶¶ 87-88.

The Complaint alleges that Quicken Loans broadly certified loans that did not comply with FHA guidelines. But it cites "representative example" claims for only four specific alleged violations: making "management exceptions," permit-

ting "value appeals," miscalculating borrower income, and misusing the TOTAL system. *Id.* ¶¶ 125-27, 139-42, 154-55, 173-74. The Complaint also alleges three other violations but without citing any representative example claims: paying commissions to underwriters, having an inaccurate post-closing review system, and failing to report underwriting defects. *Id.* ¶¶ 112, 156-65, 179-98. Based on these allegations, which Quicken Loans vigorously denies, the Complaint asserts claims under the FCA, as well as common law claims alleging breach of fiduciary duty and negligence. *Id.* ¶¶ 203-18.

## **ARGUMENT**

### I.    **THE COMPLAINT FAILS TO MAKE OUT A CAUSE OF ACTION UNDER THE FCA.**

"To state a claim under the FCA, the plaintiff must sufficiently plead [1] that the defendant made a false statement or create[d] a false record [2] with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information [*i.e.*, scienter]; [3] that the defendant . . . submitted a claim for payment to the federal government; . . . and [4] that the false statement or record was material to the Government's decision to make the payment sought in the defendant's claim." *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) (citations omitted). The complaint here fails to do so.

6

**A.    The Complaint Fails to Allege Scienter for Any Cognizable Scheme.**

**1.    The Alleged Generalized Scheme Is Not Cognizable.**

In an effort to satisfy the critical FCA requirement that its Complaint plead the alleged "fraudulent scheme" with particularity under Rule 9(b) (*Bledsoe*, 501 F.3d at 504), the United States accuses Quicken Loans of hatching and implementing a broad plan to violate any and all FHA requirements.  Compl. ¶¶ 5-13, 103-13. This broad allegation cannot support the FCA causes of action, for two reasons.

**a.    FCA Scheme Allegations Are Limited to the Conduct in the Representative Examples.**

Under Sixth Circuit law, an alleged scheme cannot be greater than the sum of its parts – the specific "representative example" false claims pled in the complaint.  As such, the Complaint's assertion of a broad scheme to violate any and all FHA rules fails to support the FCA claim because what the Complaint alleges is a broad and undifferentiated plan that extends far beyond the four specific forms of conduct covered by the only "representative examples" of improperly-underwritten loans pled in the Complaint.

In *Bledsoe*, the complaint identified certain individual sample false claims— as Sixth Circuit law requires[3]—but also included an allegation that the defendant

---

[3] *Chesbrough v. VPA, P.C*, 655 F.3d 461, 470 (6th Cir. 2011) ("[I]t is insufficient to simply plead the scheme; [the plaintiff] must also identify a representative false claim that was actually submitted to the government."); *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 505-06 (6th Cir. 2008) (plaintiff "must provide specific examples of claims submitted to the government as part of

hospital broadly engaged in "improper and illegal acts causing false claims to be filed with Medicare and Medicaid."  501 F.3d at 497-98, 504.  The Sixth Circuit made clear that, as a matter of law, the latter allegation could not be construed to establish a fraudulent scheme any broader than the specific false claims that are alleged:

> The critical question then becomes how broadly or narrowly a court should construe the concept of a fraudulent scheme.  If a court were to construe a fraudulent scheme at a high level of generality—for example, if the court concluded that the fraudulent scheme consisted of "the defendant hospital submitting false claims to Medicare or Medicaid" —then the court would, in effect, violate the principle that improperly pled allegations of fraud do not become adequate merely by placing them in the same complaint with allegations that are sufficient under Rule 9(b).  Allowing such a complaint to go forward *in toto* would fail to provide defendants with the protections that Rule 9(b) was intended to afford them.

*Id*. at 510.  Instead, the court held, allegations of specific wrongful acts "will support more generalized allegations of fraud only to the extent the … examples are *representative samples* of the broader class of claims," which means they must be the same "in all material respects, including general time frame, substantive conduct, and relation to the allegedly fraudulent scheme."  *Id*. at 510-11.

*Bledsoe* forecloses the government's broad scheme allegation here.  The assertion that Quicken Loans implemented a scheme to "underwr[i]te loans it knew

---

[the] alleged fraudulent scheme"); *United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*, No. 15-5691, 2016 WL 731843, at *6 (6th Cir. Feb. 23, 2016) (affirming dismissal of complaint that failed to allege example false claims).

8

did not comply with FHA loan requirements" (Compl. ¶ 107) is precisely akin to the allegation condemned in *Bledsoe*, *i.e.*, one accusing "the defendant hospital [of] submitting false claims to Medicare or Medicaid" (501 F.3d at 510). Instead, under *Bledsoe*, the "representative examples" cited in the Complaint can only support the allegation of a generalized scheme that involves conduct identical "in all material respects" to the conduct in those individual claims. *Id.* at 511. The United States' imagined scheme is pled too broadly, and so cannot justify the FCA claims.

