UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                              Case No. 16-cv-14050

v.

                              HON. MARK A. GOLDSMITH

QUICKEN LOANS INC.,

        Defendant.

_____/

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANT QUICKEN LOANS INC.'S MOTION TO DISMISS (Dkt. 15)

In this case, the Government alleges that Defendant Quicken Loans Inc. underwrote, approved, and endorsed certain mortgage loans for Federal Housing Administration ("FHA") insurance between September 1, 2007 and December 31, 2011, and that those loans allegedly violated FHA underwriting requirements. The Government further alleges that, by falsely certifying compliance with those requirements and submitting claims for payment when those loans defaulted, Quicken violated the False Claims Act, 31 U.S.C. § 3729 et seq. The Government also asserts federal common-law claims against Quicken for breach of fiduciary duty and negligence.

This matter is before the Court on Quicken's motion to dismiss (Dkt. 15). The issues were briefed, and a hearing was held on February 13, 2017. For the reasons explained fully below, the Court grants the motion in part and denies it in part.

## I. BACKGROUND

The FHA is an entity within the United States Department of Housing and Urban Development ("HUD"), which insures mortgages and administers several mortgage default

1

insurance programs.  Quicken Loans Inc. v. United States, 152 F. Supp. 3d 938, 942 (E.D. Mich. 2015).  As a mortgage insurer, the FHA agrees to protect mortgage lenders against the risk of loss caused by borrowers' non-payment, as authorized by the National Housing Act of 1934, 12 U.S.C. § 1701 et seq.  Quicken Loans, 152 F. Supp. 3d at 942.

One of the programs through which FHA insures home mortgages is the Direct Endorsement Lender ("DEL") program.  In the DEL program, FHA authorizes certain lenders to evaluate the credit risk of potential borrowers, underwrite mortgage loans, and certify those loans for FHA mortgage insurance without prior HUD review or approval.  Id. (citing 12 U.S.C. § 1715z-21).  "In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether 'the proposed mortgage is eligible for insurance under the applicable program regulations.'"  Id. at 942-943 (quoting 24 C.F.R. § 203.5(a)).  Once a loan is endorsed by HUD or the DEL lender, it is insured by the FHA.  Compl. ¶ 92 (Dkt. 1).  If there is a mortgage default, the holder of the mortgage note (whether the original lender or a later transferee) submits an insurance claim to HUD for any loss from the default via an electronic claim system and, in compliance with applicable rules, receives payment from the United States Treasury after the claim is approved. Id. ¶¶ 93-95.

A lender may underwrite an FHA-insured loan in one of two ways: (i) the underwriter may "manually underwrite" the loan, by making the credit decision whether to approve the borrower, in accordance with HUD underwriting rules; or (ii) the lender may use a HUD-approved Automated Underwriting System ("AUS"), which is a software system that makes the credit recommendation whether to approve the borrower.  Id. ¶ 60.

2

Beginning in July 2008, HUD required DEL lenders to electronically process eligible loan requests through an AUS.  Id. ¶ 62.  The AUS connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders ("TOTAL").  Id.  Using the data that the lender inputs into the AUS, the TOTAL algorithm makes a credit determination and provides either an "Accept/Approve" decision, which approves the loan subject to certain conditions, or a "Refer" decision, which refers the loan back to the lender for manual underwriting.  Id.  A loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if the data entered into the AUS is true, complete, properly documented, and accurate.  Id. ¶ 65.

For each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification that the individual mortgage "complies with HUD rules and is 'eligible for HUD mortgage insurance under the DEL program.'"  Id. ¶ 87 (quoting Form HUD-92900-A).  By certifying the mortgage for FHA insurance, the mortgage lender agrees to indemnify HUD for claims paid out to the lender in certain circumstances.   24 C.F.R. § 203.255(g)(1).  However, the certifications are different depending on whether the loan was manually underwritten or the lender used an AUS.  Compl. ¶ 88.

For a loan that required manual underwriting, the lender must certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and has used due diligence in underwriting the mortgage."  Id.  For a loan approved through the use of an AUS, HUD requires the lender to certify to the "integrity of the data" it entered, id. ¶ 88, which, according to the complaint, "HUD defines as data that is true, complete, and accurate," id. ¶ 64. (citing FHA TOTAL Mortgage Scorecard User Guide, ch. 2, (Dec. 2004 ed.) (Dkt. 16-6)).

As a DEL, Quicken was authorized by HUD to make loans in accordance with FHA's underwriting guidelines and program requirements and submit those loans to FHA for insurance. Compl. ¶¶ 3, 38-39, 49-68. Many of Quicken's mortgage loans were approved by HUD's TOTAL algorithm. See, e.g., id. ¶¶ 125-126, 139-142, 149-150, 173-174, 200.

In April 2012, the Department of Justice and the HUD Office of Inspector General began investigating Quicken under the False Claims Act. Quicken Loans, 152 F. Supp. 3d at 943. The scope of the investigation encompassed approximately 246,000 FHA loans that Quicken had originated from mid-2007 through December 31, 2011. Id. After the parties were unable to reach a settlement, Quicken filed suit against the Government in this district, id. at 944, which suit this Court ultimately dismissed, id. at 955.

The Government originally filed this action in the United States District Court for the District of Columbia less than one week after Quicken had filed its suit. Id. The Government's case was eventually transferred to this district, see United States v. Quicken Loans Inc., ___ F. Supp. 3d ___, 2016 WL 6838186 (D.D.C. Nov. 18, 2016); Quicken's motion to dismiss followed.

## II.  STANDARD OF DECISION

In evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[c]ourts must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief." Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010). To survive a motion to dismiss, a complaint must plead specific factual allegations, and not just legal conclusions, in support of each claim. Ashcroft v. Iqbal, 556 U.S. 662, 678-679 (2009). A complaint will be dismissed unless it states a "plausible claim for relief." Id. at 679.

4

# III.  ANALYSIS

The Court will first address Quicken's arguments in its motion to dismiss concerning the claims under the False Claims Act before addressing its arguments concerning the federal common-law claims.

## A.  False Claims Act Claims

The Government asserts two claims under the False Claims Act — a "presentment" claim under 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1) (2006), and a "false statement" claim under 31 U.S.C. § 3729(a)(1)(B).  See, e.g., United States ex rel. Winkler v. BAE Sys., Inc., 957 F. Supp. 2d 856, 864 (E.D. Mich. 2013) (using colloquial references of "presentment" and "false statement" to distinguish claims).[1]

---

[1] The applicable statutory provisions have undergone revision during the time period in which the Government alleges Quicken engaged in the fraudulent scheme, but it is of no consequence to deciding this motion.  Title 31 U.S.C. § 3729(a)(1)(A) currently imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  This section's predecessor, § 3729(a)(1) (2006), originally imposed liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval . . . ."  Section 3729(a)(1) was amended and recodified in its current form — § 3729(a)(1)(A) — when Congress passed the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009).

Title 31 U.S.C. § 3729(a)(1)(B) currently imposes civil liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  This section's predecessor, § 3729(a)(2) (2006), was also amended in 2009 and recodified in its current form.  Section 3729(a)(2) previously imposed civil liability when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  United States ex rel. Wall v. Circle C Constr., L.L.C., 697 F.3d 345, 355 n.3, 356 (6th Cir. 2012).

Unlike its amending of § 3729(a)(1), Congress included specific retroactivity language in amending § 3729(a)(2), which the Sixth Circuit held did not violate the Ex Post Facto Clause of the U.S. Constitution.  See Sanders v. Allison Engine Co., Inc., 703 F.3d 930, 942-949 (6th Cir. 2012).  Thus, insofar as the Government contends that any portion of Quicken's purportedly unlawful conduct predates the 2009 amendment, the former § 3729(a)(1) would govern any presentment claim, while the current § 3729(a)(1)(B) would govern all false-statement claims.

To state a presentment claim under the Act, the Government must sufficiently plead that (i) Quicken presented, or caused to be presented, a claim for payment or approval; (ii) the claim was false or fraudulent; and (iii) Quicken's acts were undertaken "knowingly," meaning with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim.  United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc., 838 F.3d 750, 761 (6th Cir. 2016).  To state a false-statement claim under the Act, the Government must sufficiently plead similar elements: (i) Quicken made a false statement or created a false record; (ii) Quicken did so "knowingly" (defined the same as in a presentment claim); (iii) Quicken submitted the claim for payment to the federal government; and (iv) the false statement or record was material to the Government's decision to make the payment sought by Quicken's claim.  See United States ex rel. Sheldon v. Kettering Health Network, 816 F.3d 399, 408 (6th Cir. 2016) (citing United States ex rel. SNAPP, Inc. v. Ford Motor Co., 618 F.3d 505, 509 (6th Cir. 2010)); Prather, 838 F.3d at 780 (McKeague, J., concurring in part, dissenting in part) (same).

In its motion to dismiss, Quicken raises numerous arguments that it contends warrant dismissal of all of the claims under the False Claims Act.  The Court considers each in turn.

### 1.  Statute of Limitations

Although the statute of limitations is an affirmative defense, dismissal of an action is appropriate under Rule 12(b)(6) if the "allegations in the complaint affirmatively show that the claim is time-barred."  Stein v. Regions Morgan Keegan Select High Income Fund, Inc., 821 F.3d 780, 786 (6th Cir. 2016); Jones v. Bock, 549 U.S. 199, 215 (2007) ("If allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim[.]").  The False Claims Act bars the filing of a civil action "more than

6

6 years after the date on which the violation . . . is committed," or "more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances," whichever occurs last. 31 U.S.C. § 3731(b); see also United States v. Movtady, 13 F. Supp. 3d 325, 332 (S.D.N.Y. 2014) ("statute of limitations does not begin to run until HUD pays out on the insurance plan").

The complaint alleges that Quicken's fraudulent conduct occurred between September 1, 2007 and December 31, 2011. Compl. ¶ 1. Quicken argues that any False Claims Act causes of action regarding insurance claims on defaulted mortgages submitted more than six years before the filing of the complaint on April 23, 2015 are untimely. Def. Br. at 33. The Government appears to concede this point in its response brief, claiming that it is seeking "relief solely for mortgages on which claims were made within six years of the filing date of this action — i.e., after April 23, 2009." Pl. Br. at 33 (Dkt. 19) (emphasis added). Because the Government is only seeking recovery under the False Claims Act for claims made after April 23, 2009, which fall within the applicable limitations period for this case, the Court concludes that those claims are timely.

Accordingly, the Court grants this portion of Quicken's motion to dismiss insofar as it relates to any claims submitted before April 23, 2009.

### 2. Pleading Scienter for Representative Examples of a Fraudulent Scheme

Under the liberal pleading standard of Federal Rule of Civil Procedure 8, a pleader is required to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); see also Fed. R. Civ. P. 8(d)(1) ("Each allegation must be simple, concise, and direct."). When a complaint alleges violations of the False Claims Act,

however, the plaintiff must meet the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b). Chesbrough v. VPA, P.C., 655 F.3d 461, 466 (6th Cir. 2011); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Pleading fraud with particularity under Rule 9(b) requires a plaintiff to allege: (i) the time, place, and content of the alleged misrepresentation; (ii) the fraudulent scheme; (iii) the defendant's fraudulent intent; and (iv) the resulting injury. Chesbrough, 655 F.3d at 467.