In line with that case, as the Sixth Circuit specifically held, "a 'paragraph-by-paragraph' approach" to examining the examples for purposes of a motion to dismiss "is not only permissible, but is required, if the paragraphs of [an FCA] complaint allege separate and unrelated fraudulent conduct." *Id*. at 509. The reason is, simply, that "placing allegations of fraud that are insufficient under Rule 9(b) in a complaint alongside allegations that properly state a claim does not affect the legal consequences afforded to the insufficient allegations." *Id*.[4]

That further requirement from *Bledsoe* is directly applicable here. The Complaint alleges "separate and unrelated" conduct with respect to management exceptions (Compl. ¶¶ 125-27), value appeals (¶¶ 139-40), income calculation

---

[4] A paragraph-by-paragraph approach also is required here because the Complaint asserts that each alleged falsity that resulted in a claim is a separate cause of action under the FCA. *See* Compl. at 65.

(¶¶ 149-50), and "red flags" (¶¶ 173-74).  Thus, the sufficiency of the Complaint's assertion that Quicken Loans made false statements with the requisite scienter can only be evaluated "paragraph-by-paragraph."

> b.   <u>The Broad Scheme Allegation Is Unsupported in Any Event</u>.

Even if the Complaint was not impermissibly broad under *Bledsoe*, it would not support FCA relief because the Complaint fails to allege facts to suggest that any such scheme existed.  The Complaint was filed after a three-year investigation by the DOJ, HUD, and HUD's Inspector General, involving production of over 85,000 documents, a review of "sample" loans, and eight depositions.  *See* No. 1:15-cv-00613-RBW ("D.C. Dkt."), ECF No. 4-3 at ¶¶ 55-56 (D.D.C. Apr. 29, 2015).  Despite this exercise of the broad powers of the federal government, the Complaint does not cite **any** testimony or **any** documents evidencing <u>any</u> sort of broad plan to flout FHA requirements.

What the Complaint does allege, moreover, *undermines* the United States' *ipse dixit* conclusion that there was an improper plan afoot.  The seven types of alleged misconduct are wholly unrelated and are even inconsistent with each other.  For example, the Complaint asserts that Quicken Loans was trying to "underwrite loans as quickly as possible" and hence incentivized underwriters to be "approving, rather than analyzing, loans" (*id.* ¶¶ 160-62), while at the same time asserting that Quicken Loans created "formal" processes that took time to appeal appraiser

10

opinions (*id.* ¶¶ 131-32) and to consider exceptions to established underwriting rules and automated processes (*id.* ¶ 115).

The Complaint's assertion of a broad scheme also fails because it impermissibly seeks to conjure an overall fraudulent scheme by "aggregating the states of mind of multiple individuals." *United States v. SAIC*, 626 F.3d 1257, 1274 (D.C. Cir. 2010). The *SAIC* court emphasized that "we have expressed a good deal of skepticism about corporate intent theories that rely on aggregating the states of mind of multiple individuals," particularly where they draw "no distinction between the knowledge of corporate officers and that of potentially thousands of ordinary employees." *Id*. at 1274-75. That is precisely the situation here. The Complaint alleges different kinds of conduct by various kinds of employees: underwriters (Compl. ¶¶ 128-55, 166-74), managers (*id.* ¶¶ 114-27), quality control personnel (*id.* ¶¶ 179-98), and those making compensation policy decisions (*id*. ¶¶ 156-65). The Complaint fails to allege facts to show that the decisions separately made in those different areas of the company were linked and guided from above. Likewise, no unified scheme can be inferred from the quotation of snippets from email messages written by different people about entirely different loans, often months or even years apart from the purportedly fraudulent example loans. Compl. ¶¶ 120-22, 146-47.

11

      c.     <u>The Government's Reliance on Two Other FCA Cases Does Not Support a Different Result</u>.

In its prior briefing, the United States attempted to defend its overreaching Complaint by citing two other FCA cases that survived a motion to dismiss, but those rulings are inapposite here.  First, neither case arose in this Circuit and was controlled by *Bledsoe*, which confirms that "the concept of a false or fraudulent scheme should be construed as narrowly as is necessary to protect the policies promoted by Rule 9(b)."  501 F.3d at 510.  Moreover, the allegations in those cases were materially more specific in connecting challenged practices to overall management conduct.  *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 602 (S.D.N.Y. 2013) (defendant adopted a series of changes that caused loan quality to "drop[] precipitously," but senior management "did almost nothing" despite monthly reports showing the changes); *United States v. Americus Mortg. Corp.*, No. 12-02676, 2014 WL 4274279, at *3, *6 (S.D. Tex. Aug. 29, 2014) (defendant "originated loans out of hundreds of [shadow] branches that it never disclosed to HUD" and defendant's executives "instructed a member of [the] quality control department to prepare fraudulent quality control reports and submit them to HUD").  As such, the cases are not instructive in addressing the Complaint here, which takes a collection of disconnected practices and examples and imagines a much-broader scheme to knowingly defraud.

12

## 2.    The Complaint Fails to Allege Scienter as to Each Type of Allegedly-Fraudulent Conduct.

When the inadequate scheme allegations are discarded and the specific

alleged misconduct and "representative examples" that the Complaint *must* contain

for each type of conduct are examined "paragraph-by-paragraph," it is clear that

the Complaint fails to plead the requisite scienter and must be dismissed.  This is

because each of the alleged practices was, at the very least, objectively reasonable

or not clearly impermissible under the rules in effect at the time, the Complaint

cites no facts to establish that Quicken Loans believed that such practices were not

allowed, and the specific allegations fall apart upon analysis for other reasons.

### a.    <u>Value Appeals Were at Least Arguably Permitted and, in Any Event, Involved Non-Actionable Opinions</u>.

The Complaint's allegation that Quicken Loans obtained "inflated apprais-

als" by making forbidden value appeals—that is, by requesting reconsideration of

property value after an appraisal has been conducted—fails for two reasons.