When the allegations in a complaint regarding a fraudulent scheme are "complex," "far-reaching," and "encompass many allegedly false claims over a substantial period of time," pleading every specific instance of fraud "would be extremely ungainly, if not impossible." United States ex rel. Bledsoe v. Cmty. Health Servs., Inc., 501 F.3d 493, 509 (6th Cir. 2007). Under those circumstances, the plaintiff may allege a more generalized false or fraudulent scheme perpetrated by the defendant. Id. at 510. However, the court should not construe this scheme too broadly, as doing so would violate the heightened pleading standard underlying Rule 9(b). Id. Nor should the scheme be construed too narrowly, as doing so would undermine the principle that it could be impractical for a plaintiff to plead each and every instance of fraudulent conduct. Id. To properly strike a balance between these two competing interests, a court should construe a fraudulent scheme "as narrowly as is necessary to protect the policies promoted by Rule 9(b)." Id.

Importantly, pleading a fraudulent scheme with particularity alone is insufficient to proceed to discovery. Id. at 504 (rejecting plaintiff's contention that a complaint is adequate if it "pleads a false scheme with particularity" (emphasis in original)). Rather, the plaintiff must plead a specific example of a false claim with particularity that was "submitted to the

government pursuant to that scheme." Id. at 510; see also United States ex rel. Hirt v. Walgreen Co., 846 F.3d 879, 881 (6th Cir. 2017) ("The identification of at least one false claim with specificity is 'an indispensable element of a complaint that alleges a [False Claims Act] violation in compliance with Rule 9(b).'" (quoting Bledsoe, 501 F.3d at 504)). These examples will support more generalized allegations of fraud if they are representative "of the broader class of claims." Bledsoe, 501 F.3d at 510.

In other words, the examples of specific false claims must be "characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme." Id. at 511. This means that the examples must be pled with specificity "in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme," such that "a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims." Id.[2]

---

[2] The Court rejects the Government's contention that it does not have to plead specific examples "when a centralized scheme is pled with adequate supporting facts." Pl. Br. at 8 (citing Prather, 838 F.3d at 768-769).

In Hirt, the Sixth Circuit acknowledged its prior use of language suggesting, but not resolving, the possibility "of relaxing the requirement that a plaintiff identify at least one false claim with particularity if that plaintiff, through no fault of his own, cannot allege the specifics of actual false claims that in all likelihood exist." Hirt, 846 F.3d at 881. Questioning whether courts may "relax" the pleading standard established by Federal Rule of Civil Procedure 9(b), the Sixth Circuit went on to note that it had applied the "relaxed" standard only once — in Prather — and that it did so because the qui tam plaintiff in that case had detailed personal knowledge of fraudulent Medicare billing practices, even though she had no knowledge that a specific request for payment had actually been submitted. See id.; Prather, 838 F.3d at 769. Nonetheless, the Prather plaintiff's allegations were found sufficient because "[t]hey provide a detailed overview of the alleged fraudulent scheme, and, when accepted as true, it [was] difficult to deny the strong inference that the specific requests for anticipated payment that [the plaintiff] identified and described were submitted." Prather, 838 F.3d at 769. The Prather court held that these allegations were sufficient "to establish with particularity that the defendant 'submitted a claim for payment,' — as it described when, where, and how the defendant submitted the claim." Hirt, 846 F.3d at 882.

9

In this case, the Government alleges that Quicken created a fraudulent scheme of "knowingly representing to HUD certain FHA-insured mortgages had been underwritten with due diligence and were eligible for FHA insurance when, in fact, they were not." Pl. Br. at 4-5. According to the Government, the "allegations of falsity are narrowly based on rules related to the creditworthiness of the borrower and the sufficiency of the collateral securing the mortgages." Id. at 5. The complaint then provides ten specific examples of false claims that were submitted to HUD, all of which fall within one of the following four practices Quicken used to carry out its scheme: (i) permitting "value appeals," (ii) making "management exceptions," (iii) miscalculating borrower income, and (iv) manipulating data and ignoring "red flags." Quicken argues that the Government has failed to sufficiently plead scienter as to each of the examples found within the four practices identified in the complaint.[3]

---

Prather offers the Government no support for its "relaxed" pleading argument. Prather did not dispense with the requirement of specific instances of fraud. The only "relaxation" concerned whether an inference of actual submission of the specific claim could be drawn from the allegations made. See Wells Fargo, 972 F. Supp. 2d at 619 n.17 ("Because the Government is empowered to investigate allegations of fraud before bringing suit and ha[s] access to all of the relevant facts before filing its complaint," it cannot "hide behind the relaxed pleading standard courts sometimes apply to qui tam relators who rely on inference rather than facts."). Thus, the Government is obligated to plead a specific example of a false claim with particularity to be allowed to proceed to discovery. Bledsoe, 501 F.3d at 510; Hirt, 846 F.3d at 881.

[3] The complaint also asserts other allegedly noncompliant conduct on behalf of Quicken regarding FHA program rules: (i) implementing a quality control process that failed to adequately assess its compliance with FHA requirements; (ii) hiding its underwriting problems from HUD by failing to self-report loans, as required under program rules; and (iii) incentivizing employees to ignore FHA requirements by paying inappropriate commissions barred by program rules. Compl. ¶¶ 156-165, 179-198. Quicken argues that these allegations cannot provide an independent basis for liability under the False Claims Act, because there are no representative example loans for these claims. Def. Br. at 22. In response, the Government states that it "is not alleging that any false claims independently arise from these practices." Pl. Br. at 21. Therefore, the Court will only address whether the representative examples of the four previously mentioned practices withstand scrutiny under Rule 9(b).

Although Rule 9(b) requires a plaintiff to plead the "circumstances constituting fraud" with particularity, allegations of "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  To determine whether a plaintiff's factual allegations give rise to an inference of fraudulent intent, "the court must conduct an inquiry of the competing plausible inferences and must find scienter has been sufficiently pled as long as a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683, 701 (E.D. Mich. 2010); see also Robert N. Clemens Trust v. Morgan Stanley DW, Inc., 485 F.3d 840, 848 (6th Cir. 2007) (allegations of a defendant's motive and opportunity "may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct").  "[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.  An ample factual basis must be supplied to support the charges."  United States ex rel. Pervez v. Beth Israel Med. Ctr., 736 F. Supp. 2d 804, 810-811 (S.D.N.Y. 2010); United States v. Honeywell Int'l Inc., 798 F. Supp. 2d 12, 22 (D.D.C. 2011) ("[T]he particular difficulties of proving scienter do not absolve plaintiffs of their duty to plead some facts from which the court may reasonably infer knowledge." (emphasis in original)).

To satisfy scienter under of the False Claims Act, the Government must prove that Quicken "knowingly" presented, or caused to be presented, a false or fraudulent claim, or "knowingly" made, used, or caused to be made or used, a false record or statement.  31 U.S.C. §§ 3729(a)(1)(A)-(B).  A defendant acts "knowingly" if it acted with "actual knowledge" of, or with "deliberate ignorance" or "reckless disregard" to, the possibility that the submitted claim was false.  31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii).

11

While actual knowledge addresses a defendant's subjective knowledge, deliberate ignorance addresses whether there is willful blindness from which subjective intent can be inferred. United States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 57 (D.D.C. 2007). Reckless disregard has been described as an "aggravated form of gross negligence." Wall, 697 F.3d at 356; accord United States v. Krizek, 111 F.3d 934, 941 (D.C. Cir. 1997) ("[R]eckless disregard lies on a continuum between gross negligence and intentional harm."); cf. United States v. King-Vassel, 728 F.3d 707, 712 (7th Cir. 2013) ("innocent mistakes or negligence are not actionable under" the False Claims Act).[4] Scienter under the False Claims Act "is necessarily a fact-intensive inquiry." United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 456 F. Supp. 2d 46, 61 (D.D.C. 2006).

Having established the governing legal framework, the Court now turns to Quicken's specific arguments for each of the practices, as well as the representative examples. Determining whether the examples of false claims are sufficiently pled with particularity requires the Court to engage in a paragraph-by-paragraph analysis of the complaint. See Bledsoe, 501 F.3d at 509.

### i. Value-Appeals Process

The complaint alleges that Quicken created a value-appeals process, which "permitted employees to request specific inflated values from appraisers in order to make a loan eligible for

---

[4] The False Claims Act "has contained the 'reckless disregard' language for almost thirty years," and its definition has been clarified by various sources. King-Vassel, 728 F.3d at 712. For instance, the Senate Report that accompanied the addition of "reckless disregard" to the False Claims Act in 1986 "evinced an intent to hold liable '[o]nly those who act in gross negligence,' that is, those who failed 'to make such inquiry as would be reasonable and prudent to conduct under the circumstances.'" Id. at 713 (quoting S. Rep. No. 99-345, at 20). Other courts have understood reckless disregard to mean "an extension of gross negligence" or an "extreme version of ordinary negligence," which tracks the definition in Black's Law Dictionary that "a person acts with reckless disregard 'when the actor knows or has reason to know of facts that would lead a reasonable person to realize' that harm is the likely result of the relevant act." Id. (quoting Black's Law Dictionary at 540-541 (9th ed. 2009)).

FHA insurance."  Compl. ¶ 111; see also id. ¶ 131 (in violation of FHA rules, "Quicken created a formal value appeal process that improperly requested from appraisers a specific and desired value").  The complaint further claims that this practice was "specifically prohibited by the governing FHA requirements, which forbade lenders from requesting specific valuations from appraisers."  Id. ¶ 111; see also id. ¶ 130 ("FHA rules specifically provide that an appraisal cannot be 'based on a requested minimum valuation, a specific valuation or range of values'" (citing Mortgagee Letter 1996-26, Ex. 3 to Def. Mot. (Dkt. 16-3))); id. ("To preserve appraiser independence, FHA rules have continually prohibited a lender such as Quicken from requesting or providing to the appraiser 'an anticipated, estimated, encouraged or desired value.'" (citing Mortgagee Letter 2009-28, Ex. 4 to Def. Mot. (Dkt. 16-4))).[5]

According to the complaint, the value-appeals process "led to appraisers increasing the appraised value of a property, often with no justification for the increase," thereby allowing Quicken "to maximize its profit by approving more and larger FHA-insured loans than were otherwise approvable."  Id. ¶ 111; see also id. ¶ 128 (value-appeals process "resulted in employees demanding and receiving a higher home appraisal value with no documentation or justification for the increased value of the home or the FHA loan").  The Government provided four representative examples in the complaint (all of which involved mortgages that were closed in 2008) where Quicken allegedly requested value appeals in violation of FHA rules, falsely certified that the loan was eligible for FHA insurance, and caused a false claim to be submitted to HUD.  See generally id. ¶¶ 139-142.