Compl. ¶¶ 128-43.

<u>First</u>, this allegation does not plead that Quicken Loans acted knowingly or

recklessly in using value appeals because value appeals were not unambiguously

prohibited when they allegedly were made.  A defendant cannot be held liable

under the FCA where a "reading of the [allegedly violated] statute, albeit erro-

neous, was not objectively unreasonable."  *Safeco Ins. Co. of America v. Burr*, 551

U.S. 47, 69 (2007); *accord United States ex rel. Swafford v. Borgess Med. Ctr.,* 24

13

F. App'x 491, 491 (6th Cir. 2001) ("Disputes as to the interpretation of regulations do not implicate False Claims Act liability."); *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015) (no scienter alleged when falsity "turns on a disputed interpretive question" on which defendant's position was "objectively reasonable" and defendant was not specifically "warned . . . away from the view it took").

This rule requires dismissal of the FCA claims to the extent they rest on the value appeals allegations.  The Complaint asserts that value appeals were barred under FHA Mortgagee Letters 1996-26 and 2009-28.  Compl. ¶ 130.[5]  But the 1996 Letter (Exhibit 3 hereto) expressly applied to appraisers, *not to lenders* like Quicken Loans; and it also merely required the appraiser to certify that the appraisal was not "based on" a requested value (and the Complaint here does not dispute that the appraisers made those certifications).  And although the 2009 Letter (Exhibit 4 hereto) allegedly prohibited value appeals effective as of 2010, the Complaint concedes (¶ 143) that Quicken Loans had stopped the alleged practice before that.  Indeed, during the time in question, FHA guidelines affirmatively allowed underwriters to request reconsideration of the appraiser's value opinion.  *See* HUD Handbook 4000.4, REV-1, ch. 3-3.G (Exhibit 5 hereto)

_____

[5] The Complaint's *legal* assertion (¶ 139) that value appeals violated HUD guide-lines is entitled to no weight.  *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

(underwriter "may contact the appraiser or return the case to the appraiser for reconsideration."). In sum, it "was not objectively unreasonable" for Quicken Loans to believe that value appeals were permissible, and such appeals were not plainly prohibited, so the Complaint fails to that extent to plead scienter.[6]

Apart from this failing, the allegation that Quicken Loans used value appeals to generate "inflated appraisals," and then certified the loans as compliant with FHA guidelines, does not support the FCA causes of action (including the scienter element) for the independent reason that appraisals are opinions, not facts. "At minimum, the FCA requires proof of an objective falsehood." *United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000), *aff'd*, 302 F.3d 637 (6th Cir. 2002).[7] But "[e]xpressions of opinion ... or statements as to conclusions about which reasonable minds may differ cannot be false." *Roby*, 100

---

[6] Citing emails as to which the United States conspicuously omits dates, the Complaint asserts "Quicken also knew its value appeal process was prohibited by HUD guidelines." Compl. ¶ 135. The first two email quotes (*id.* ¶¶ 134-35) do not speak to whether anyone at Quicken Loans knew or had reason to believe that value appeals violated FHA guidelines, and the third email (*id.* ¶ 136) does not concern value appeals; rather it shows an Operations Director's refusal to order a second appraisal because it would lead to a guidelines violation.

[7] *See also*, *e.g.*, *Hamilton Cnty. Emergency Commc'ns. Dist. v. Bells South Telecomms., LLC*, 154 F. Supp. 3d 666, 697 (E.D. Tenn. 2016) ("The alleged false claim must contain an 'objective falsehood' that the Defendant knew was false."); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) (under the FCA, an opinion only "can qualify as a false statement where the speaker knows facts 'which would *preclude* such an opinion'") (citation omitted).

F. Supp. 2d at 625.  And courts have repeatedly held that a real estate appraisal constitutes a "subjective opinion," not a "statement of fact."  *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010).[8]  Indeed, federal regulations expressly define an appraisal as "'an opinion as to the market value' of a property."  *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 607 (2014) (citing 12 C.F.R. §§ 34.42(a), 34.45).  And the Complaint itself acknowledges that an appraisal is not an exact number capable of mathematical proof, but rather can only be "reasonable" and within the range of "plausibility."  Compl. ¶¶ 54-56 (citing HUD Handbook).  Since a value is an opinion, the allegation that Quicken Loans adopted  "inflated appraisals" as a result of value appeals and then certified the loan for insurance does not entail a factual misstatement that is potentially actionable under the FCA.

>           b.    The "Red Flags" and "Manipulating Data Allegations Do Not Involve Unambiguously Prohibited Conduct.

The Complaint alleges that Quicken Loans had a knowing and reckless practice of "ignoring red flags" about the borrowers' ability to repay loans in situations where the loans otherwise had been approved by the FHA's TOTAL computerized loan evaluation system.  Compl. ¶ 169.  But the Complaint does not and cannot cite any regulation saying—much less ambiguously—that lenders were required to

---

[8] *See also Ridha v. Mortg. Elec. Registration Sys., Inc.*, No. 10-13824, 2010 WL 4867416, at *2 (E.D. Mich. Nov. 23, 2010); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1185 (C.D. Cal. 2011).