In its motion to dismiss, Quicken argues that the complaint fails to allege scienter as to these examples because value appeals were not unambiguously prohibited by HUD at the time

---

[5] The complaint notes that Quicken ceased requesting value appeals as part of its value-appeals process in 2009.  Compl. ¶ 143.

13

the loans were made, and Quicken's interpretation of the rules was not objectively unreasonable. <u>See generally</u> Def. Br. at 13-15.[6]  In support of this argument, Quicken first claims that FHA Mortgagee Letter 1996-26, which required an appraiser to certify that the appraisal was not "based on" a requested value, did not apply to lenders.  Def. Br. at 14.  Quicken further claims that FHA Mortgagee Letter 2009-28 — which, according to Quicken, "allegedly prohibited value appeals effective as of 2010" — cannot be used to satisfy scienter because Quicken ceased requesting value appeals in 2009.  <u>Id.</u> (citing Compl. ¶ 143).  Quicken also claims that FHA guidelines allowed underwriters to "request reconsideration" of an appraiser's value opinion.  <u>Id.</u> at 14-15.

The Government responds that the complaint "details that the standards set forth in the Mortgagee Letters are not only requirements of the appraiser, but also requirements of the lender."  Pl. Br. at 13 (citing Compl. ¶¶ 56-58).  The Government further contends that the emails referred to in the complaint sufficiently allege that Quicken knew the value-appeals process was in violation of FHA requirements.  <u>Id.</u> at 11-12 (citing Compl. ¶¶ 135-136).  The Court agrees with the Government.

Viewing the allegations in the light most favorable to the Government, the complaint sufficiently alleges that FHA requirements prohibited Quicken from requesting or providing to an appraiser a specific or desired value at the time the example mortgages were closed in 2008. <u>See</u> Compl. ¶ 56 ("The appraisal must include the appraiser's certification that, among other

---

[6] Quicken also argues that appraisals cannot be false because they are opinions, not facts.  <u>See generally</u> Def. Br. at 15-16.  In response, the Government claims that Quicken's argument misconstrues the allegations in the complaint.  <u>See generally</u> Pl. Br. at 15.  The Court agrees with the Government.  The complaint makes it clear that the Government is not claiming that the appraisal values themselves violated FHA requirements.  Rather, the Government is arguing that Quicken's practice of requesting a specific and desired value from the appraiser violated FHA requirements.

things, the appraisal was not based on a requested minimum value or a specific value." (citing HUD Handbook 4150.2, CHG-1, ch. 5-1.A)); id. ("The Direct Endorsement Lender 'must accept responsibility, equally with the appraiser, for the integrity, accuracy, and thoroughness of the appraisal, and will be held accountable by HUD for the quality of the appraisal.'" (quoting Mortgagee Letter 1994-54)); id. ¶ 58 ("FHA rules specifically provide that an appraisal cannot be 'based on a requested minimum valuation, a specific valuation or range of values.'" (quoting Mortgagee Letter 1996-26)); id. ("Appraiser independence from lenders has been a significant concern of the FHA, and as HUD reaffirmed in 2009, lenders are prohibited from providing the appraiser 'an anticipated, estimated, encouraged or desired value.'" (quoting Mortgagee Letter 2009-28)).

Of the three mortgagee letters referenced in these allegations of the complaint, only two were attached as exhibits in the briefing.  First, Mortgagee Letter 1996-26 set forth certain minimum appraisal standards, one of which was that a statement be included "in the certification required by [the Uniform Standards of Professional Appraisal Practice] . . . that the appraisal is not based on a requested minimum valuation, a specific valuation or range of values, or the approval of a loan."  Mortgagee Letter 1996-26 at 2.  Although the appraiser was the individual required to make the statement in the certification, this letter was sent to "all approved mortgagees."  Id. at 1.  Thus, those mortgagees who received the letter were clearly aware, and sufficiently warned, that an appraisal could not be based on a requested or specific valuation.

Furthermore, the Mortgagee Letter 2009-28 not only provides that "new requirements set forth in this mortgagee letter will be effective for all case numbers assigned on or after January 1, 2010," but that "existing requirements will remain in effect."  Mortgagee Letter 2009-28 at 1

(emphasis added).    In the portion entitled "Affirming Existing Requirements," the letter expressly states:

> FHA is <u>reaffirming</u> these requirements.    Mortgagees and third parties working on behalf of mortgagees are prohibited from:
>
>         \*        \*        \*
>
> <u>Providing to the appraiser an anticipated, estimated, encouraged or desired value for a subject property or a proposed or target amount to be loaned to the borrower</u>, except that a copy of the sales contract for purchase must be provided.

<u>Id.</u> at 3 (emphasis added).  This language clearly contradicts Quicken's contention that this letter prohibited value appeals for the first time in 2009 with an effective date of 2010.

The allegations in the complaint, when viewed in the light most favorable to the Government, also allow for the reasonable inference that Quicken knew its value-appeals process was in violation of FHA requirements.    <u>See</u> Compl. ¶ 134 (email from Darren Thomas, operations director responsible for appraisals, entitled "Asking for the max increase available," allegedly instructed employees to state in request to appraisers that "any additional value would be appreciated"); <u>id.</u> ¶ 135 (email from Clint Bonkowski, the divisional vice president for underwriting, in which he allegedly wrote, "I don't think the media or any other mortgage company (FNMA, FHA, FMLC) would like the fact we have a team who is responsible to push back on appraisers"); <u>id.</u> ¶ 136 (email from Thomas rejecting the request of David Lee, a regional vice president, for a second value opinion, in which Thomas allegedly wrote, "we cannot order a 2nd opinion appraisal as FHA will already be aware of this appraisal, We already have a couple of loans that are not insurable because of this situation," where a requested value appeal was initially denied by the appraiser, and the appraiser responded that "it appears someone is attempting to force an inflated value").

Finally, Quicken's reliance on Safeco Insurance Company of America v. Burr, 551 U.S. 47 (2007), to support the argument that its interpretation of FHA requirements was not objectively unreasonable is unavailing. Safeco involved a consumers class-action suit against insurance companies for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq. See generally Safeco, 551 U.S. at 52-56. FCRA imposes liability on anyone who "willfully fails" to provide notice to the consumer of an "adverse action based in whole or in part on any information contained in a consumer credit report." Id. at 52. The plaintiffs in Safeco accused the insurance companies of failing to provide adverse-action notices to consumers after the company reviewed credit reports and provided less favorable rates to the consumers based upon the reports. Id. at 55-56. The companies argued that they did not "willfully" fail to comply with FCRA because, under their interpretation of the relevant statute, liability goes only to acts known to violate FCRA. Id. at 56-57.

After holding that the term "willfully" encompassed recklessness, the Supreme Court considered whether it could infer from Safeco's interpretation of the statute that Safeco acted recklessly. Id. at 57, 69. According to the Court, "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Id. at 69. The Court further noted that Safeco did not have any statutory, regulatory, or judicial guidance "that might have warned it away from the view it took." Id. at 70. The Court ultimately concluded that, "[g]iven this dearth of guidance and the less-than-pellucid statutory text, Safeco's reading was not objectively unreasonable, and so falls well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability." Id.

Safeco offers Quicken no solace.  It involved a statute whose language was ambiguous — giving rise to the test whether the defendant's reading of the statute was objectively unreasonable; here, no ambiguity with the False Claims Act is alleged, making the Safeco test irrelevant.

Even if the Safeco test were applicable, the complaint plausibly alleges that Quicken's interpretation of its obligations concerning value appeals was objectively unreasonable.  The complaint alleges that Quicken was equally responsible for an appraisal, Compl. ¶ 56 (citing Mortgagee Letter 1994-54), and, unlike the defendant in Safeco, who had no legal "guidance" from governmental authorities, Safeco, 551 U.S. at 70, Quicken had fair warning that an appraisal could not be based on a requested or specific valuation, Compl. ¶ 56. (citing HUD Handbook 4150.2, CHG-1, ch. 5-1.A); see also id. ¶ 58 (citing Mortgagee Letter 1996-26)). Although FHA guidelines allow underwriters to request "reconsideration" of an appraiser's value opinion, see HUD Handbook 4000.4, REV-1, ch. 3-3.G, Ex. 5 to Def. Mot., at 2 (cm/ecf page) (Dkt. 16-5) ("If the underwriter concludes that the appraisal report findings are inconsistent, or otherwise unacceptable, he may contact the appraiser or return the case to the appraiser for reconsideration."), it does not follow that Quicken was objectively reasonable to interpret reconsideration as permitting a request for a specific and desired value from an appraiser through its value-appeals process. Quicken's position is objectively unreasonable, because it would provide an easy evasion of the prohibition of asking for specific amounts through the expedient technique of asking for reconsideration in any instance.  In fact, the only plausible harmonization of the prohibition of asking for specific amounts and the allowance for seeking reconsideration can be found in confining the latter to the grounds that may be urged — such as the traditional arguments concerning new, overlooked, or misapplied information — but without seeking a

specific dollar amount.  In light of the clear proscription of requesting an exact appraisal amount, Quicken's unreasonable interpretation ran an unjustifiably high risk of violating FHA requirements, which plausibly satisfies the reckless disregard standard under the <u>Safeco</u> test.

Because the Government has sufficiently alleged scienter relative to the value-appeals process examples, the Court denies this portion of Quicken's motion to dismiss.

### ii.  Management-Exception Process

The complaint alleges that Quicken created a management-exception process that allowed its underwriters "to request management approval for an exception to underwriting requirements that could not be met."  Compl. ¶ 115.  The Government provided two representative examples in the complaint where Quicken granted management exceptions that allegedly violated FHA underwriting requirements.

In the first case, the Government alleges that Quicken failed to obtain a self-employed borrower's signed tax returns or information directly from the IRS for the two most recent years, as required under condition 22 of the AUS certificate.  <u>Id.</u> ¶ 125(c).  Rather, the Government claims that a Quicken employee granted an exception to HUD's income verification requirements and permitted the loan to proceed.  <u>Id.</u> ¶ 125(d).  Because of this, the Government alleges that "Quicken knowingly qualified the borrower based on income documentation that was more than twenty months old at the time the mortgage was endorsed."  <u>Id.</u>  Quicken approved and endorsed the loan for FHA insurance and certified that it complied with HUD requirements and was eligible for insurance.  <u>Id.</u> ¶ 125(a).  A claim for insurance was filed after the borrower became delinquent, which HUD paid in the amount of $487,010.33.  <u>Id.</u> ¶ 125(e).