16

perform additional creditworthiness evaluations on loans that had been approved by the TOTAL system. To the contrary, the Complaint admits (¶ 66) that the FHA rules affirmatively provided that, if a loan was approved by TOTAL, "a Direct Endorsement underwriter shall not be required to certify that the underwriter has personally reviewed the credit application" (24 C.F.R. § 203.255(b)(5)) – that is, had no duty to look further at the borrower's creditworthiness. *See also* FHA TOTAL Mortgage Scorecard User Guide, at 4 (Dec. 29, 2011) (Exhibit 6 hereto) ("The mortgage credit portion of the loan application that receives an 'Accept' or 'Approve' [system] recommendation … does not need to be reviewed by [an] Underwriter."). The rules, thus, did not unambiguously require a lender to identify, never mind analyze, any so-called "red flags" if the loan had been approved by TOTAL.[9] This allegation therefore fails to support the required scienter element.[10]

In a related passage, the Complaint separately alleges that Quicken Loans impermissibly manipulated borrower data by entering numbers into the TOTAL system before the data were verified, supposedly to somehow "game" the system

---

[9] The one email on this topic cited in the Complaint (¶ 171) reinforces that scienter has *not* been pled. As the Complaint admits, that email simply shows a policy of relying on approvals by the FHA's TOTAL system; the email does not in any way suggest that Quicken Loans believed that it was not allowed to do so.

[10] This allegation also fails because the Complaint does not and cannot cite any FHA rules defining what the United States has now unilaterally and retroactively deemed to be "red flags" that had to be further considered.

17

(allegedly by determining what level of assets the borrower needed and when best to verify the borrower's assets).  Compl. ¶¶ 167-68.  But the only document cited in the Complaint (¶ 67) as supposedly prohibiting this practice simply did *not* do so, much less unambiguously.  Rather, it addressed data manipulation in the narrow, and wholly unrelated, situation where there was a "difference between data entered into TOTAL and verified by the lender" as to three specific types of inputs.  Mortgagee Letter 2005-15 (Exhibit 7 hereto).  Moreover, the Complaint does not allege that the data that Quicken Loans entered into the system, or the data ultimately relied on to make the loan, were incorrect.  Thus, Quicken Loans cannot be said to have acted with the requisite scienter to violate the FCA in this manner.

        c.     The Complaint Fails to Allege That Quicken Loans Intentionally Miscalculated Borrower Income.

The Complaint's allegation that Quicken Loans miscalculated borrower income fails to supply scienter to the supposed scheme, because the Complaint fails to allege facts to suggest that any errors in the two "representative examples" offered were knowing rather than inadvertent.  For the first loan, the Complaint alleges (¶ 149) that the underwriter used a monthly income of about $3,300 when the documentation showed monthly earnings of only about $2,700.  But the Complaint does not even contain a conclusory allegation that the underwriter *knowingly* used the wrong amount, much less the factual allegations to support such an assertion of scienter.  Likewise, for the other loan, the Complaint merely

alleges that the underwriter used pension income without documenting that this income would continue for three years. *Id.* ¶ 150. But again, the Complaint fails to allege even in conclusory fashion, much less with facts, that the underwriter knew of, or acted recklessly to cause, this supposed mistake. As such, the Complaint fails to allege that Quicken Loans purposefully miscalculated incomes.[11]

The Complaint unsuccessfully tries to establish scienter by selectively quoting from three emails to suggest that Quicken Loans knew its underwriters regularly miscalculated income. Compl. ¶¶ 152-55. But these emails had nothing to do with the two claim loans cited in the Complaint (¶¶ 149-50) and hence cannot provide the missing scienter element for them. And *Bledsoe* prevents the United States from basing its FCA case on miscalculation of income without example loans individually satisfying all of the required elements for pleading an FCA claim.

Moreover, the emails fail to establish any general, knowing violations. The Complaint cites an email finding errors among underwriters with "less than 12 months experience." *Id.* ¶ 155. But underwriters on FHA loans have a minimum thirty-six months of experience (HUD Handbook 4155.2, ch. 2.A.4.a, Exhibit 8

---

[11] *See Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992) ("bad math is no fraud"); *United States ex rel. Shackelford v. Am. Mgmt., Inc.*, 484 F. Supp. 2d 669, 673 (E.D. Mich. 2007) (FCA requires "scienter . . . beyond mere negligence to trigger liability"); *United States ex rel. Morris v. Crist*, No. 97-1395, 2000 WL 432781, at *6 (S.D. Ohio 2000) ("Mere negligence or innocent mistake is insufficient to satisfy the [FCA's] standards for knowledge.").

hereto), so the email is irrelevant to this case. The other two emails—concerning Quicken Loans testing its underwriters' ability to calculate income, and management's review of underwriter performance in calculating income (Compl. ¶¶ 152-55)—simply reinforce that Quicken Loans was taking steps to analyze and improve income calculation quality, which is far from showing a knowing or reckless indifference as required to state an FCA claim.

d.   The "Management Exceptions" Claim Fails to Allege a Knowing Violation of Any FHA Requirement.

The Complaint alleges (¶ 124) that Quicken Loans falsely certified compliance with FHA guidelines as a result of a "management exception" process that supposedly granted exceptions to those guidelines. But the Complaint, again, fails to allege facts to show that Quicken Loans knowingly or recklessly certified guideline compliance for either of the "representative example" loans offered in support of this allegation.