In the second case, the Government alleges that Quicken failed to properly document and verify the income of a co-borrower that it input into the AUS system.  <u>Id.</u> ¶ 126(c).  According to

the complaint, condition 22 of the AUS certificate requires the lender to obtain the most recent year-to-date pay stub for the co-borrower, as well as a verification of employment, and condition 10 of the AUS certificate requires that all verification documents must be dated within 120 days of the closing date of the loan.  Id.  Rather than obtain the documentation, Mike Lyon, Quicken's operations director, granted an exception to HUD's income verification requirements and permitted the loan to proceed without obtaining a paystub for the co-borrower that complied with HUD's documentation requirements.  Id. ¶ 126(d).  Thus, according to the complaint, Quicken "knowingly used a stale paystub that was more than four months old at the time the loan closed, in clear violation of HUD requirements."  Id.  Nevertheless, Quicken approved and endorsed the loan for FHA insurance and certified that it complied with HUD requirements and was eligible for insurance.  Id. ¶ 126(a).  A claim for insurance was filed after the borrower became delinquent, which HUD paid in the amount of $238,295.32.  Id. ¶ 126(e).

Regarding the first example, Quicken argues that the complaint fails to plead scienter for two reasons: (i) the availability of a 2007 tax return at the time the loan was closed in October 2008 is speculative, and (ii) the complaint does not allege that the employee knew that the 2007 tax return was available or acted recklessly as to whether it was available.  Def. Br. at 20-21.

Regarding the second example, Quicken argues that the complaint fails to plead scienter because it does not allege that either the underwriter or the manager had knowledge that the document was more than 120 days old when the loan was certified.  Id. at 21.  According to Quicken, the allegation that it "knowingly used a stale paystub" is too conclusory to plausibly suggest a knowingly false certification, because it presumes that Quicken calculated the timing of the paystub, recognized it was too old, but used it anyway.  Id.

The Court disagrees.  The complaint clearly alleges that Quicken created a management-exception process, whereby underwriters could "request management approval for an exception to an FHA underwriting requirement that could not be met in order to approve loans."  Compl. ¶ 110; see also id. ¶ 115.  "As part of this process, Quicken granted management exceptions to allow violations of FHA underwriting requirements."  Id. ¶ 115.  The complaint also includes allegations that Quicken had knowledge of this management-exception process.  Id. ¶ 118 (Bonkowski testified "that an underwriter's decision whether to seek a documented management exception or to provide the exception on his own 'depends on what that . . . underwriter [is] comfortable with.'"); id. ¶ 120 (for loan granted a management exception, Jeanine Taylor, operations director of the FHA team, allegedly wrote in an email that the borrower "does not have the FHA required docs but we are going to go with it"); id. ¶ 121 (after receiving "absolute confirmation" from Bobbi MacPherson, FHA product manager, that a loan would be "uninsurable," Lyon granted a management exception, and allegedly wrote in an email, "whenever we bump into utterly stupid underwriting guidelines like this, we have to push back hard . . . I'll put the exception in on this one").

Furthermore, the two examples in the complaint illustrate underwriters requesting, and receiving, management exceptions for their respective loans.  Id. ¶¶ 125(d), 126(d).  Given the allegations about the purpose of the management-exception process, it logically follows that an underwriter would not have sought a management exception unless the loan did not satisfy FHA underwriting requirements in the first place.  Why else would the management exception be sought?  Similarly, a manager's grant of the underwriter's request would not come about unless the loan did not originally satisfy FHA underwriting requirements.

21

Quicken's demand that the complaint include factual allegations that the first underwriter knew that the 2007 tax return was available, or that the other underwriter consciously knew that the paystub was more than 120 days old, <u>see</u> Def. Br. at 20-21, does not reflect any recognized pleading requirement.  The complaint need not include allegations as to whether those underwriters had specific knowledge of the particular errors.  Rather, the Government need only plead sufficient factual allegations from which the underwriters' scienter can be reasonably inferred.

For the first example, the complaint alleges that the approval of the loan required Quicken to obtain signed tax returns from 2006 and 2007.  Compl. ¶ 125(c).  However, because the loan was granted a management exception to HUD's income verification requirements, the loan was improperly qualified based on the income documentation that was more than 20 months old at the time of the mortgage was endorsed.  <u>Id.</u> ¶ 125(d).  Thus, by requesting and receiving a management exception for the income verification requirement, it can be reasonably inferred that the underwriter either had knowledge of the 2007 tax return or acted recklessly as to whether it was available.

For the second example, the complaint alleges that the approval of the loan required Quicken to obtain the most recent year-to-date pay stub for the co-borrower and that all verification documents be dated within 120 days of the loan's closing date.  <u>Id.</u> ¶ 126(c).  However, because the loan was granted a management exception to HUD's income verification requirements, the loan was improperly qualified based on a paystub that was more than four months old at the time the loan closed.  <u>Id.</u> ¶ 126(d).  By requesting and receiving a management exception for the income verification requirement, it can be reasonably inferred that the underwriter either had knowledge of the paystub's date or acted recklessly as to its date.  Nor is

22

the complaint's assertion that "Quicken knowingly used a stale paystub" conclusory, as Quicken suggests, because it is a reasonable inference that is supported by other factual allegations.

The Court concludes that the allegations in the complaint allow for the reasonable inference that the underwriters had either the actual knowledge that the particular loan did not satisfy FHA requirements or, at a minimum, recklessly disregarded that fact; the Government has sufficiently alleged scienter for the management-exception process examples, thereby asserting plausible violations of the False Claims Act.

The Court denies this portion of Quicken's motion to dismiss.

### iii.   Miscalculation of Income

According to the complaint, "an underwriter must evaluate the 'adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations.'"   Compl. ¶ 144 (quoting 24 C.F.R. § 203.5(d)).   To adequately evaluate a borrower's income, "the underwriter must be able to accurately calculate and document the income according to FHA requirements."   Id.   The Government provided two representative examples in the complaint where Quicken allegedly miscalculated a borrower's income but certified that the loans were eligible for FHA insurance.

In the first example, the Government alleges that Quicken "overstated the income used to qualify the borrower[ ] for the loan" because "Quicken used a monthly income of $3,293.33," but "the documentation of the borrower's income for the previous two years . . . only supported a monthly income of no more than $2,700."   Compl. ¶ 149(c).   The Government claims that Quicken approved and endorsed the loan for FHA insurance based on the overstated monthly income.   Id. ¶¶ 149(a), (c).   Quicken also "certified that the information and data used to underwrite the loan had integrity and were properly verified, that all of the AUS conditions had

been satisfied, and that the loan complied with all HUD requirements and was eligible for FHA insurance." Id. ¶ 149(a). A claim for insurance was filed after the borrower became delinquent, which HUD paid in the amount of $182,747.35. Id. ¶ 149(d).

In the second example, the Government alleges that Quicken first failed to properly document a co-borrower's pension income because Quicken "used a pension income of $9,381.33 to qualify the [co-]borrower for an FHA-insured mortgage" but "failed to verify and document the continuance of the co-borrower's pension income for three years." Id. ¶ 150(c). According to the complaint, condition 22 of the AUS certificate required such verification because, "if any benefit will expire within three years, the income may be used only as a compensating factor." Id. The Government also alleges that Quicken "did not determine or document the non-occupying co-borrowers' monthly condominium fees, and such fees were not taken into consideration when calculating the debt-to-income ratio." Id. ¶ 150(d). Further, the Government alleges that Quicken did not include in the AUS calculation of monthly liabilities the co-borrower's "monthly payment of $2,042 to Bank of America," which was revealed in a credit report. Id. ¶ 150(e). Nevertheless, Quicken approved and endorsed the loan for FHA insurance, as well as certified the loan's compliance with HUD requirements and its eligibility for insurance. Id. ¶ 150(a). A claim for insurance was filed after the borrowers became delinquent, which HUD paid in the amount of $98,243.25. Id. ¶ 150(f).

In its motion to dismiss, Quicken argues that the complaint fails to allege that any errors in the two representative examples of miscalculated income were knowingly made, as opposed to being "inadvertent" or a "mistake." Def. Br. at 18-19. For instance, Quicken contends that the complaint does not allege that the underwriter for the first example knowingly or recklessly used the wrong amount. Id. at 18. For the second example, Quicken contends that the complaint does

not allege that the underwriter knew of, or acted recklessly to cause, the supposed mistake regarding pension income.  Id. at 18-19.

While the complaint does not contain any express factual allegations that the particular underwriters either knew of or recklessly disregarded the income errors, a court may look to whether there are facts alleged from which inferences may be drawn regarding intent.  See Honeywell, 798 F. Supp. 2d at 22; Pervez, 736 F. Supp. 2d at 810-811.

The first example in the complaint identified only a single income discrepancy.  Without more, this error can hardly be said to amount to a plausible claim under the False Claims Act distinguishable from an innocent mistake or simple negligence.  King-Vassel, 728 F.3d at 712.  However, the second example contained numerous blatant errors that "even the shoddiest recordkeeping would have revealed" as income miscalculations.  Krizek, 111 F.3d at 942 (reckless disregard was amply supported where the physician "failed utterly to review bills submitted on his behalf" to Medicare for excessive number of patient-care hours, including billing for treatment that "approached twenty-four hours in a single day").

Nor can the various errors regarding income miscalculations in the second example — e.g., failure to verify and document the co-borrower's pension income for three years, failure to determine or document the non-occupying co-borrowers' monthly condominium fees, and failure to include the non-occupying co-borrowers' monthly payment to a bank — be characterized as instances of "bad math" or "flawed reasoning" that fall outside the scope of False Claims Act liability.  United States ex rel. Roby v. Boeing Co., 100 F. Supp. 2d 619, 625-626 (S.D. Ohio 2000).  Rather, these glaring errors and omissions, at the very least, allow for the reasonable

inference that the underwriter acted with reckless disregard in calculating the co-borrowers' income for the mortgage loan, which supports a plausible claim under the False Claims Act.[7]

Compounding Quicken's reckless disregard in this case are the complaint's allegations that Quicken management "was aware that inaccurate calculation and documentation of borrower's income was a problem that consistently plagued the company," but Quicken failed to correct it. Id. ¶ 151. For instance, in 2008, only 44 percent of Quicken's underwriters passed a test meant "to evaluate their proficiency in calculating and documenting a borrower's income," which led Mike Lyon, operations director, to allegedly write in an email that some underwriters "need to go back to school." Id. ¶ 152. In 2009, Bill Emerson, the CEO of Quicken, allegedly sent an email to the "Credit and Risk Management Group," in which he wrote, "calculating income is our biggest buy back issue," and asked what could be done to "make sure we don't screw up income." Id. ¶ 153. And, in 2010, Quicken's "Credit Strategies Group" allegedly recognized Quicken's "recurring income calculation challenges." Id. The complaint alleges

---

[7] The facts and theory of recklessness asserted here are similar to allegations upheld in other False Claims Act cases. See, e.g., Gulf Grp. Gen. Enters. Co. W.L.L. v. United States, 114 Fed. Cl. 258, 328-329, 333 (Fed. Cl. 2013) (plaintiff acted with reckless disregard where the plaintiff failed to conduct minimal examination of records and prepared submissions in such a "sloppy and unsupervised fashion" that the government was overbilled); King-Vassel, 728 F.3d at 712-713 (for reckless disregard, the plaintiff need only show that the defendant "had reason to know of facts that would lead a reasonable person to realize that she was causing the submission of a false claim" or that the defendant "failed to make a reasonable and prudent inquiry into that possibility"); United States ex rel. Ervin & Assocs., Inc. v. The Hamilton Secs. Grp., Inc., 370 F. Supp. 2d 18, 42 (D.D.C. 2005) (the standard of reckless disregard "was designed to address the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered" and is meant to cover those who ignore "obvious warning signs"); United States v. Raymond & Whitcomb Co., 53 F. Supp. 2d 436, 447 (S.D.N.Y. 1999) ("[A] failure to conduct a proper investigation before making a false statement may be sufficiently reckless to yield False Claims Act liability."); cf. United States ex rel. Williams v. Renal Care Grp., Inc., 696 F.3d 518, 531 (6th Cir. 2012) (defendants did not act with reckless disregard where the evidence showed that defendants "consistently sought clarifications on the issue, followed industry practice in trying to sort through ambiguous regulations, and were forthright with government officials over [the subsidiary's] structure").

that, despite recognizing the recurring problem of income miscalculation from 2008 to 2010, Quicken failed to correct this problem. See id. ¶ 154.