For the first loan (¶ 125), the Complaint alleges that an unidentified Quicken Loans employee granted an exception to close a loan without the FHA-required "most recent two years" of tax returns. The Complaint asserts that "[b]ecause the loan closed in October 2008," those two most recent years would have been 2006 and 2007. *Id.* But this assertion rests on sheer speculation that the 2007 tax return was available (rather than unavailable) by the October 2008 closing because the borrower had not obtained the standard filing extension allowed by IRS rules. Nor

20

does the Complaint allege that the unidentified Quicken Loans employee involved knew that the 2007 tax return was available or acted recklessly as to whether it was. *Id.* This "example" thus is devoid of the facts necessary to establish that Quicken Loans violated the FHA rule, much less knowingly.

For the second loan (¶ 126), the Complaint alleges a management exception that supposedly allowed the underwriter to verify a borrower's income through use of a paystub that was "more than four months old at the time the loan closed." But the Complaint fails to allege that either the manager or underwriter consciously knew or was reckless or deliberately indifferent to the particular detail that the document was supposedly more than 120 days old when he or she certified the loan. *Id.* Rather, the Complaint only alleges that "Quicken [Loans] knowingly used a stale paystub" (*id.*), which merely asserts that Quicken Loans knew it was using the pay stub, not that Quicken Loans had undertaken the timing calculations, recognized the stub was too old, but used it anyway. Such conclusory pleading does not allege the facts needed to plausibly suggest that this loan was closed with a knowingly false certification.[12]

---

[12] The Complaint's email evidence concerning exceptions, which does not relate to any "representative" loan, is of no more help to the United States. The Complaint alleges that one email shows that a Quicken Loans executive did a post-closing review of exceptions and opined that some of them should not have been granted. Compl. ¶ 119. But the Complaint does not allege that any of those exceptions were exceptions to FHA guidelines, as opposed to exceptions to the Company's additional, stricter guidelines. Moreover, this after-the-fact review shows that Quicken

      e.    <u>The Three Allegations Unsupported by Any Representative Examples Cannot Stand on Their Own and Do Not Support the Other Allegations</u>.

The Complaint also makes other claims of alleged noncompliance with FHA program rules *but advances no "representative example" loans for these claims*: that the company (1) "implemented a quality control process that failed to adequately assess its compliance with FHA requirements" (¶ 12); (2) "hid its underwriting problems from HUD" by failing to self-report loans as required under program rules (*id.*); and (3) "incentivized" its employees to ignore FHA requirements by paying inappropriate "commissions" barred by program rules (¶ 165). The government conceded in its prior briefing (D.C. Dkt. ECF No. 34, at 31-32 ("D.C. Opp.")) that these allegations *cannot* provide an independent basis for FCA liability, as they are not supported by "example" loans. *See* note 3 *supra* (each allegation of wrongful conduct must be supported by representative examples of actual false claims).

The government nevertheless argued in its prior briefing that these allegations are somehow "probative of Quicken Loans' knowledge that its mortgages are materially deficient" (D.C. Opp. at 32). As a threshold matter, this effort to end-

---

Loans was focused on improving loan quality, not recklessly avoiding the subject. Furthermore, the Complaint does not allege that any of the loans identified in the email (or either of the loans identified in the emails in paragraphs 120-21) resulted in an insurance claim against the government. The loan identified in paragraphs 122-23 likewise is of no help to the government because, as the Complaint alleges, the loan had already closed a month before the purported exception occurred.

run the Sixth Circuit *Bledsoe* rule that each allegedly fraudulent scheme must be supported by representative examples fails as a matter of law. In any event, these additional inchoate allegations plainly fail to supply the missing proof of scienter for the example loans identified for other alleged practices.

With respect to quality control, the Complaint (¶ 187) identifies three *non-claim* loans that it contends were not properly scored in post-closing reviews—but an error after the loan is made could not be probative of the state of mind of the underwriter who certified the loan for insurance prior to its closing. Furthermore, the emails the government relies upon to support this allegation (¶¶ 188-89) suggest that Quicken Loans' executives were unhappy about *all* loan errors, and thus reflect a concern—not a reckless disregard—about loan quality.

Turning to the reporting to HUD of loans with "serious underwriting deficiencies" (¶ 194), nowhere does the Complaint allege (much less with supporting facts) that Quicken Loans understood self-reporting guidelines to refer to underwriting mistakes by Quicken Loans, rather than to "fraud or other serious violations" by the borrower, which the Complaint (¶ 194) concedes that Quicken Loans did report. Indeed, even HUD thought the self-reporting requirements were at least unclear, as the agency found it necessary to issue a formal Mortgagee Letter in 2013 (after the period at issue in this case) to spell out, for the first time, that certain underwriting deficiencies found during quality control review should

23

be self-reported.  *See* Mortgagee Letter 2013-41 (Exhibit 9 hereto).  Given that history, it would be frivolous for the government to now contend, in this case, that Quicken Loans' alleged non-reporting of such deficiencies prior to that Letter was knowingly or recklessly fraudulent.[13]

As to the compensation allegations, the Complaint's attempt to conjure scienter from the payment of bonuses to underwriters (¶ 162) ignores that the FHA guidelines explicitly *permit* a lender to pay its underwriters "bonuses."  HUD Handbook 4060.1, REV-2, ch. 2-9.A (Exhibit 10 hereto); *see also* HUD Handbook 4000.1 I.A.3.C.iv(B)(3)(b)(ii) (2015)  (Exhibit 11 hereto).  The guidelines only prohibit paying commissions to underwriters—that is, compensating underwriters with a percentage of each loan[14]—and the Complaint alleges no facts to show that the Company did that.