Further, Bill Banfield, director of capital markets, allegedly sent an email to other senior managers in 2011 that, according to the complaint, identified "income problems as 'pervasive in any one of the forums where we review for errors,' and asking whether training was necessary." Id. ¶ 155. Responding in an email, Clint Bonkowski, divisional vice president for underwriting, wrote, "do we have issues with income yes, do 50% of our UW's have less than 12 months experience yes, do we need to do some training, absolutely," but concluded that it would be a "waste of [underwriters'] time and loss of production just to say we trained them." Id. The complaint then states that "Bonkowski testified that he could not remember or identify any income training that took place after he sent the 2011 email." Id.[8]

The Government argues that these allegations "demonstrate that Quicken's management was fully aware of its pervasive miscalculation . . . of income, and chose not to fix the problem." Pl. Br. at 18. This focus on management actions and intent is relevant on the question of recklessness. Wells Fargo, 972 F. Supp. 2d at 620 n.18 (citing Bledsoe, 501 F.3d at 506) (because the Government alleged violations of the False Claims Act against the bank, not the individual employees who signed the false mortgage loan origination certification, the bank's intent must be sufficiently pled, not the employees' intent). The Court agrees that the Government has set forth sufficient allegations that Quicken's management knew of a pervasive problem with inaccurate income calculation and was reckless in failing to take appropriate action to correct it.

_____

[8] The complaint also refers to three emails in which Quicken arguably knew about potentially miscalculated income regarding other specific loans outside of the provided examples. See Compl. ¶¶ 146-147.

Because the Court concludes that the Government has sufficiently alleged scienter for the second income-miscalculation example and asserted a plausible violation of the False Claims Act, the Court denies Quicken's motion as to income miscalculation.

### iv.  Manipulating Data and Ignoring "Red Flags"

Regarding data manipulation, the complaint alleges that Quicken's underwriters manipulated "data entered into the AUS in order to gain a TOTAL Accept/Approve decision." Compl. at ¶ 166.   According to the complaint, Quicken employees would circumvent the TOTAL system by entering "hypothetical data in order to determine the minimum amount of a given variable — for example, borrower assets or income — that TOTAL required in order to obtain an Accept/Approve decision." Id. ¶ 167.

The complaint further alleges that Quicken employees would manipulate "the way in which they verified data to obtain data that would be skewed." Id.  For instance, the complaint alleges that "Quicken would verify data points at a time when it was most favorable to obtaining an accept decision," such as "obtaining a bank statement at a time when the borrower had an inflated balance." Id. ¶ 168.  By doing so, "Quicken employees knew the balances were not a full and complete representation of the borrower's financial situation" because "the account balance would be in excess of the average account balance." Id.

The Government provided one representative example in the complaint where Quicken allegedly manipulated data.  See id. ¶ 173. In that example, a Quicken employee allegedly manipulated the AUS in order to obtain an Accept/Approve decision by entering hypothetical data into the AUS to determine the amount of assets the borrower would need to obtain the accept decision. Id. ¶ 173(d).  Recognizing that the borrower did not have this amount of assets,

the complaint states that the employee waited to verify the assets when the borrower's account was maximized — i.e., on the day the borrower received her paycheck.  Id.

Quicken argues that the complaint failed to allege scienter for this example because Mortgage Letter 2005-15 did not unambiguously prohibit this type of data manipulation.  Def. Br. at 18 (citing Compl. ¶ 67).  According to Quicken, that letter addressed data manipulation in the narrow situation where there was a "'difference between data entered into TOTAL and verified by the lender' as to three specific inputs," none of which was an input at issue the Government's example.  See id. (quoting Mortgagee Letter 2005-15, Ex. 7 to Def. Mot. (Dkt. 16-7)).  Quicken further argues that scienter has not been sufficiently pled because the complaint does not allege that the data Quicken entered into the system was incorrect.  Id.

The Government responds that the complaint pled, in detail, the requirements of TOTAL that Quicken violated, Pl. Br. at 16 (citing Compl. ¶¶ 62-68), identifies the particular manner in which Quicken committed these violations, id. at 16-17 (citing Compl. ¶¶ 166-171), and provides examples of these violations, id. at 17 (citing Compl. ¶¶ 173-174).

The following are the relevant allegations in the complaint that the Government claims set forth the FHA requirements that Quicken violated:

- "When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps.  Many of these conditions relate to ensuring the data the lender entered is true, complete, and accurate."  Compl. ¶ 62;

-  "HUD requires the lender to certify to the integrity of the data it entered, which HUD defines as data that is true, complete, and accurate. . . .  If the lender later receives information or learns of information that materially differs from the information previously entered by the lender, the lender must re-submit a proposed loan to TOTAL through the AUS."  Id. ¶ 64;

- It is the lender's "responsibility to ensure the integrity of the data relied upon by TOTAL" because such data "is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage application based on the data supplied by the lender."  Id. ¶ 65; and,

29

- "To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from 'manipulating . . . application variables [in] TOTAL mortgage scorecard to obtain an accept/approve risk classification.'" Id. ¶ 67 (quoting Mortgagee Letter 2005-15)).

Insofar as it relates to the prohibition of data manipulation, paragraph 67 of the complaint appears to be the most relevant, and, thus, consideration of Mortgagee Letter 2005-15 is required.

Mortgagee Letter 2005-15 begins by noting that "minor changes to certain application variables, e.g., cash reserves after closing, income, and the total mortgage payment used to render the risk classification from TOTAL do not warrant the need for rescoring the mortgage." Mortgagee Letter 2005-15 at 1.  Thus, the letter indicates that FHA would be "providing a degree of tolerance before triggering the requirement that a mortgage be rescored" as to three variables — cash reserves, income, and tax and insurance escrows.  Id.  The letter emphasizes that "these tolerance thresholds are provided for those situations where loan application data differ from what the mortgage lender entered into TOTAL early in the loan processing phase and then documents later on."  Id. at 2.  The letter then states that these tolerances "are not to result in willfully manipulating these application variables into the TOTAL mortgage scorecard to obtain an accept/approve risk classification."  Id. (emphasis added).

For Quicken to have knowingly violated the FHA's requirement prohibiting data manipulation based on this letter, the example loan would have to involve the manipulation of one of the three specified variables — income, cash reserves after closing, or tax and insurance escrows — for purposes of obtaining an Accept/Approve TOTAL decision.  However, there are no allegations in the complaint that any of these specified variables were manipulated, that a borrower's assets in a bank account falls within one of these variables, or that the variables also

30

include assets.  Nor are there any allegations to suggest that it would violate any FHA requirement for an underwriter to wait until a borrower received a paycheck to enter the assets into the AUS, or that a requirement exists that requires an underwriter to enter some average amount when it comes to assets.

Moreover, HUD requires a lender to certify to the "integrity of the data" that it entered into the AUS.  Compl. ¶ 64.  Although neither party sought to define the phrase "integrity of the data" in their briefs, the complaint posits that HUD defines "integrity of the data" as "data that is true, complete, and accurate."  Id.  The complaint does not contain any allegations that, at the time the underwriter entered the borrower's assets data for the example loan, the data were somehow untrue, incomplete, or inaccurate. Because the complaint did not sufficiently allege scienter for this example of data manipulation, the Court concludes that it does not plausibly state a claim under the False Claims Act.

In addition to data manipulation, the complaint alleges that Quicken's underwriters ignored "obvious red flags that indicated a borrower would not be able to repay the mortgage." Compl. ¶ 166; see also id. ¶ 169 ("Once a TOTAL Approve/Accept decision was obtained, Quicken would often fail to analyze risk factors and red flags indicating the borrower would be unable to make the mortgage payments associated with their FHA insured mortgage.").

Quicken argues that the complaint fails to cite any regulation "that lenders were required to perform additional creditworthiness evaluations on loans that had been approved by the TOTAL system."  Def. Br. at 16-17.  Quicken further contends that, if a loan is approved by TOTAL, the FHA rules provide that the underwriter has no duty to review the borrower's creditworthiness.  Id. at 17 (citing 24 C.F.R. § 203.255(b)(5); FHA TOTAL Mortgage Scorecard User Guide (Dec. 29, 2011), Ex. 6 to Def. Mot., at 4 (Dkt. 16-6)).  Because the rules did not

unambiguously require a lender to identify or analyze "red flags" if the loan was approved by TOTAL, Quicken claims that the complaint has failed to sufficiently allege scienter.  Id.

In its response brief, the Government does not allege or provide any specific FHA rule, regulation, or requirement regarding "red flags," but it cites the HUD rule mandating that lenders exercise "due diligence."  See Pl. Br. at 16 (citing Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983)).  This general obligation to exercise due diligence was alleged in the complaint.  See Compl. ¶ 50 (alleging "due diligence is a critical component" of the DEL program and is "required by federal regulation and HUD Handbooks").[9]

Beyond this general duty, there are specific FHA requirements that the Government argues Quicken violated when Quicken allegedly ignored red flags in the two examples set forth by the Government under that theory.  To understand the Government's red flag theory for the examples, those requirements must first be analyzed.

As explained above, beginning in July 2008, HUD required DEL lenders "to electronically process eligible loan requests through an AUS."  Id. ¶ 62.  For a loan approved through the use of an AUS, the lender is required "to certify to the integrity of the data it entered, which HUD defines as data that is true, complete, and accurate."  Id. ¶ 64 (citing FHA TOTAL Mortgage Scorecard User Guide, ch. 2, (Dec. 2004 ed.)).  The Government claims that this certification is material because "TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage applicant based on the data supplied by the lender," and the loan

---

[9] The complaint elaborates on this general obligation of due diligence.  See Compl. ¶ 51 (due diligence requires "an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral" (citing HUD Handbook 4155.1, REV-5, ch. 2-1)); id. ¶ 52 (lender owes HUD a duty to "'exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment'" (quoting 24 C.F.R. § 203.5(c)).

receiving an Approve/Accept TOTAL decision "is only eligible for FHA's insurance endorsement if 'the data entered into the AUS are true, complete, properly documented, and accurate.'" Id. ¶ 65 (quoting FHA TOTAL Mortgage Scorecard User Guide, ch. 2 (Dec. 2004 ed.)). The complaint further notes that, "[b]ecause TOTAL cannot analyze data that is not available to it, certain loans are not eligible for an AUS approval and must be manually underwritten." Id. ¶ 66. A manual downgrade becomes necessary if "additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve." Id. ¶ 66 (quoting FHA TOTAL Mortgage Scorecard User Guide, ch. 2 (Dec. 2004 ed.)).