_____

[13] In an effort to overcome the absence of any rule clearly requiring Quicken Loans to self-report errors, the government previously argued that Quicken Loans can be held liable under the FCA for "knowingly conceal[ing] material violations . . . even without a specific self-reporting requirement."  D.C. Opp. at 24.  But the cases that the government cited merely stand for the proposition that a person who knows about a material violation *at the time of certification* and conceals it may be liable.  *Id.*  The Complaint makes no allegation that Quicken Loans knew of any errors when it made the certifications; instead, it alleges that errors were found during quality control after the loans had been made and certified.

[14] A "commission" is "[a] fee paid to an agent or employee for a particular transaction, usu[ally] *as a percentage of the money* received from the transaction." Black's Law Dictionary (10th ed. 2014) (emphasis added); *see also Sullivan v. Unum Life Ins. Co. of Am.*, No. 10-4076, 2011 WL 3837134, at *10 (D. Minn. Aug. 26, 2011).

**B.**     **The Complaint Fails to Allege That Any Falsity Was Material.**

Less than six months ago, the Supreme Court in its *Escobar* opinion announced that the FCA has a "rigorous" and "demanding" materiality requirement and, defining that requirement, set out standards that the Compliant does not and cannot meet. *Escobar*, 136 S. Ct. at 2004.

The Court first ruled that an allegedly false statement is "material" only if the government "would not have paid" the claim had it known of the alleged falsity. *Id.* at 2004. Therefore, the FCA's materiality requirement is not satisfied simply because "the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 2004. That holding dooms the Complaint here, which merely alleges that the allegedly false certifications were "required for each lender to enter and remain in the program" and "for a claim on a loan to be submitted for FHA insurance." Compl. ¶ 91. *Escobar* flatly rejected the government's position that every violation of a statutory, regulatory, or contractual requirement that was a condition of payment or participation in a government program is automatically material. 136 S. Ct. at 2001-02. And the Complaint here fails to allege that the supposed violations are "so central" to the FHA program that HUD "routinely rescinds contracts" or requires indemnification when it learns of those violations. *Id.* at 2001.

Nor is this just sloppy or curable pleading:  the Complaint is based on a hodgepodge of alleged technical deficiencies that the government could not in good faith allege were "so central" to the FHA program that it "would not have paid" the claims had it known of those technical flaws.  Courts since *Escobar* have not hesitated to dismiss complaints for failing to plead facts showing materiality under this test, and this Court should do the same.[15]

Relatedly, the Court in *Escobar* held that an FCA complaint must allege facts to show that "the defendant knowingly violated a requirement *that the defendant knows is material* to the Government's payment decision."  136 S. Ct. at 1996 (emphasis added).  This means a complaint must plead facts showing that "the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" at issue.  *Id.* at 2003.  But the Complaint here fails to allege that Quicken Loans knew that FHA consistently refused to pay claims that contravened the technical requirements at issue—much less to allege facts that would establish such knowledge by Quicken Loans.  There are no allegations, for example, that the Company knew that the FHA refused to pay claims (or sought indemnification thereafter) in all instances where income was miscalculated, or an

---

[15] *See, e.g.*, *United States ex rel. Scharff v. Camelot Counseling*, No. 13-3791, 2016 WL 5416494, at *8-9 (S.D.N.Y. Sept. 28, 2016); *United States v. N. Adult Daily Health Care Ctr.*, No. 13-4933, 2016 WL 4703653, at *11-12 (E.D.N.Y. Sept. 7, 2016).

exception granted, or an appraisal modified by an appraiser.  Instead, the Com-

plaint (¶ 106) merely asserts in boilerplate language that Quicken Loans "knew,

deliberately ignored, or recklessly disregarded that it originated and underwrote

loans that were not in compliance with HUD requirements."  That simply does not

allege the required facts.  As such, the Complaint should be dismissed under

*Escobar*.

### C.     The Complaint Fails to Allege Facts to Establish That the Purported False Statements Proximately Caused HUD's Losses.

In an FCA case, the plaintiff's damages "must be determined by the appli-

cation of proximate causation."  *United States ex rel. Roby v. Boeing Co.*, 79 F.

Supp. 2d 877, 892 (S.D. Ohio 1999) (citations omitted); *see also United States ex

rel. Fago v. M&T Mort. Corp.*, 518 F. Supp. 2d 120, 122 (D.D.C. 2007) (govern-

ment may only recover damages if "the specific misrepresentations made to HUD

. . . were the direct and proximate cause of HUD's losses and not merely the 'but

for' cause of those losses").  For two reasons, the Complaint here fails to allege

facts to establish that the alleged false statements proximately caused the FHA

insurance fund's losses.