The two examples in the complaint regarding red flags were underwritten using an AUS. See Compl. ¶¶ 173(a), 174(a). Thus, Quicken's certification as to those examples related to the integrity of the data. Id. ¶¶ 64, 88, 200.

The first example involved a borrower who was renting the subject property at the time the mortgage loan closed. Id. ¶ 173(e). According to the complaint, "[t]ransactions that are sales from a landlord to a tenant are limited to 85% loan-to-value unless there is written evidence that the borrower has been renting the property from the landlord for the six months immediately predating the sale." Id. (citing HUD Handbook 4155.1, REV-5, Ch. 1-8.A). Although the loan for this example had a 95.40% loan-to-value ratio, there was "no written documentation that the borrower had been renting the subject property for at least six months." Id. The complaint alleges that Quicken "did not ensure that the information it entered into the AUS to obtain approval had integrity," id. ¶ 173(b), because the borrower was ineligible for the loan absent the written documentation, see id. ¶ 173(e). Quicken's certification that the data entered into

TOTAL had integrity despite having incomplete information plausibly states a claim under the False Claims Act.

For the second example, the complaint alleges that Quicken "allowed the AUS to rely on inaccurate and incomplete data," because the AUS system did not consider the borrower's monthly payment for a secondary mortgage "when calculating the borrower's debt to income ratio and it was not listed on the final Uniform Residential Loan Application." Compl. ¶ 174(e). According to the Government, condition 22 on the AUS certificate required Quicken to "verify the monthly payment amount when a debt or obligation was revealed that was not listed on the loan application and/or credit report that was not considered by the AUS, and resubmit the loan with the borrower's complete and accurate monthly debts entered." Id. The complaint alleges that Quicken failed to resubmit the loan with true and accurate monthly debts amounts. Id. A claim for insurance was filed after the borrower became delinquent, which HUD paid in the amount of $124,723.83. Id. ¶ 174(f).

The second example also states a plausible claim under the False Claims Act. Although the underwriter was not required to certify that he or she personally reviewed the credit application when the TOTAL program initially determined that the application represented an acceptable risk, 24 C.F.R. § 203.255(b)(5), the borrower's monthly payment for a secondary mortgage, revealed in a credit report, required Quicken to verify the payment amount and resubmit the loan to AUS with the complete and accurate monthly debts entered, Compl. ¶¶ 64, 174(e), which Quicken failed to do. Further, a manual downgrade may also have been necessary for this example, as the information likely affected the overall insurability or eligibility of a mortgage not captured by data entered into TOTAL. See FHA TOTAL Mortgage Scorecard

34

User Guide, ch. 2 (Dec. 2004 ed.).  This example has sufficient factual allegations to plausibly state a claim under the False Claims Act.

The Court grants the motion as to manipulation of data, but denies it as to red flags.

### 3.  Materiality

For each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification that the mortgage complies with HUD rules and is eligible for FHA insurance under the DEL program.  Compl. ¶ 87.  Without this certification, the lender cannot endorse the particular loan for FHA insurance.  Id. ¶ 90.  The Government alleges that Quicken misrepresented its compliance with HUD requirements by certifying that the subject loans were eligible for FHA insurance when, in fact, they were not.

To be actionable under the False Claims Act, a misrepresentation of compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision.  Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989, 2002 (2016) ("Escobar I").  The Act defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  Importantly, liability for failing to disclose violations of a legal requirement does not turn upon whether the requirement is expressly designated as a condition of payment — i.e., liability is neither limited to claims of misrepresentation about express conditions of payment, nor is liability automatically material because the requirement is expressly labeled a condition of payment.  Escobar I, 136 S. Ct. at 2001.  Rather, what matters is "whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision."  Id. at 1996; see also id. at 2002.

35

A unanimous Supreme Court emphasized in Escobar I that the materiality requirement is "rigorous" and "demanding." Id. at 2002-2003.  Declining to provide any sort of bright-line test for materiality, the Supreme Court endorsed a more holistic approach, noting that "materiality cannot rest on 'a single fact or occurrence as always determinative.'"  Id. at 2001 (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 39 (2011)); see also United States ex rel. Escobar v. Universal Health Servs., Inc., 842 F.3d 103, 109 (1st Cir. 2016) ("Escobar II") ("The language that the Supreme Court used in Escobar [I] makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive.").

In viewing the allegations in the complaint in the light most favorable to the Government, the Court concludes that they plausibly allege that Quicken knew that its noncompliance with FHA's certification requirement was material to the Government's payment decision.

Importantly, the certification requirement is not material simply because the Government has the ability to refuse payment or seek indemnification from Quicken for the alleged violations.  And the Court recognizes that many of the guideposts offered by the Supreme Court in Escobar I are absent in this case.  For instance, the Government does not contend that the certification with underwriting requirements is an express condition of payment, which would be relevant for determining whether or not it was material.  Nor is there any allegation that Quicken knew that the Government consistently refused to pay claims in the mine run of cases based on noncompliance with the certification requirement.  However, there is also no evidence to suggest that HUD paid the claims at issue in this case despite actual knowledge of the violations.

Although the Government states in its response brief that it has pursued claims against other lenders who engaged in similar conduct, see Pl. Br. at 25 & n.7, it provides no citation to

36

any allegation in the complaint to support its assertion. Nor does the Government argue that this Court should look beyond the complaint to these cases, where the complaint itself fails to contain sufficient allegations. But even if these cases demonstrate that the Government has gone after other lenders, thereby suggesting that the certification requirement might be material, the complaint does not allege that Quicken <u>knew</u> of this fact.

The Government argues that the complaint sufficiently pleaded materiality because "the false statements about compliance with FHA requirements were capable of influencing agency action," and that FHA "would not have endorsed the loans for FHA mortgage insurance had FHA known" of the noncompliance. Pl. Br. at 24 (citing Compl. ¶¶ 90-92).

Upon review, the allegations in the complaint support an inference that FHA would not have insured the particular loans at issue in this case had it known of Quicken's alleged noncompliance with underwriting requirements. <u>See</u> Compl. ¶ 90 ("Absent the applicable certification for an individual loan . . . the [DEL] cannot endorse that loan for FHA insurance."); <u>id.</u> ¶ 91 ("The certifications are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance. The certifications are essential for a claim on a loan to be submitted for FHA insurance. And the certifications are needed to protect HUD and the FHA insurance fund from undue risk and loss."); <u>id.</u> ¶ 92 ("Without those requirements being met, the lender could not endorse the loan for FHA insurance. It is only because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.").

Further, these allegations sufficiently allege that a lender's certification with FHA underwriting requirements is not "minor or insubstantial,"[10] as they go to the essence of the bargain between HUD and Quicken. Although originally buried in a parenthetical in a footnote of <u>Escobar I</u>, the First Circuit has seemingly imputed some signification to the statement that, if the information at issue goes to the "very essence of the bargain," then it is more likely to be material. <u>Escobar II</u>, 842 F.3d at 110 (quoting <u>Escobar I</u>, 136 S. Ct. at 2003 n.5 (quoting <u>Junius Constr. Co. v. Cohen</u>, 178 N.E. 672, 674 (N.Y. 1931))).

Here, the existence of a lender's certification to FHA requirements is a prerequisite to the endorsement of FHA insurance. Absent the certification, the mortgage loan would be ineligible for FHA insurance in the first place. <u>See</u> Compl. ¶¶ 90-92; <u>see also</u> <u>United States v. Americus Mortg. Corp.</u>, No. 4:12-cv-02676, 2014 WL 4274279, at *11 (S.D. Tex. Aug. 29, 2014). These allegations plausibly assert that the certification requirement is material, as it is neither minor nor insubstantial; rather, the certification requirement goes to the essence of the bargain. <u>Escobar I</u>, 136 S. Ct. at 2003; <u>Escobar II</u>, 842 F.3d at 110.

The Government argues that the complaint has also sufficiently pled that "Quicken and its officials knew that its origination and underwriting violations were material." Pl. Br. at 27. According to the Government, the complaint "is rife with emails and statements that reveal in no uncertain terms Quicken's knowledge that HUD would not permit a loan to be endorsed for

---

[10] The Government argues in its response brief that noncompliance with the certification requirement is not "minor or insubstantial" because Quicken's violations "were widespread and systemic," noting that "61 percent of mortgages reviewed per month during the relevant time period contained what Quicken termed 'unacceptable' or 'major' underwriting defects." Pl. Br. at 25 (quoting Compl. ¶ 190). This assertion misconstrues the "minor and insubstantial" inquiry of <u>Escobar I</u>, which asks whether the noncompliance with the requirement itself (i.e., certification with underwriting requirements) is minor or insubstantial. The Government's assertion that there were numerous violations of this type does not equate to the requirement itself being material to the Government's payment decision.

mortgage insurance had it known" of the violations.  Id.  The Government claims that these emails "reflect active contemplation by upper level management that Quicken's violations were material[.]"  Id.  The Court agrees.

In addition to finding that the complaint sufficiently alleges that the certification requirement was material, the Court concludes that the complaint sufficiently alleges that Quicken knew that the certification requirement was material.  See Compl. ¶¶ 121, 135-136, 146-147, 175-176.

The Court denies this portion of Quicken's motion to dismiss.

### 4.   Causation for Damages

The False Claims Act imposes two types of civil liability — liability for a civil penalty, and liability for the Government's actual damages.  United States ex rel. Fago v. M & M Mortg. Corp., 518 F. Supp. 2d 108, 120 (D.D.C. 2007).  Recovering statutory civil penalties does not require proof that the alleged false claim or statement caused the government any damages.  Id. Recovering actual damages, however, requires proof that the defendant caused the government to pay claims "because of" the alleged false claim or statement.  Id.; 31 U.S.C. § 3729(a)(1). Accordingly, Quicken's argument that the Government has failed to sufficiently allege causation is limited to the Government's request for actual damages; it does not apply to the Government's request for a civil penalty.[11]

The standard for proving causation for damages in a False Claims Act action is not uniformly applied among the courts.  See Wells Fargo, 972 F. Supp. 2d at 625-626.  The Seventh Circuit has adopted a less restrictive approach for proving actual damages, such that the

---

[11] Proximate causation has also been applied to determine whether a defendant "caused" a false claim to be presented, see, e.g., United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 714 & 715 n.17 (10th Cir. 2006), but Quicken has limited its proximate-causation argument to damages only.