Courts in FCA cases arising in the mortgage context have held that

proximate cause is absent where the alleged misstatement did not relate to the

27

borrower's ability to repay the loan.[16]  But the Complaint here contains only the conclusory legal assertion (¶ 200) that the alleged "false certifications and violations of HUD requirements bore upon the likelihood of whether the borrower would make mortgage payments" —not *facts* to support that assertion, as required. Indeed, this conclusory assertion is contradicted by facts pled in the Complaint. The Complaint alleges (¶ 120), for example, that one certification was untrue because the borrower had not submitted required citizenship documentation, but it does not allege any facts showing that such citizenship documentation related to the borrower's ability to repay the loan.  *See Fago*, 518 F. Supp. 2d at 122 (failure to notify HUD of presence of non-genuine signatures not proximate cause).  Likewise, the Complaint's assertions (¶¶ 125-26) that Quicken Loans failed in other instances to obtain the most-recent borrower information available do not show proximate causation to HUD's loss because the Complaint does not deny that all of the other underwriting criteria (income, credit history, etc.) were satisfied.  In sum, the government seeks to recover even though the borrower's ability to repay the loan was *exactly* as represented, but the FCA's proximate cause requirement bars the government from pursuing such a windfall.

---

[16] *See United States v. Hibbs*, 568 F.2d 347, 349-52 (3d Cir. 1977) (as applied to FHA loans, "the false information furnished to the government [must bear] upon the likelihood of the applicants meeting mortgage payments, [such that] the misrepresentation had a causal connection with the subsequent defaults"); *Spicer*, 57 F.3d at 1159 (no causation where falsity relates to an "ancillary requirement, not material to HUD's determination that the borrowers were financially qualified").

28

Even where an alleged misstatement arguably related to the borrower's ability to repay, any FCA complaint involving FHA loans must allege facts to show that the loan default did not actually result from a cause unrelated to the alleged misstatement. *See Hibbs*, 568 F.2d at 351; *Fago*, 518 F. Supp. 2d at 122. The Complaint here entirely fails to meet this standard as well. For example, the Complaint alleges (¶ 126) that a statement about a borrower's income was inaccurate because Quicken Loans used a paystub that was too old (*id.*), but the Complaint does not allege that, had the paystub been more recent, the loan would not have defaulted anyway because of a job layoff, divorce, poor health, changed economic circumstances, or a decline in house prices. The absence of such allegations means that proximate causation has not been pled.

It is vitally important that the Court vigorously enforce the proximate cause requirement in this case, lest the government be allowed to unfairly shift onto Quicken Loans what the loans' insurer, the FHA, had agreed to cover. Now that the United States has suffered losses, many of them unexpected due to the Great Recession, it is fundamentally unfair to foist those losses back on its insured, Quicken Loans. A robust proximate cause test properly limits the government, and here requires the dismissal of the FCA claims.

## II.   THE COMPLAINT FAILS TO STATE A COMMON LAW CLAIM.

### A.   Count III Fails to State a Claim for Breach of Fiduciary Duty.

Count III fails for three reasons.  <u>First</u>, to state a claim for breach of fiduciary duty, the Complaint must allege facts to establish that Quicken Loans owed a fiduciary duty to HUD.  *Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 884-85 (E.D. Mich. 2016).  The Complaint fails to allege any such facts.  Instead, the Complaint (¶ 41) merely cites two cases, but neither of them recognized a fiduciary duty, much less under these circumstances.[17]  In any event, the FHA Program did *not* create "a relationship" where "one reposes faith, confidence, and trust in another's judgment and advice" such that a fiduciary duty could arise.  *Yatooma v. Zousmer*, No. 3025921, 2012 WL 1697004, at *4-5 (Mich. Ct. App. May 15, 2012) (quotations omitted).[18]  Rather than blindly trusting Quicken Loans, FHA subjected the company (like all DE lenders) to detailed rules and supervision.  In addition to the many detailed rules, HUD maintained extensive oversight of Quicken Loans' FHA activities both through on-site audits and HUD's ability to conduct post-endorsement review of any loan.  *See* Mortgage Letter 2011-02, at 4 (Jan. 5, 2011)

---

[17] *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976), held that there was a "business relationship" between FHA and a mortgagee, not a fiduciary relationship.  *Mt. Vernon Cooperative Bank v. Gleason*, 367 F.2d 289, 291-92 (1st Cir. 1966), held that the VA was "entitled to sue for the recovery of a payment made by mistake"; the case did not mention, much less impose, a fiduciary duty.

[18] *See also Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541, 549 (W.D. Mich. 1998) (fiduciary duty may exist where one party "is so easily dominated" that "reliance . . . for business making decision[s] is inevitable") (citation omitted).

30

(Exhibit 12 hereto); 24 C.F.R. §§ 203.4(c), 203.255(e). Those provisions refute the conclusory legal allegation that Quicken Loans was a fiduciary.

Second, Count III fails because Quicken Loans and HUD had a contractual relationship that precludes tort claims. "It is well-settled that a plaintiff may not assert a tort claim against a defendant with whom he had a contractual relationship unless the duty that the defendant allegedly breached is distinct from a duty owed under the contract between the parties." *Emmet v. Franco*, No. 16-1211, 2016 WL 4396059, at *8 (E.D. Mich. Aug. 18, 2016).[19] For every loan, there is a "contract" between the parties that "includ[ed] the provisions of the [FHA Program] regulations" (24 C.F.R. § 257; page 5 *supra*), and those regulations comprehensively governed the parties' relationship as to each loan, including the underwriter's duties. 24 C.F.R. § 203.255(b)(5). Count III thus fails because the allegedly-breached duties are the same as owed under the parties' contracts.