Government need only demonstrate that it "would not have guaranteed the loan 'but for' the false statement." United States v. First Nat'l Bank of Cicero, 957 F.2d 1362, 1374 (7th Cir. 1992). The Third, Fifth, and D.C. Circuits have adopted a narrower "proximate causation" standard. Fago, 518 F. Supp. 2d at 120 (citing United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 200 (D.C. Cir. 1995); United States v. Miller, 645 F.2d 473, 475-476 (5th Cir. 1981); United States v. Hibbs, 568 F.2d 347, 351 (3d Cir. 1977)). Under this approach, the plaintiff is required "to show that the specific misrepresentations made to [the government] in this case were the direct and proximate cause of [the government's] losses, and not merely the 'but for' cause of those losses." Id. at 122.

It appears as though the Sixth Circuit has endorsed (at least implicitly) the latter proximate causation standard for damages under the False Claims Act. See United States v. United Techs. Corp., 782 F.3d 718, 728 (6th Cir. 2015) ("[D]amages under the False Claims Act" "requires proof of . . . causation . . . ." (citing Schwedt, 59 F.3d at 200)); accord Roby, 79 F. Supp. 2d at 892 (damages in a False Claims Act case "must be determined by the application of proximate cause"). Thus, the Government must allege that Quicken's actions were the proximate cause of the actual damages sustained.

Some courts have imputed a rather high burden for proving proximate cause, suggesting that the defendant "should be liable only for those damages that arise because of the falsity of the claim, i.e., only for those damages that would not have come about if the defendant's misrepresentation had been true." Schwedt, 59 F.3d at 200 (emphasis in original). In other words, "if the subject matter of the alleged misrepresentation is unrelated to the ultimate reason for the borrower's default (and the claim against HUD that flows from that default)," the Government cannot recover any damages. Fago, 518 F. Supp. 2d at 122.

40

Along these lines, Quicken argues that, insofar as any alleged misstatement relates to a borrower's ability to repay the loan, a False Claims Act complaint involving FHA loans "must allege facts to show that the loan default did not actually result from a cause unrelated to the alleged misstatement." Def. Br. at 29 (citing Hibbs, 568 F.2d at 351; Fago, 518 F. Supp. 2d at 122); see also id. ("[T]he Complaint does not allege that, had the paystub been more recent, the loan would not have defaulted anyway because of a job layoff, divorce, poor health, changed economic circumstances, or a decline in house prices."). In response, the Government argues that proximate cause turns on "foreseeability," which may be satisfied "when the alleged violations are material to HUD's determination that the mortgage applicant met the financial requirements to qualify for FHA-insured mortgages, material to the determination of whether the borrower had a sufficient personal financial stake in the property to have the proper incentive to avoid default, or material to the collateral securing the loan." Pl. Br. at 29 (citing United States v. Spicer, 57 F.3d 1152, 1159 (D.C. Cir. 1995)). The Court believes that Quicken's interpretation strays too far from traditional proximate cause analysis, as foreseeability is the appropriate benchmark for allegations of proximate cause.

It has traditionally been understood that proximate cause turns "ultimately on foreseeability." Dan B. Dobbs, et al., The Law of Torts § 413 n.2 (2d ed.); see also Restatement (Second) of Torts, § 548A ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance."); id. § 548A, cmts. *a* & *b* (discussing foreseeability).

The use of foreseeability for proximate cause is consistent with its application to the "causes to be presented" element of a presentment claim under the False Claims Act. See United States ex rel. Westenhoefer v. Jefferson, 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015) (applying

proximate-cause standard for determining whether the defendant "causes" to be presented a false claim, recognizing that, "[u]nder federal law an act will be deemed a proximate cause of a result if the act is a substantial factor in the sequence of responsible causation, and if the result is reasonably foreseeable or anticipated as a natural consequence"); Sikkenga, 472 F.3d at 714 & 715 n.17 (recognizing the Third Circuit's use of "traditional principles of tort law to analyze causation for damages under the [False Claims Act]" and adopting proximate-cause standard for "causes to be presented" analysis).

This foreseeability principle is also used in analyzing fraud claims outside the context of the False Claims Act, including federal securities violations. See, e.g., Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp., 830 F.3d 376, 384-385 (6th Cir. 2016) (in the securities fraud context, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor" (emphasis omitted)); In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 513 (2d Cir. 2010) ("A misrepresentation is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations. . . . The zone of risk is determined by the purposes of the securities laws, i.e., to make sure that buyers of securities get what they think they are getting. In this context, therefore, recovery is limited to only the foreseeable losses for which the intent of the laws is served by recovery." (emphasis omitted)); Salvani v. ADVFN PLC, 50 F. Supp. 3d 459, 473-474 (S.D.N.Y. 2014) ("The Second Circuit has repeatedly analogized the concept of loss causation to proximate cause, as loss causation requires that the damages suffered by a plaintiff be a foreseeable consequence of any misrepresentation or material omission. A loss is foreseeable if it is within the zone of risk concealed by the misrepresentations and omissions alleged by the

disappointed investor.  In other words, to establish loss causation, there must be an allegation that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." (emphasis omitted)).

Thus, to recover actual damages under the False Claims Act, the Court holds that the complaint's factual allegations must support an inference that it was reasonably foreseeable that the false claim would result in a default of the mortgage loan.  Cf. Tumminello v. Father Ryan High Sch., Inc., ___ F. App'x ___, 2017 WL 395106, at *6 (6th Cir. Jan. 30, 2017) (holding that plaintiff failed to plead facts that would support an inference that the school had any knowledge of the bullying situation to allege that the student's suicide was foreseeable for proximate causation).  The Government has satisfied that burden here.

As discussed at length supra, Quicken's practices resulted in the overvaluation of property through its value-appeals process, as well as problems with a borrower's income resulting from either a management exception or from miscalculation.  These allegations bear directly on the borrower's ability to repay the loan, such that the borrower's default was a reasonably foreseeable outcome.  See United States v. Eghbal, 548 F.3d 1281, 1284 (9th Cir. 2008) (recognizing that other courts have found that "false statements regarding the credit worthiness of purchasers to afford housing establish the required causal connection" under the "narrower proximate causation" approach (citing Miller, 645 F.2d at 475)); see also Spicer, 57 F.3d at 1159-1160 (where it was undisputed that defendant intentionally misrepresented buyer's financial qualifications in order to induce HUD to approve mortgage loan, and HUD suffered significant losses when buyer defaulted, defendant's misrepresentations were "more than a 'but-for' cause; they proximately caused HUD's losses"); Miller, 645 F.2d at 476 (holding that, although "[f]alse statements regarding residential property may not reasonably be a cause for

43

subsequent defaults of mortgagors, as was the case in <u>Hibbs</u> . . . , false statements regarding the ability of purchasers to afford housing could very well be the major factor for subsequent defaults," and concluding that the Government had "clearly alleged the necessary causation factor" to avoid dismissal of complaint). Therefore, drawing all reasonable inferences in the Government's favor, the Court concludes that it is plausible that Quicken's actions were the proximate cause of the defaults.

Moreover, proximate cause, foreseeability, and intervening causes are questions for the jury, "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." <u>Tumminello</u>, 2017 WL 395106, at *6; <u>Aetna Cas. & Sur. Co. v. Leahey Const. Co.</u>, 219 F.3d 519, 543 (6th Cir. 2000) ("In any case where there is a question upon which reasonable minds might differ as to the foreseeability of a particular risk or character of an intervening cause, the question is one for submission to the jury under proper instructions as to proximate cause."). At this pleading stage, the allegations are sufficient to support a plausible inference that a borrower's default was a reasonably foreseeable outcome of Quicken's actions.

The Court denies this portion of Quicken's motion to dismiss.

### B. Federal Common-Law Claims for Breach of Fiduciary Duty and Negligence

#### 1. Statute of Limitations

The Government's federal common-law claims are subject to the statute of limitations set forth in 28 U.S.C. § 2415. The statute prescribes a six-year limitations period for claims related to express or implied contracts, 28 U.S.C. § 2415(a), and a three-year limitations period for tort actions for money damages, 28 U.S.C. § 2415(b). Quicken argues that the Government's claims

are untimely because they sound in tort and are subject to a three-year statute of limitations.  Def. Br. at 33.

Although there is no dispute between the parties that the Government's negligence claim is subject to a three-year statute of limitations, compare Def. Br. at 33 (stating that claim is governed by the three-year statute of limitations) with Pl. Br. 34 (arguing that 28 U.S.C. § 2416(c) extends the three-year statute of limitations for the negligence claim), the Government argues that its fiduciary duty claim sounds in contract, not tort, and is governed by a six-year statute of limitations.  Pl. Br. at 33 (citing United States v. Reunion Mortg., Inc., No. C 13-02340, 2013 WL 5944252, at *8 (N.D. Cal. Nov. 5, 2013)).

The Court agrees with Quicken that the breach-of-fiduciary-duty claim is subject to the three-year statute of limitations in § 2415(b).  See Wells Fargo, 972 F. Supp. 2d at 614.[12]  There is case law holding that the six-year contract limitations period should be utilized.  E.g., Reunion Mortg., 2013 WL 5944252, at *8 (holding that the six-year statute of limitations applied to breach of fiduciary duty claim because it was predicated on defendants' participation in the DEL program).  While a contract does form part of the background of the claim, the gist of the claim is a breach of duty that is independent of the contract.  Pl. Br. at 32 ("Quicken's duty did not arise solely from a mortgage insurance contract, but from its obligation as a trusted business

---

[12] In its response, the Government argues that its common-law claim for breach of fiduciary duty is governed by federal common law, but, when such law is silent, this Court should look to "state common law unless there is a reason to believe it is inconsistent with federal interests.  Pl. Br. at 31 n.11 (citing United States v. Applied Pharmacy Consultants, Inc., 182 F.3d 603, 606 (8th Cir. 1999)).  Quicken does not appear to challenge this contention, as it, too, applies state common law for purposes of determining whether a fiduciary duty has been plausibly alleged.  See Def. Br. at 30.  The Court agrees that state common law "may be used if it is not in conflict with federal common law and does not frustrate specific policy objectives of federal legislation," United States v. Schlesinger, 88 F. Supp. 2d 431, 440 (D. Md. 2000), and, under Michigan case law, "a claim for breach of fiduciary duty [is] a common law tort," Borock v. Comerica Bank-Detroit, 938 F. Supp. 428, 430 (E.D. Mich. 1996) (emphasis added).

partner and fiduciary that HUD entrusted to directly endorse mortgages for insurance without any prior review by HUD."); <u>see also</u> Compl. ¶¶ 38-41, 96-97, 211-213.  Therefore, the Court concludes that both of the Government's federal common-law claims are subject to the three-year statute of limitations.