Third, tort law claims are also inconsistent with the comprehensive FHA Program scheme. "The judiciary may not, in the face of such comprehensive . . . schemes, fashion new remedies that might upset carefully considered legislative programs." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL–CIO,* 451

---

[19] *See also Spengler v. ADT Sec. Servs., Inc.*, 505 F.3d 456, 458 (6th Cir. 2007) (Michigan law does not permit tort claims that "emanate[] only from the contract"); *Brock v. Consol. Biomedical Labs.*, 817 F.2d 24, 25 (6th Cir. 1987) (dismissing breach of duty claim where "plaintiffs do not claim that the defendant has caused any harm in the realm beyond the contract").

U.S. 77, 97 (1981).  The FHA program defines HUD's available remedies, including seeking indemnification if, but only if, "the mortgagee knew or should have known of a serious and material violation of FHA origination requirements."  24 C.F.R. § 203.255(g)(3); 12 U.S.C. § 1715z-21(c).  Adding common law tort remedies would unfairly and retroactively change the balance of the regulatory program.  *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 316 (1947).

### B.   Count IV Fails to State a Claim for Negligence.

Count IV fails for two of the three reasons that bar Count III:  namely, because the assertion of tort claims is foreclosed both by the parties' contractual relationship and by the comprehensive nature of the regulatory program.  *See also Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 658 (Mich. 1997) (dismissing negligence and other tort claims due to failure to allege "an independent legal duty distinct from the duties arising out of the contractual relationship").

### C.   The Common Law Claims Fail for Lack of Proximate Causation.

Proximate cause is an element of both breach of fiduciary duty and negligence claims.[20]  Because the Complaint fails to allege facts to establish proximate cause (*see* pages 27-30 *supra*), these claims fail for this reason too.

---

[20] *See*, *e.g.*, *Petroleum Enhancer, LLC v. Woodward*, No. 07-12425, 2013 U.S. Dist. LEXIS 24180, at *23-24 (E.D. Mich. Feb. 22, 2013); *Womack v. Mal-Mart Stores, Inc.*, No. 14-12615, 2016 U.S. Dist. LEXIS 42052, at *4-5 (E.D. Mich. Mar. 30, 2016).

### III.    MANY OF THE CLAIMS ARE UNTIMELY.

All of the common law claims and certain of the FCA claims are time

barred.  The Complaint, which was filed on April 23, 2015, alleges (¶ 1) that the

conduct occurred "between September 1, 2007 and December 31, 2011."  The

common law claims are governed by a three-year statute of limitations.  28 U.S.C.

§ 2415(b) (actions brought by the United States "founded upon a tort shall be

barred unless the complaint is filed within three years after the right of action first

accrues").  Thus, they must be dismissed as untimely on their face.  *See Cataldo v.*

*U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (dismissal appropriate where

"allegations in the complaint affirmatively show that the claim is time-barred").

The FCA bars actions filed "(1) more than 6 years after the date on which

the violation . . . is committed, or (2) more than 3 years after the date when facts

material to the right of action are known or reasonably should have been known

. . . ."  31 U.S.C. § 3731(b).  Thus, the FCA causes of action relating to any

insurance claims that were filed more than six years prior to April 23, 2015 (i.e.,

before April 23, 2009) are untimely unless there is a basis for tolling.  The

Complaint fails to allege any basis for tolling.  *See* Compl. ¶ 202 (merely asserting

that responsible official did not know and should not have known facts until April

23, 2009, which is more than three years before filing).  While Plaintiff in the pre-

motion conference conceded that the limitations ban precludes any recovery for

claims <u>paid</u> more than six years prior to April 23, 2015, there is no reason to restart the effect of the time bar by calculating accrual based on payment, rather than presentment of the allegedly false claims.  The six-year period cannot be tolled by the government's own delays.  Accordingly, the FCA claims as to all insurance claims submitted prior to April 23, 2009 should be dismissed.  *See Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 879 (6th Cir. 2006) (affirming dismissal because "complaint was not timely filed" under Section 3731(b)).

## <u>CONCLUSION</u>

For the foregoing reasons, Quicken Loans respectfully requests that the Court dismiss the Complaint in its entirety with prejudice.

Dated:  December 22, 2016

Respectfully submitted,

QUICKEN LOANS INC.

By its attorneys,

/s/ Jeffrey B. Morganroth

| | |
|---|---|
| Thomas M. Hefferon | Jeffrey B. Morganroth |
| Sabrina M. Rose-Smith | **MORGANROTH &** |
| W. Kyle Tayman | **MORGANROTH, PLLC** |
| **GOODWIN PROCTER LLP** | 344 North Old Woodward Avenue |
| 901 New York Avenue, NW | Suite 200 |
| Washington, DC  20001 | Birmingham, MI 48009 |
| Tel.:  202.346.4000 | Tel.:  248.864.4000 |
| Fax:  202.346.4444 | Fax:  248.864.4001 |
| thefferon@goodwinlaw.com | jmorganroth@morganrothlaw.com |
| srose-smith@goodwinlaw.com | P41670 |
| ktayman@goodwinlaw.com | |

## <u>LOCAL RULE CERTIFICATION</u>

I, Jeffrey B. Morganroth, certify that Quicken Loans' Motion to Dismiss complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts).  I also certify that it is the appropriate length pursuant to the Court's December 15, 2016 order.  ECF No. 13.

/s/ Jeffrey B. Morganroth
Jeffrey B. Morganroth

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2016, a copy of the foregoing was served by electronic means via the Court's CM/ECF System on all counsel registered to receive electronic notices.


/s/Jeffrey B. Morganroth