Quicken bears the initial burden of demonstrating when the claims accrued and that the statute of limitations has run.  <u>United States v. Carell</u>, 681 F. Supp. 2d 874, 889 (M.D. Tenn. 2009); <u>United States v. Kensington Hosp.</u>, No. 90-5430, 1993 WL 21446, at *5 (E.D. Pa. Jan. 14, 1993).  It has failed to do so in its motion to dismiss.

For purposes of § 2415(b), a cause of action founded upon a tort "accrues when it first could be sued upon by a plaintiff."  <u>United States v. Saint Louis Univ.</u>, No. 07-CV-0156, 2007 WL 4115807, at *5 (S.D. Ill. Nov. 16, 2007).  Although Quicken states that the conduct at issue occurred between September 1, 2007 and December 31, 2011, <u>see</u> Def. Br. at 33, Quicken does not argue that the right of action actually accrued in December 2011 in the sense that the Government could have sued at that time.  Nor has Quicken provided any other date based on the facts alleged in the complaint to suggest when the claims accrued.

Because Quicken has failed to establish that the "allegations in the complaint affirmatively show that the claim is time-barred," <u>Stein</u>, 821 F.3d at 786, the Court denies this portion of Quicken's motion to dismiss without prejudice.[13]

### 2.  Plausibility of the Federal Common-Law Claims

Quicken first argues that the FHA program did not create a fiduciary relationship because Quicken was subjected to "detailed rules and supervision," and HUD "maintained extensive

---

[13] The Government also argues that its federal common-law claims are timely because 28 U.S.C. § 2416(c) "extends," as opposed to "tolls," the limitations period, and Quicken did not bear its burden of proving that the period has run.  Pl. Br. at 34.  Because Quicken has failed to demonstrate when those claims accrued, the Court refrains from addressing this argument.

oversight of Quicken['s] FHA activities both through on-site audits and HUD's ability to conduct post-endorsement review of any loan." Def. Br. at 30. Quicken also argues that the existence of a contractual relationship between it and HUD defines the duties that the parties owe each other, thereby precluding tort claims except to the extent that the source of any tort duty is independent of the contract. Id. at 31. According to Quicken, there was a contract for every loan, which included the provisions of the FHA program regulations, and those regulations governed the parties' relationship as to each loan, including the underwriter's duties. Id. Quicken argues that the negligence claim similarly fails because the parties' contractual relationship entirely defines Quicken's duties. Id. at 32

In response, the Government states that the complaint "specifically alleges facts showing that [ ] Quicken had a duty to act as a fiduciary in its role as then lender," Pl. Br. at 31 (citing Compl. ¶¶ 38-41, 96-97), which did not arise solely from a mortgage insurance contract, but, rather, from Quicken's "obligation as a trusted business partner and fiduciary that HUD entrusted to directly endorse mortgages for insurance without any prior review by HUD," id. at 32.

"Under Michigan law, a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one upon the judgment and advice of another." Petroleum Enhancer, LLC v. Woodward, 690 F.3d 757, 765 (6th Cir. 2012). The existence of such a relationship places a duty on the fiduciary "to act for the benefit of the principal regarding matters within the scope of the relationship." Id. at 766.

A fiduciary relationship may arise in one of the following situations:

> (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, [or] (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship.

47

Mike Vaughan Custom Sports, Inc. v. Piku, 15 F. Supp. 3d 735, 753 (E.D. Mich. 2014).  Courts have traditionally recognized the following as fiduciary relationships: trustees to beneficiaries, guardians to wards, attorneys to clients, and doctors to patients.  See, e.g., Ford Motor Co. v. Ghreiwati Auto, 945 F. Supp. 2d 851, 865 (E.D. Mich. 2013).

When a particular relationship falls outside of these well-defined examples, determining whether it amounts to a fiduciary relationship is a question of fact.  Id.  Because there is no rule in the Sixth Circuit that a particular relationship could never impose fiduciary obligations, the Court must look to the actual relationship that existed between the parties.  Fremont Reorganizing Corp. v. Duke, 811 F. Supp. 2d 1323, 1345 (E.D. Mich. 2011); see also Muglia v. Kaumagraph Corp., 64 F.3d 663, 1995 WL 492933, at *5 (6th Cir. 1995) (table) ("Except for certain per se fiduciary relationships . . . fiduciary relationships arise from the facts and circumstances surrounding the relationship between the parties.").  Because "the inquiry as to whether a fiduciary relationship exists is fact-specific, a claim alleging the existence and breach of fiduciary duties is generally not subject to dismissal under Rule 12(b)(6)."  Ajuba Int'l, L.L.C. v. Saharia, 871 F. Supp. 2d 671, 688 (E.D. Mich. 2012).  This is because a finding that a fiduciary relationship existed between the parties often "requires an examination into a fully developed record beyond simply the language of the parties' agreement." McGregor v. Hunting Specialized Coating, Inc., No. 04-73547, 2005 WL 1345676, at *3 (E.D. Mich. June 3, 2005).

While other courts have held that a fiduciary relationship may plausibly exist under substantially similar circumstances, e.g., Wells Fargo, 972 F. Supp. 2d at 632-633, this Court concludes that further factual development is required to better understand the specifics of how the mortgage underwriting process actually works.  Only then can this Court properly assess the degree to which trust is a significant component of the parties' relationship.  The factual

48

development will also assist the Court in determining what standard of care Quicken may have owed the Government regarding the negligence claim, and whether the standard is distinct from any duties owed under the insurance contracts.

The Court denies this portion of Quicken's motion without prejudice.[14]

### 3. Comprehensive Remedial Scheme

Quicken claims that FHA's remedial scheme, which affords a remedy to HUD in the form of indemnification if "the mortgagee knew or should have known of a serious and material violation of FHA origination requirements," is sufficiently comprehensive to preclude federal common-law claims for breach of fiduciary duty and negligence. See Def. Br. at 32 (citing 24 C.F.R. § 203.255(g)(3); 12 U.S.C. § 1715z-21(c)).

In response, the Government claims that the authority to pursue indemnification under the FHA did not exist at the time Quicken endorsed the mortgages at issue in this case. Pl. Br. at 32 (citing 77 Fed. Reg. 3598, 3605 (Jan. 25, 2012) (denoting an effective date of February 24, 2012 for 24 C.F.R. § 203.255(g))). The Government further claims that Quicken failed to provide legal authority that requires the Government to elect a programmatic administrative remedy, as opposed to a common-law claim. Id. The Government also notes that other courts

---

[14] Quicken argues that the common-law claims should also be dismissed because the complaint does not allege sufficient facts to establish proximate cause. Def. Br. at 32. According to Quicken, "[b]ecause the Complaint fails to allege facts to establish proximate cause [for the False Claims Act claims], these [common-law] claims fail for this reason too." Id. Without knowing whether a duty existed between the parties beyond that imposed by their contract, the Court is unable to determine whether a breach of that duty proximately caused the Government's harm.

have allowed common-law claims for breach of fiduciary duty to proceed.  Id. at 32-33 (citing Wells Fargo, 972 F. Supp. 2d at 632-633).[15]

In its reply brief, Quicken argues that HUD's indemnification authority is not a recent development, but, rather, "HUD got that authority in 1996," and it "has used it since 2005."  Def. Reply at 10 (Dkt. 20) (citing 12 U.S.C. § 1715z-21; Mortgagee Letter 2005-06, Ex. 2 to Def. Reply (Dkt. 21-2)).

Resolving the timing of when HUD received authority to seek indemnification, the Court finds that such authority existed during the relevant time period at issue in this case.  Although the provision for indemnification in the Federal Regulations, see 24 C.F.R. § 203.255(g), may have had an effective date of February 24, 2012, see 77 Fed. Reg. 3598-02, 2012 WL 194572 (Jan. 25, 2012), HUD had the statutory authority under the National Housing Act to seek indemnification from a mortgagee dating back to at least September 1996, see generally 12 U.S.C. § 1715z-21 (noting an effective date of September 26, 1996).[16]

While it is undoubtedly true that "[t]he comprehensive character of [a] remedial scheme expressly fashioned by Congress strongly evidences an intent not to authorize additional

---

[15] There is no indication that the Wells Fargo court was called upon to address the same type of argument raised in this case by Quicken — namely, that the judiciary should not fashion a new remedy that might upset carefully considered legislative programs.

[16] 12 U.S.C. § 1715z-21(c)(1) ("If the Secretary determines that a mortgage insured by a mortgagee pursuant to delegation of authority under this section was not originated in accordance with the requirements established by the Secretary, and the Secretary pays an insurance claim with respect to the mortgage within a reasonable period specified by the Secretary, the Secretary may require the mortgagee approved under this section to indemnify the Secretary for the loss." (emphasis added)); 12 U.S.C. § 1715z-21(c)(2) ("If fraud or misrepresentation was involved in connection with the origination, the Secretary may require the mortgagee approved under this section to indemnify the Secretary for the loss regardless of when an insurance claim is paid." (emphasis added)); see also Mortgagee Letter 2005-06 at 4-5 ("Mortgagee agrees to indemnify FHA under the conditions of Section 256(c) of the National Housing Act.").

remedies," such that federal judges should not "amend these comprehensive enforcement schemes by adding to them another [ ] remedy not authorized by Congress," <u>Nw. Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO</u>, 451 U.S. 77, 93-94 (1981) (involving the Equal Pay Act and Title VII),[17] Quicken has provided no authority or precedent that reached the same conclusion regarding the FHA program.

Because there is an enforcement mechanism available for the Government for the particular matters at issue in this case — namely, seeking indemnification and bringing an action under the False Claims Act — it may be that Congress displaced or preempted a judicially fashioned federal rule for the common-law claims asserted in the complaint.  <u>See</u> <u>Conille v. Sec'y of Hous. & Urban Dev.</u>, 840 F.2d 105, 111-112 (1st Cir. 1988) (where there is "no comprehensive legislative scheme or enforcement mechanism addressing the particular matters at issue," a federal court is "compelled to fashion the applicable federal rule of decision"). However, at this time, the Court determines that further factual development is required regarding how administrative remedies operate in order to assess whether they properly support the view that the Congress did not intend to allow court development of other remedies beyond the administrative scheme and the False Claims Act.

The Court denies this portion of Quicken's motion without prejudice.

### IV.  CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Quicken's motion to dismiss (Dkt. 15).  Regarding the Government's claims under the False Claims Act, the Court

---

[17] <u>See also</u> <u>Nw. Airlines</u>, 451 U.S. at 97 ("The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement. . . .  The judiciary may not, in the face of such comprehensive legislative schemes, fashion new remedies that might upset carefully considered legislative programs.").

grants the motion to dismiss insofar as it relates to any claims submitted before April 23, 2009, and it grants the portion of the motion concerning the alleged practice of data manipulation. Regarding the Government's federal common-law claims, the Court denies the motion to dismiss without prejudice.  In all other respects, the motion is denied.

SO ORDERED.

Dated:  March 9, 2017                                    s/Mark A. Goldsmith
      Detroit, Michigan                               MARK A. GOLDSMITH
                                        United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 9, 2017.

                                         s/Karri Sandusky
                                         Case Manager