```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3

 4    UNITED STATES OF AMERICA,

 5                   Plaintiff,

 6                                        Case No. 16-cv-14050
      -v-
 7

 8    QUICKEN LOANS, INCORPORATED,

 9                   Defendants.
      _____/
10

11
                     MOTION ON DISCOVERY DISPUTES
12
                  BEFORE HONORABLE MARK A. GOLDSMITH
13
              Detroit, Michigan, Monday, July 31st, 2017.
14

15    APPEARANCES:

16    FOR THE PLAINTIFF:     SAMUEL BUFFONE
                             HARIN C. SONG
17                           U.S. DEPARTMENT OF JUSTICE
                             601 D Street, NW
18                           Room 10316
                             Washington, D.C.  20004
19
      FOR THE DEFENDANT:     JEFFREY B. MORGANROTH
20                           344 North Old Woodward Avenue
                             Suite 200
21                           Birmingham, MI 48009

22    FOR THE DEFENDANT:     THOMAS M. HEFFERON
                             901 New York Avenue, N.W.
23                           Washington, D.C.  20001

24
      David B. Yarbrough, CSR, FCRR
25    Official Court Reporter
      (313) 410-7000
```

1

TABLE OF CONTENTS

2                                                                    PAGE

3    WITNESSES:

4    NONE

5

6

7

8

9

10

11

12

13

14

15                            EXHIBITS

16

17   NONE

18

19

20

21

22

23

24

25

```
 1          Detroit, Michigan.

 2          Monday, July 31st, 2017.

 3          At or about 1:37 p.m.

 4                    --     ---     --

 5          THE CLERK OF THE COURT:  Please rise.  The United

 6  States District Court for the Eastern District of Michigan is

 7  now in session, the Honorable Mark Goldsmith presiding.  You

 8  may be seated.

 9          The Court calls case number 16-14050, United States

10  of America versus Quicken Loans, Incorporated.  Counsel, please

11  state your appearances for the record.

12          MR. BUFFONE:  Sam Buffone on behalf of the United

13  States of America.

14          MS. SONG:  Harin Song on behalf of the United States

15  of America.

16          MR. MORGANROTH:  Good afternoon, your Honor.  Jeffrey

17  Morganroth on behalf of Quicken Loans.

18          MR. HEFFERON:  Good afternoon, your Honor.  Thomas

19  Hefferon for Quicken Loans.

20          THE COURT:  Good afternoon.

21          MR. BUFFONE:  Good afternoon, your Honor.

22          THE COURT:  We've convened this hearing to resolve

23  some discovery problems that the parties are having.  I've

24  reviewed the memorandums that were submitted.  Have you worked

25  out any of the issues since the filing of these memorandums?
```

1          MR. MORGANROTH:  The only issue, your Honor, that we

2    have worked out in part would be the attorneys' eyes only

3    designation issue.  We've been trying to work that out.

4    There's still some issues in terms of getting to the finish

5    line, but that one we had made some progress on.

6          THE COURT:  Okay.  So let's work off the government's

7    memorandum.  First issue raised by the government is the

8    compensation-related data.  Do you want to tell me anything

9    more about that?

10          MR. BUFFONE:  Your Honor, I think we addressed it in

11   our memorandum, but briefly, we had agreed to, based on some

12   representations by Quicken, to take certain data related to

13   compen -- or certain information related to compensation, but

14   then we did further inquiry and realized there was readily

15   available data fields related to their compensation,

16   specifically related to the speed bonus that we allege in the

17   Complaint.  This is one of the key concerns that we have and

18   this data is needed to provide context to the bonuses that

19   Quicken Loans' employees and underwriters received.  We need to

20   know, you know, how quickly underwriters worked and whether or

21   not this speed bonus forced them to work more quickly and

22   forced them to have problems with their underwriting because

23   they were working quickly in order to maximize their bonus.

24   The data fields that we've requested go directly to this and go

25   directly to the data in-points -- inputs that go into the speed

1  bonus and so we'd ask the Court to order Quicken to produce

2  these data points so that we can see how the speed bonus

3  operated in practice.

4           THE COURT:  Okay.  Mr. Morganroth?

5           MR. MORGANROTH:  Yes, your Honor.  This was an issue,

6  your Honor, that was addressed at the May 22nd hearing on

7  discovery disputes and the parties actually resolved this.  At

8  the end of the hearing, the resolution of this issue was put on

9  the record and then the government followed up with a written

10 confirmation of that before your Honor ruled on that hearing on

11 May 24th, 2017 indicating they withdrew the issue from

12 consideration.  Since that time, we feel that there's

13 essentially a bate and switch going on here.  The government

14 now claims to reopen the issue on the basis that somehow they

15 were misled as to the existence of compensation data.  The

16 truth is that no one was misled and they couldn't have possibly

17 been misled.

18          The list of the fields that Mr. Buffone is referring

19 to right now, that list was produced to the government May

20 18th, 2016 in this case, one year before the discovery dispute

21 and discovery hearing.  This wasn't new information.  They had

22 this information for over a year and the statements that I made

23 on the record were the exact same statements that I made in

24 meet and confer conferences, the exact same statements that

25 were made in written response -- written correspondence that

1    were submitted and in objections.  Those statements were true

2    then and they're still true now.  The best summary of the

3    compensation information is the pay stubs and that's what was

4    agreed to be produced; that is what was produced.

5           The reports that the government is referencing, they

6    don't even exist.  Here's the disconnect.  The fields that were

7    produced is essentially from a system as it sits now, big, and

8    that system has changed over the course of time.  The fields

9    don't pertain for the most part to the time period that's

10   relevant to this case which is six to 10 years ago, 2007 to

11   2011.  For instance, one of the fields is the hours worked.

12   Underwriters were not paid on an hourly basis during that time

13   period until after the relevant time period in this case.

14   Their hours weren't tracked until mid-2010, at all so there

15   wouldn't be any data that even exists for virtually all of that

16   time period for that just one category, but the reports that

17   have requested, there aren't such reports.  That the system

18   doesn't contain historic come reports, can't give it to them.

19          The fields for the most part in terms of the data

20   doesn't exist.  It's for --

21          THE COURT:  Well, do any of the fields exist?

22          MR. MORGANROTH:  Well, for instance the example I

23   just gave you in terms of hours tracked, after mid-2010 that

24   field does exist.  We would have do quite a bit of extraction

25   because the system doesn't work the same way as it did back in

1   2010, but there would have to be quite a bit of extraction done

2   to just to get that partial information.  What the issue was

3   when we before your Honor was that the government had asked for

4   all of the data points that went into the compensation

5   decisions for any employee of Quicken Loans that touched an FHA

6   loan for each pay period and our position was as a response

7   that that information is not in a central repository, it would

8   be a monumental task to try to reconstruct it.  There are a lot

9   of different data points and team leaders who manage and decide

10  and calculate income do it pursuant to a formula.  Those

11  compensation plans were produced and there is no summaries as

12  sometimes it's done by e-mails, sometimes notes, sometimes

13  spreadsheets, sometimes a combination and it would be very,

14  very burdensome and a monumental task to go and try to figure

15  all of that out.  The best summary was in the pay stubs which

16  has been produced and that was pursuant to this agreement.

17  This position --

18           THE COURT:  When you say best summary, what do you

19  mean?  Best summary of what?

20           MR. MORGANROTH:  Of the compensation that was paid

21  and the breakdown of that compensation for each employee.

22           THE COURT:  And would that include how bonuses were

23  calculated?

24           MR. MORGANROTH:  Well, how bonuses are calculated is

25  based on the compensation plans.  They have that.  This would

1    be the actual bonus number would be broken down of what was
2    actually paid during that pay period for that employee, so they
3    would have the compensation plans that has the actual formula.
4    Now they have the pay stubs that they could apply and see what
5    actually was paid in terms of breakdown and bonus and so forth.
6         THE COURT:  It would just be a number though, a
7    single number of what the bonus was for a particular pay
8    period?
9         MR. MORGANROTH:  Yes, your Honor.  It would be a
10   breakdown of each component of someone's compensation pursuant
11   to the compensation plan.  This position that there was speed
12   bonus paid is false.  There was no speed bonus paid.  That is
13   false premise.  Essentially, one of the data points that went
14   into the compensation formula was efficiency, but that data,
15   that was only one of the factors and it was modified and
16   qualified by other factors such what the base bonus amount was,
17   what the quality scores were, quality and efficiency were taken
18   into account hand in hand and companywide goals, so you would
19   need all this information to be able to make sense of this
20   theory that there was a speed bonus, but there aren't fields
21   for all this information.  In fact there's not fields for most
22   of this information and all we feel is going on here is we're
23   being re-traded in an agreement that was entered into before
24   your Honor on a hearing that took place and there's just no
25   point to it and it's based on some data fields that were

1   produced a year before the hearing that the government had in

2   their possession and yet those data fields don't apply, again

3   I'm going to say for the most part because of the time period

4   that's at issue here, six to 10 years ago versus current and

5   that's the current fields that this system tracks now.  So

6   unless there's anything else, your Honor, I mean, that's the

7   crux of the --

8          THE COURT:  When you say it would take a lot of work

9   to extract some of this data, what do you mean by a lot of

10  work?

11         MR. MORGANROTH:  Well, we'd have to go through for

12  each employee with their team leaders, we'd have to go through

13  e-mails.  We'd have to search for spreadsheets.  We'd have to

14  search for hard, handwritten notes, umm, because there's no

15  place to just do a search electronically, there's no file.

16  You're going to have to do that for every employee and that's

17  why --

18         THE COURT:  How many employees are we talking about?

19         MR. MORGANROTH:  Well, the original request was for

20  every employee who's touched an FHA loan from 2007 to the

21  present and each pay period.  That was the original request.

22         THE COURT:  We're not talking just about underwriters

23  here?

24         MR. MORGANROTH:  That was not the discovery request

25  that was at issue.  During the hearing it was argued well what

1   if we just ask about underwriters and that was a point that was

2   made by the government during the hearing and ultimately based

3   on the give and take, we settled on this and it was that give

4   us the pay stubs and it was give us for a select number, you

5   know, select positions and that's what we worked out and that

6   was the agreement that was put on the record before we left the

7   courthouse and there's nothing new since that time period,

8   nothing.

9           THE COURT:  Okay, all right.  Let me, any response

10   from the government?

11          MR. BUFFONE:  Yes, your Honor, briefly.  First, your

12   Honor, I have a copy of the compensation plan which I can

13   submit for the record if that would be helpful to you in

14   understanding this dispute.

15          THE COURT:  I don't think so just yet, but go ahead.

16          MR. BUFFONE:  Okay.  Thank you, your Honor.  Your

17   Honor, I think first addressing the prior agreement, that

18   agreement was reached off of based on the representations to

19   the Court that this data didn't exist and so the government

20   felt that there was no data that existed and there was no data

21   for the Court to produce and there was no data for the United

22   States to seek and so we --

23          THE COURT:  Well, I heard Mr. Morganroth say that

24   some of this was produced back in May of 2016.

25          MR. BUFFONE:  Your Honor, I think what he was

1    referring to is the, umm, the report that lists the data fields

2    in the database, not the actual data itself, so we --

3         THE COURT:  But you knew what kind of information

4    supposedly might be available back in May of 2016?

5         MR. BUFFONE:  This is a spreadsheet your Honor with

6    hundreds if not thousands of fields that go into this database

7    so while it had been produced and we don't dispute that, we

8    think that we were basing it off of Quicken's representations

9    about whether or not this data existed and believe that it's

10   Quicken's duty to inform us whether or not data exists that

11   they can extract response to our request, not the United

12   States' responsibility to go into their data systems, find the

13   data fields exist and identify for Quicken what data fields

14   exist and might be responsive.  So while they had produced data

15   fields, we had been basing off of their representations or

16   their arguments that they weren't going to produce

17   compensated-related data and then at the hearing they then said

18   that well the data doesn't exist, we would have to do this

19   expansive search so we said on your representation that the

20   data doesn't exist, we will take the year-end summaries, but we

21   want to go back and do our own due diligence to make sure that

22   we don't see evidence that the data does exist.  We've

23   identified, we did that and honestly your Honor I think that we

24   feel somewhat sandbagged by the representations that Quicken

25   has to do a search of e-mails and handwritten notes and other

1   things and then we go back and look at the data dictionaries

2   and we see that no, there are specific data fields that go to

3   these imputes in the compensation plans.  We've looked at the

4   year-end summaries --

5             THE COURT:  You say that there are data fields.  I'm

6   heard from Mr. Morganroth that the data don't exist except

7   perhaps they might be or some of these data might be

8   extractable with great work, great effort.  What's your

9   response to that?

10            MR. BUFFONE:  One, this is the, you know, the reason

11  we raised this with Quicken is 'cause we wanted to know did the

12  data exist or not and this is the first time we've heard that

13  well some of the data may not exist and to the extent it does

14  exist, it would take great effort.  They'd never raised with us

15  the burden of it.  They never raised with us what years it

16  exists for and what years it doesn't so we haven't had a chance

17  to really have a fulsome conversation with Quicken about that.

18  For one, the speed bonus didn't exist for the entire time

19  period and so it did start I believe in either 2009 or 2010 so

20  that would be the time period that we're looking for these data

21  points for.  You know, we've looked at the year-end summary.

22  We see that for some underwriters, their bonus is more than

23  their compensation so their base compensation based off of

24  their salary is less than the amount of their bonus for that

25  year so that's a very high bonus and we looked back at the

1    data -- at the compensation plans and we see that the base

2    bonus is based off of the number of units that they underwrote,

3    but then we see that the efficiency can get up to 125 percent

4    so it can more than double that base bonus. Then there are the

5    success of the team's company goals, but that only goes to a

6    five percent or 10 percent increase in the bonus. So the

7    biggest way if you look at the compensation plans to us to make

8    the bonus larger is to underwrite faster and so if underwriters

9    underwrite faster, they can make their bonus more than doubled.

10   We see very large bonuses --

11        THE COURT: So your point is going to be in terms of

12   the relevance here? The underwriters had an incentive to move

13   loans as fast as possible because their compensation depended

14   on that, right?

15        MR. BUFFONE: Yes.

16        THE COURT: And then is there going to be something

17   of an argument that says and because of that, they would also

18   have an insensitive to cheat, to not pay attention to FHA rules

19   because their compensation would be enhanced the more loans

20   that they managed to get through the system. That's the

21   argument the government's going to be making?

22        MR. BUFFONE: Yes, your Honor, I think it's two-fold,

23   that first Quicken incentivized their underwriters to approve

24   loans because if an underwriter rejected a loan, it didn't go

25   to their bonus and then second Quicken incentivized the

1    underwriters to not spend time underwriting their files because

2    they could more than double that bonus if they moved really

3    fast.

4         THE COURT:  All right, so you have all of that

5    already by way of the plans, right?  The plans establish the

6    incentives, right?

7         MR. BUFFONE:  Yes, but --

8         THE COURT:  What more do you want to get out of this?

9    You tell me, what more do you want to get out of this besides

10   the fact that you've already established that you can through

11   the plans that there is an incentive to move loans and perhaps

12   then there's an incentive to cheat?

13        MR. BUFFONE:  Because your Honor it's impossible to

14   tell how the plans worked without seeing the data that goes

15   into it, so we don't know if the driver of the compensation is

16   the number of units they underwrote, if the driver of the

17   compensation is how quickly they underwrote.  You know, we can

18   that there's a more than -- they can more than double their

19   bonus by underwriting quickly, but would don't know if their

20   bonus was based off of underwriting a lot of loans without

21   getting a speed bonus or if it was based off of underwriting

22   loans very quickly and doubling their bonus, so.

23        THE COURT:  Well, didn't you tell me there was a cap

24   on one kind of bonus activity, there's only minimal, five

25   percent and the speed bonus was something that went up to 125

1    percent?  Can't you tell by the pay stubs whether or not you're

2    dealing with a speed bonus or this other kind of bonus?

3              MR. BUFFONE:  No, your Honor.  The five percent cap

4    is these team goals that I believe Mr. Morganroth is saying

5    would be very difficult for them to find and very difficult to

6    see if  an underwriter met them and so we represent them -- we

7    take help at his word and we recognize that we won't have full

8    insight into in five percent for meeting the team goal and an

9    extra five percent for meeting the company goal and so we won't

10   know if they got that five or that 10 percent, but the base

11   bonus is based on how many loans the underwriter approved and

12   then the efficiency bonus or the speed bonus can provide a zero

13   percent increase if it was below 1.5, you know, a 50 percent

14   increase at a certain rate, a 75 percent increase at another

15   rate, a 100 percent increase at another rate, a 125 percent

16   increase at another rate and so without knowing where they fall

17   into it, we can see that an underwriter got more than half of

18   their compensation based on a bonus, but is that because they

19   did it at the rate where they got no increase and it was all

20   based on the number of units that they underwrote or is that

21   because their compensation more than doubled because they

22   underwrote very quickly to maximize their speed bonus?

23             THE COURT:  Well, aren't the incentives the same no

24   matter what?  In other words, your theory is the more you push

25   through the system, the more you're going to get paid, right?

1          MR. BUFFONE:  Yes, your Honor.

2          THE COURT:  There's just different ways of measuring

3    it, right?  There's an efficiency bonus that you get based on

4    pushing loans through based on units of time, right, and then

5    other bonuses are based on other factors, but in all cases the

6    theory of the government remains the same; the more approvals

7    there are, the higher the pay and the greater the incentive to

8    cheat.  Isn't that right?

9          MR. BUFFONE:  Yes, your Honor.

10          THE COURT:  So what difference does it make if we

11   tune exactly what part of the bonus reflects what incentive?

12   The base incentive is always the same; the more you approve,

13   the more you make, the greater the incentive to cheat.  Am I

14   missing something?

15          MR. BUFFONE:  I think the one part that you're

16   missing is the jump through a lot of hoops.  When

17   Mr. Morganroth started talking about burden, he talked about

18   going back and finding handwritten notes, going back and

19   finding summary Excels, going back through e-mails.  We're not

20   asking that.  We're saying here are 13 fields, to the extent

21   they exist and have data, please do the extract for us.  To the

22   extent they don't exist or don't have data from the relevant

23   time period, then, you know, we'll see if they're picked up

24   through ESI searches and if they're not, then --

25          THE COURT:  When you say do the extracts for us, what

1    do you mean specifically by that?

2         MR. BUFFONE:  We would like Quicken to have their

3    database engineers and look at these fields and see if for the

4    employees, the underwriters who signed the certification to HUD

5    that we have reached a comprise on the ones that we are going

6    to focus are compensation-based requests for, if data exists

7    for those employees from the relevant time period, then please

8    extract that data and produce it to the government.

9         THE COURT:  How many people is that?

10        MR. BUFFONE:  I believe it's around 23, your Honor.

11        THE COURT:  So will they have to write code then to

12   locate this data do you think?  Is that what they would have to

13   do?

14        MR. BUFFONE:  You always have to write code when you

15   extract information from a database.  The question is how

16   complex the code is.  To the extent that you're identifying the

17   data field, you're identifying the employees, relational

18   databases which is what we understand Quicken has, the burden

19   in writing code to pull data from a relational database should

20   not be that great although I'm not an expert in Quicken's data

21   system, so I don't know for sure.  Unless the Court has any

22   other questions, I'll rest, your Honor.

23        THE COURT:  Okay.  Let's move on to the next issue,

24   deposition transcripts.  I understand the government's

25   position.  Let me hear from Mr. Morganroth about that.

1        MR. MORGANROTH:  Yes, your Honor.  Again, this issue

2   is based on a false premise.  Each one of the cases that the

3   government is referencing has nothing to do with our case in

4   this courthouse.  None of the issues are the same.  There are

5   no FHA guidelines at issue in any of those cases.  There are no

6   value appeal issues in any of those cases.  This was an issue

7   that was a subject of an extensive meet and confer conferences

8   and, you know, essentially it went away and I'm not sure why

9   it's come back now.  It went away prior to the April 20th, 2017

10  order your Honor issued that each side was supposed to raise

11  whatever discovery disputes they had.  This is an old discovery

12  dispute from eight months ago and we, we addressed the reasons

13  why these cases had nothing to do with the current case that's

14  before your Honor and I can go through each one of them to

15  explain it.  For instance --

16        THE COURT:  Well, before you do that, I'm just trying

17  to understand.  Aside from the argument that these are not

18  relevant to our subject matter, there's no great burden in

19  producing these, right?  We're just talking about some

20  deposition transcripts?

21        MR. MORGANROTH:  Well, your Honor, those cases have

22  protective orders and there's confidentiality agreements in

23  those and Quicken Loans is not the only party that has a say in

24  whether those documents would be released, now so the problem

25  there was we asked the government well it seemed like they

```
 1    might have some of these transcripts irrespective of that they
 2    shouldn't because there are protective orders and
 3    confidentiality agreements, but it seemed like they had some of
 4    these transcripts because they cited to some of these
 5    transcripts in a motion to compel in this court and in previous
 6    pleadings that were filed.  One was the Alig case which
 7    apparently the government and the lawyers in Alig are working
 8    together it seems like and another case, the Nomura case, they
 9    cited to a transcript.
10              THE COURT:  When you say there are protective orders
11    and other parties involved, who else is involved on the defense
12    side other than Quicken?
13              MR. MORGANROTH:  Well, it depends what case -- well,
14    there's plaintiffs and plaintiffs entered into a protective
15    order as well.
16              THE COURT:  Well, do you think the plaintiffs are
17    going to care if the government sees this?
18              MR. MORGANROTH:  They may, I don't know.  I mean, we
19    doesn't have the right to waive their right to the protective
20    order.  They have to waive that right, too.
21              THE COURT:  All right, so assuming that could be
22    addressed, is there another objection to turning these over?
23              MR. MORGANROTH:  Well, they're just not relevant.
24    They're not relevant to anything.  I mean, for instance the
25    Alig case, that's a case based on the estimate of value that a
```

1    borrower provided in an application was turned over to an

2    appraiser before the appraisal was done.  That's what that case

3    is about.  There are no FHA guidelines in that case.  There's

4    no value appeals.  I mean, it just doesn't have any relevance.

5         The Brown case, that case is not about value appeals,

6    that's about finance charges and a property value that again

7    was based, allegedly based on an estimate given by a borrower

8    in an application that was turned over to an appraiser.  That's

9    what that case is about and it's a different time frame.

10   Almost all of these cases are a different time frame.  That's

11   from 2006.  Our case here is 2007 to 2011.  There's no FHA loan

12   even involved in the Brown case.  None of these cases have any

13   FHA guidelines that are at issue and that's the difference

14   between the Wells case.  The reason why the Wells transcripts

15   were relevant is because there were FHA guidelines in terms of

16   the meaning, interpretation and construction that are at issue

17   in our case and in addition the reason why the Wells case

18   transcripts are relevant is because of the materiality issue

19   under Escobar.  None of these cases have any FHA guidelines at

20   issue so they can't --

21        THE COURT:  Okay.  Let me hear from the government to

22   see what they think is the relevance here.

23        MR. MORGANROTH:  Okay.

24        MR. BUFFONE:  Thank you, your Honor.  We have

25   reviewed some of the transcripts that plaintiff's counsel has

1   produced to us and some of the cases that were not covered by

2   the protective order, but they were in redacted form because

3   where they were covered by a protective order, we did not

4   receive that portion of them.  From the portions that we did

5   review, the transcripts do seem relevant.  They provide

6   insights into the way that Quicken's processes and motivations

7   in underwriting loans.  For the majority of the cases that we

8   requested other than Brown and Nomura, I believe that they do

9   involve FHA loans and so we believe that they will be directly

10  relevant to this case and we just think that is way to

11  streamline discovery.  If the -- we're asking for the

12  transcripts of key individuals who are on both of the parties'

13  initial disclosures and so we think that it allows us to

14  streamline discovery, to see what those people had said before.

15  Many of these individuals testified only a 30B6 basis on behalf

16  of Quicken Loans.  We would just like to know the position that

17  Quicken took in related litigations about origination in

18  underwriting and mainly about origination in underwriting of

19  FHA loans.

20          THE COURT:  What about cases that have nothing to do

21  with FHA loans?  What's the relevance there?

22          MR. BUFFONE:  So the Brown case and the Nomura case,

23  from the excerpts that we've seen in public filings, while we

24  haven't actually reviewed the transcripts, they generally talk

25  about Quicken's processes in underwriting loans which is not

1    that different our understanding between the process used to

2    underwrite a conventional loan versus the process used to

3    underwrite an FHA loan and so we think that there is

4    significant overlap in that processes.  We haven't generally

5    asked for discovery into Quicken's underwriting of conventional

6    loans to try and lessen the burden, but in case like this where

7    there is limited to no burden in producing the transcript, we

8    think it is relevant to the way that they underwrite and the

9    way that their underwriting processes work as there's

10   significant overlap and finally --

11        THE COURT:  How would you deal with the protective

12   order issue?

13        MR. BUFFONE:  As I was just about to say, your Honor,

14   we are happy to approach plaintiff's counsel in each of these

15   cases and obtain the consent if Quicken would prefer.  We don't

16   think that that should be a problem at all.

17        THE COURT:  Are there any of these other parties in

18   these other cases aside from Quicken and the plaintiffs?

19        MR. BUFFONE:  Not that I'm aware of, your Honor, but

20   you have counsel in this case.  You know, I know that

21   Mr. Hefferon at least is counsel for TSI and Quicken and Alig,

22   so I think that they know much better than I do.  I believe TSI

23   might be a party in some of these cases, but that is a sister

24   company of Quicken where there's significant overlap between

25   the two companies, but other than TSI, I'm not aware of parties

1     other than the plaintiffs and Quicken.  Thank you, your Honor.

2              THE COURT:  All right.  Let's move on to tracking

3     items.

4              MR. MORGANROTH:  Your Honor, can I just address two

5     of those questions briefly?

6              THE COURT:  Okay.

7              MR. MORGANROTH:  One is one of the cases is

8     FHFA v. Nomura.  Quicken's not even a party to that case.  This

9     is one of the cases that was asked for in terms of depositions.

10             THE COURT:  So what do you care if Quicken wasn't a

11    party to the case?

12             MR. MORGANROTH:  Because there's a protective order

13    in the case in terms of the deposition and that case --

14             THE COURT:  Why don't you let the other parties to

15    the case worry about the protective order?  If your client is

16    not a party to it, what do you care?

17             MR. MORGANROTH:  Well, my client is a party to the

18    protective order.  As a witness they had to sign off on the

19    protective order.  My point here, your Honor, is you asked if

20    there were other parties involved.  There are a lot of other

21    parties, that's the Nomura case.  It's a totally different time

22    period.  It's 2005 to 2007.  That's an RMBS case about

23    prospectuses and whether or not they misrepresented that loans

24    complied with underwriting guidelines.  None of these cases

25    deal with FHA loan underwriting guidelines and the final point

```
1    I just want to make your Honor is to Mr. Buffone's point, the
2    FHA loans that are at issue in our case were underwritten by
3    underwriters who only did FHA underwriting.  They didn't do
4    conventional underwriting, so the point that Mr. Buffone's
5    trying make is well it might give us insight 'cause these are
6    conventional loans.  It's a different set of underwriters that
7    work on the conventional loans versus the FHA loans and that's
8    why none of these cases could possibly mean anything to our
9    case here because they don't deal with FHA loans, FHA
10   guidelines and it's a different set of underwriters,
11   underwriters who don't work on FHA loans.
12            THE COURT:  All right, thank you.  Let's move on to
13   item three which is the tracking items related to management
14   exceptions.  All right, Mr. Buffone, you want to address that?
15            MR. BUFFONE:  Yes, briefly, your Honor.  I think
16   there are three things that we're requesting here.  There's
17   underwriter and a, underwriter exceptions and appraiser review
18   exception tracking items and we believe these are management
19   exceptions by another name.  The Complaint in paragraphs 117
20   through 118 specifically discusses underwriter exceptions as
21   being another type of management exception when the underwriter
22   decides to grant the exception on their own rather than going
23   to management.  The tracking items were the exception text
24   where the text track item discusses the exception that was
25   requested, helps give context to help us understand why the
```

1    exception request was made and if the exception was granted to

2    FHA guidelines.  We think these clearly fall within the Court's

3    prior order and that they're needed to help us prove knowledge

4    in this case, your Honor.

5            THE COURT:  Just a second.

6            (Pause)

7            THE COURT:  Are appraisal review exceptions the same

8    as value appeals or is there a subset or something that

9    straddles the value appeals tracking items?

10           MR. BUFFONE:  I think, your Honor, we have limited

11   insight and limited discovery into receiving this.  You know,

12   to the extent Quicken has merely said that they won't produce

13   them, I know that we have gotten them for some loans.  I will

14   say I believe that they are exceptions for problems with

15   appraisals where there is a problem with the appraisal that

16   does not specifically such as -- there are many requirements in

17   reviewing an appraisal to make sure it's an acceptable

18   appraisal by FHA standards as well as by USPAP, the standard

19   appraisal standards and so I believe these are exceptions more

20   broadly to the standards in having an acceptable appraisal for

21   FHA and for a loan in general.

22           THE COURT:  So are these loans where there was an

23   exception made for some requirement that pertained to an

24   appraisal, but it didn't deal with a value appeal problem?  Is

25   that right?

```
 1          MR. BUFFONE:  Yes, your Honor.  So when underwriting
 2    a loan, you underwrite -- there's kind of two basic buckets
 3    that you underwrite.  There's the credit underwriting which is
 4    the majority of what we're talking about in this case and so
 5    that's reviewing the borrower's income, reviewing their debts,
 6    reviewing their credit score.  Then there's the collateral
 7    underwriting, so making sure not just the borrower has the
 8    capacity to repay the loan, but if they were to default, the
 9    collateral holding up the mortgage, the house, does that have
10    the value that you think it has so that you can recover the
11    unpaid principal balance even if the borrower doesn't make a
12    payment so this goes to the collateral underwriting and it's
13    not that you just get an appraiser, appraisal and you're done,
14    you still have to underwrite that appraisal, make sure that
15    appraisal is sound, make sure that appraisal meets the relevant
16    standards and so we think these are management exceptions that
17    go to collateral underwriting rather than management exceptions
18    that go to credit underwriting.
19          THE COURT:  Okay.
20          MR. BUFFONE:  Thank you, your Honor.
21          THE COURT:  All right.  Mr. Morganroth?
22          MR. MORGANROTH:  Yes, your Honor.  This is another
23    one that has been resolved by the Court pursuant to May 26th
24    order and what we see is happening here is the government is
25    asking for more.  They just want more.  After May -- pursuant
```

1    to this Court's May 26th order, Quicken Loans was required to

2    produce the management exception track items for the claimed

3    loans.  We did that.  There are five management exception

4    tracking items.  Those were produced on June 23rd.

5            The tracking items that they now seek are not

6    management exception tracking itums and for some reason they

7    decide they want more and their pigeonholing it into the order

8    that had nothing to do with these other tracking items and I

9    might add, your Honor, that these tracking items have been

10   produced pursuant to -- these items -- I'm sorry, these

11   management exception tracking items plus the ones that are at

12   issue now were all produced with respect to the 487 loan sample

13   which we learn now is only 350 loans, they call it loan

14   selection.  What the hearing was about is whether or not the

15   management exception tracking items should be produced for all

16   of the claim loans and what your Honor ruled at that time was

17   yes, produce those managements exception track items, there are

18   five of them and we've done that.

19           The parties did meet and confer on this issue and

20   we've explained to the government that the tracking items that

21   they're referencing now are not management exception tracking

22   items.  One of these tracking items was simply used to alert

23   underwriter when a loan had to be re-underwritten.  That's not

24   a management exception tracking item.  Another one of them is

25   when there would be an internal audit done by what's called

1    Quicken University.  Not a management exception tracking item.

2    Two others are used to just document decisions that are made,

3    not management exception decisions, just decisions that an

4    underwriter makes.

5            THE COURT:  Are you saying in all these cases you've

6    just mentioned, there's no person above the underwriter who is

7    making a decision?

8            MR. MORGANROTH:  Correct.  Yes, your Honor.  Another

9    one concerns request for vendor items to be completed in a

10   manner and an order other than the normal hot list

11   prioritization so there's hot list prioritization.  There's a

12   deviation where the vendor items are going to be completed, a

13   request to be completed in a different order; again, no

14   management exception.  There's no management that's involved in

15   that.

16           THE COURT:  What's a hot list?

17           MR. MORGANROTH:  A hot list is just a task list and

18   that prioritize what should be done in what order.  Another

19   one, the final one concerns wire funds for rush closing

20   scenarios.  Not dictated by management, not an exception, this

21   is just when there's a closing that has to take place faster,

22   there is a tracking item that talks about what the funds would

23   have to be wired.  None of these are management exception

24   tracking items and, you know, I --

25           THE COURT:  Just a minute, just a minute.

1          (Pause)

2          THE COURT:  Okay, go ahead.

3          MR. MORGANROTH:  Again, the claim population appears

4     to and we'll get to this on one of the issues we're raising,

5     appears to have changed in the case.  It's changed from 3,600,

6     at one point went to 4,600, now it's down to 2835.  We've

7     produced the management tracking exceptions for all the claimed

8     loans even though the case is really about 1,400, 1,600 loans

9     less, but these tracking items that are being raised now, I

10    just want to reiterate they've been produced as to the loan

11    sample.  They have them on the loan sample.  It's just a

12    question of whether they're entitled to more now on the claim

13    loans when this issue was brought up and they don't fit under

14    management exception tracking items even though the government

15    is somehow trying to pigeonhole them under that by saying we

16    have to produce them.  That's, that's the whole gist, your

17    Honor.

18         THE COURT:  Okay.  All right, number four is

19    testimony of former secretary of HUD, Shawn Donovan.  So what

20    is it you want to find out from Mr. Donovan, Mr. Morganroth?

21         MR. MORGANROTH:  Yes, your Honor.  The first thing

22    that I would like to address since we've seen their papers on

23    this is the standard.  It's not up to us to have the burden to

24    prove that Mr. Donovan should appear.  Under the Sixth Circuit

25    case, Serano (phonetic), it's actually flipped.  It's the

1    government's burden to show based on a clear and particularized

2    statement, not stereotypical or conclusory allegations, that

3    one of the Rule 26(c) elements that's enumerated in the Rule is

4    present.  The government hasn't done that and they can't do

5    that.

6            In addition, there couldn't possibly be any

7    inconvenience to the government here under the Apex Doctrine

8    because Mr. Donovan doesn't work for the government any longer.

9    He's not a government employee and under the Tucci (phonetic)

10   case, the Apex Doctrine wouldn't even apply here, but getting

11   to your Honor's question and that's Tucci v. City of Suffolk,

12   why is it that we want to take Mr. Donovan's deposition.  We

13   want to take his deposition because it goes to the heart of the

14   matter under materiality under Escobar and it goes to the heart

15   of the matter of interpretation of FHA guidelines and the

16   quality of Quicken Loans' FHA loans that they originated.

17   There were direct communications between Mr. Donovan and

18   representatives of Quicken Loans regarding these subject

19   matters.

20           THE COURT:  You mean specific loans?

21           MR. MORGANROTH:  No, the overall quality of their

22   lending and their compare ratios that measures defaults.  There

23   were discussions that related to the quality of Quicken Loans

24   FHA underwriting, the importance of Quicken Loans to the FHA

25   program, the FHA program practices and procedures, issues that

1    go to materiality, issues that go to HUD's --

2         THE COURT:  Tell me about that, materiality?  How

3    would anything he has to say bear on materiality?

4         MR. MORGANROTH:  Well, because there were topics that

5    came up in terms of whether or not those categories of issues

6    were something that was important to the FHA in terms of

7    seeking either indemnification or a repurchase or cancelling or

8    never endorsing insurance policies.  Those topics were

9    discussed with Mr. Donovan, it was more than one

10   representative.  If Mr. Donovan wants to come in and

11   characterize it as something else, well then he should be doing

12   that under oath.  We saw in their papers that there's this

13   position that he wants to take a position that Mr. Gilbert

14   pressured him.  That's not true, but he should say that under

15   oath if that's what he wants to testify to and it wasn't just

16   Mr. Gilbert who he had communications with.

17        Mr. Donovan also was in the middle of HUD's efforts

18   to recover losses that were suffered as a result of the global

19   financial crisis, losses to the FHA program and he is in the

20   middle of the FHA program's financial issues.  We did depose

21   the deputy assistant secretary July 28th and he testified that

22   he had communications with Mr. Donovan that did relate to

23   Quicken Loans and he also testified that Mr. Donovan was in the

24   middle of the FHA program practices and procedures in terms of

25   enforcement mechanisms, investigations and their efforts to

1   recover the losses that the FHA fund incurred during this

2   financial crisis.  There are issues in part of our defense that

3   there was a program that was followed and instituted by HUD

4   that had nothing do with wrongdoing.  The whole point was to

5   try and find lenders who had deep pockets and those lenders

6   were the top lenders and to try and shake them down for

7   recovery of dollars that they could use to prop up their

8   reserve fund.  Mr. Donovan appears to have been in the middle

9   of that based on the testimony of Deputy Assistant Secretary

10  Coulter.

11            THE COURT:  You're saying the deputy secretary said

12  Mr. Donovan was involved in the shakedown effort?

13            MR. MORGANROTH:  Well, he didn't use those words, but

14  he was involved --

15            THE COURT:  What did he say?

16            MR. MORGANROTH:  He said that he was involved in that

17  program and that he --

18            THE COURT:  What program?

19            MR. MORGANROTH:  This program to target large lenders

20  for the purpose of generating revenue for the fund and

21  Mr. Coulter testified about details of that program and the

22  purpose of the program and his viewpoint in terms of an opinion

23  as to the program and he testified that Mr. Donovan was in the

24  middle of that, but he didn't testify to what Mr. Donovan's

25  view point was or opinion or statements or any of that.

1              He testified that he did have communications with

2    Mr. Donovan about or relating to Quicken Loans and other

3    lenders as well.  Mr. Donovan is not a government employee.  It

4    will not inconvenience the government.  That is half-day

5    deposition that we've asked for and I did notice in their

6    papers they cited the Budroe (phonetic) case, but that's old

7    superceded law.  That was a 2008 case that's been superceded by

8    Sixth Circuit case in Serrano, 2012 and the only issue is

9    whether or not the government could come forward with

10   particularized statements of harm as referenced in Rule 26(c)

11   which they have not and they can't because Mr. Donovan is not

12   even an employee of the government.  Under the Tucci case, the

13   Apex Doctrine wouldn't even apply.

14              THE COURT:  Okay.  Mr. Buffone?

15              MR. BUFFONE:  Thank you, your Honor.  First, I think

16   it's important to look at what it is that Quicken Loans has

17   said they think Secretary Donovan is relevant for.  First, they

18   say he has extensive knowledge of the FHA program and while

19   Secretary Donovan as the secretary of HUD certainly has

20   knowledge of the FHA program, that simply is not the standard

21   for deposing someone who is a cabinet-level secretary.  If

22   having knowledge of the program means that Secretary Donovan is

23   open for deposition, it would lead to the absurd result of him

24   being deposed in every Section Eight case, every fair housing

25   case, every case about HUD grants.  HUD does lots of work that

1    the secretary certainly has knowledge of the work that HUD does

2    in all these different programs, but there's been no showing of

3    particularized knowledge or particularized involvement of any

4    FHA standards that are at issue in this case.  In fact, on

5    Friday Quicken took the deposition of one the line level -- of

6    one of the, a HUD employee who talked about when there's

7    disagreement within HUD, what happens and it's elevated to the

8    FHA commissioner and the FHA commissioner decides that, not

9    that it goes all the way up to the secretary and there's no

10   evidence here that the secretary's office was involved in any

11   of the FHA guidelines that are at issue here.

12          The next thing that Quicken says this is relevant to

13   is HUD's efforts to recover losses?  First I'd like to read to

14   you from the transcript from Friday about this and the question

15   was what was the time frame of those discussions, those

16   discussions were happening -- so there's a discussion about the

17   enforcement efforts that HUD, umm, that HUD had and then there

18   is okay, what was substance of communications you had with the

19   Secretary Donovan?  Answer, again those would have been fairly

20   high level conversations relating to the process and my opinion

21   on the process and approach.  Question, and in your discussions

22   and communications with Secretary Donovan, they related to

23   Quicken Loans as well as some of the other lenders as well that

24   were in the program so to speak?  Answer, so there was no

25   discussion with Secretary Donovan specific to Quicken Loans.

1          So again the testimony was that they weren't

2    discussions specific to Quicken Loans, there's discussions

3    generally related to the effort to enforce FHA underwriting

4    guidelines against lenders who had committed fraud against the

5    FHA program.  The efforts, HUD's efforts and DOJ's efforts to

6    recover losses to the FHA program is simply irrelevant to this

7    case.  There have been numerous lenders that have settled with

8    the Department of Justice.  All of those settlements have

9    involved agreed upon statements of facts where the lenders have

10   admitted to their conduct.  If the Court would like to review

11   those statements of facts about the settlements in other cases,

12   we can certainly submit them, but we don't think the fact that

13   there were investigations of other lenders that led to

14   settlements where the lenders admitted to facts that form the

15   basis for the government's allegations that they had defrauded

16   the FHA program is relevant to this case at all.  The fact that

17   the government in a False Claims Act enforcement action is

18   seeking to recover the monies that the government paid out as a

19   result of those false claims is not controversial, but we also

20   think not relevant to this action.

21          The last category that Quicken seeks to depose

22   Secretary Donovan about is his personal communications with

23   Quicken executives and we know nothing about those because

24   Quicken has and continues to be extremely vague about what

25   those communications are.  When did those communications

```
 1   happen?  Who had those communications?  What was the content of
 2   those communications?  Quicken has provided none of those
 3   details and so we have no basis to understand that Quicken is
 4   seeking relevant information.  From the best we can tell, those
 5   communications took place well after the relevant time period,
 6   well after the facts at issue in this case and they have to
 7   bearing or relevance to this matter at hand.  To the extent
 8   that Quicken wants to talk about process, your Honor, Quicken
 9   has not served a Rule 45 subpoena, Quicken has not noticed the
10   deposition and so there's nothing for the Court to actually
11   rule on.  To the extent the Court wants more a detailed
12   statement from Secretary Donovan about the burden that would be
13   present here, we think Quicken should first have to go through
14   the steps of actually noticing the deposition and allow us to
15   more fully brief the issue for the Court, but if we were to
16   fully brief the issue for the Court, we think that this will
17   directly relate to the deposition of Priscilla Presley that the
18   Court in the Sixth Circuit Cintas upheld that they noted that
19   she had no knowledge relevant to the particular trademark and
20   state law claims at issue here and we think that there will be
21   little knowledge of the core relevant facts at issue in this
22   case and that there was harassment and burden based on having
23   that deposition when there was no relevance.
24           THE COURT:  Well, what about the argument that
25   Mr. Donovan is no longer with the government so there's no
```

1    burden on the government?

2         MR. BUFFONE:  Well, there's still burden on Secretary

3    Donovan, your Honor.  You don't get to depose anyone in any

4    case.  They have to have some relevance.  I mean, he still has

5    to take time out of his day, he still has to show up for a

6    deposition, he still has to give testimony.  If that testimony

7    is not going to be relevant, I don't understand why we would

8    burden the former secretary with that and there really is a

9    chilling effect on people serving in the government if they're

10   going to be forced to testify about anything that tangentially

11   touches on their time as secretary.  As secretary of HUD, he

12   has oversight on everything that HUD does.  That doesn't mean

13   that in any litigation that involves HUD he should be drawn

14   into it.  Yes, if Quicken can make that particularized showing

15   that he was somehow involved in the facts and issues of this

16   case, that would be a different issue and a different

17   conversation we would be having.  We are allowing Quicken to

18   depose high-level people.  As I just said, they deposed the

19   deputy, umm, the deputy assistant secretary for FHA.  They are

20   taking depositions and have asked for depositions of political

21   people, but when those people are directly involved in the FHA

22   program, when they have direct involvement with the facts and

23   issues at issue in this case, those depositions are proper.

24   When they haven't made any showing about how Secretary Donovan

25   is relevant to this case at all and have merely put forward

1    irrelevant things that they want to ask the secretary about,

2    about the government's enforcement actions against FHA lenders,

3    that has no relevancy to the facts and issues of this case, to

4    the government's claims or Quicken Loans' defenses in this

5    case.  That simply should not be allowed.

6         THE COURT:  All right.  I want to move on to the next

7    item about Quicken asking for what the government says is work

8    product regarding the sample universe.

9         MR. MORGANROTH:  Yes, your Honor.  Can I just correct

10   in terms of Mr. Buffone's reading of the deposition transcript

11   in the last issue?

12        THE COURT:  I don't think you have to.  Let's just

13   move on to the work product issue.

14        MR. MORGANROTH:  Thank you, your Honor.  So this is

15   the sampling methodology disclosure issue in your Honor's May

16   26th order, the government was required to disclose its

17   sampling methodology and justification by July 7, 2017.  On

18   that date there was a disclosure made, it was in answer to, a

19   supplemental answer to an interrogatory requesting that

20   information.  There were several deficiencies with that

21   disclosure.  We did have a meet and confer conference on that.

22   The government corrected two of the deficiencies, but two other

23   deficiencies still remain.

24        The first deficiency is the government won't provide

25   to us the justification why the population of 2,835 loans was

1    chosen to be sampled.  The disclosure explains that 2,835 loan

2    population consists of loans that become or became 60 days

3    delinquent within two years, but the question is what is the

4    justification for choosing a sample population based on that

5    criteria?  Your Honor did order them to provide the

6    justification.  That is an important issue because the field

7    keeps changing.  2,835 loans is just a subset of the claim

8    loans that's referenced in the Complaint.  That was 3,885 loans

9    and that's the Complaint in section, or paragraph 101 and then

10   the 2,835 loans is a subset of the amount of claim loans that

11   were referenced in a list that was provided to us in a document

12   production request, the third set, that was 4,632 loans.  So

13   the question is is this case now about 2,835 loans?  If it is

14   because that's the sample population, we should be told that

15   and we should be told why is it about those loans as opposed to

16   the 3,885 loans or the 4,632 loans that were referenced in

17   other pleadings.  So that's the first deficiency.

18           The second deficiency is when the government provided

19   us with their list of sample loans, there were 487 loans.

20   Ultimately it was disclosed to us that only 350 of those loans

21   constituted a sample and that was based on pressing by your

22   Honor.  If you recall the government wouldn't tell us anything

23   about their sample, they just had this 487 loan list and we

24   were led to believe that was the entire sample.  So we've

25   learned since then that there are 137 other loans.  Is that

```
 1    part of their sample or not?  We've heard at oral argument and
 2    the last time we were here that those loans were chosen and
 3    they should be treated as part of the sample and should be part
 4    of this special discovery agreement that the parties had as to
 5    what should be furnished in discovery regarding the sample, but
 6    if it's part of the sample, then we need to know how they were
 7    selected, the 137 loans which we've never gotten a straight
 8    answer and it's not part of their disclosure.  If it's not part
 9    of the sample, then we have a problem and the problem is why is
10    the government entitled to this special discovery on these
11    other 137 loans pursuant to an agreement that deals with the
12    sample and why aren't we getting answers to our discovery
13    requests relating to other loans that we select?  The
14    government isn't free to just pick which loans the parties can
15    conduct discovery on.  We can ask questions about loans, but
16    we're told they're not going to give us any answers about these
17    other loans because they're not part of the sample and they're
18    going to prove this case using sampling which we contest, so
19    they can't have it both ways.  Either it's part of the sample
20    and give us the justification and the criteria and the
21    methodology for selecting them.  If it's not a part of the
22    sample, fine, then it shouldn't -- those 137 loans should not
23    be part of the special discovery agreements and if they are,
24    then we're entitled to answers on all the other loans as well
25    that we select for whatever reason, so those are the issues
```

1    there, your Honor.

2         THE COURT:  Okay.  Mr. Buffone?

3         MR. BUFFONE:  Thank you, your Honor.  The United

4    States believes that we complied with the Court's order and did

5    provide exactly what the Court instructed us to.  We provided

6    them the sample methodology and the justification for why that

7    sample methodology was used.  As part of that, we stated that

8    counsel instructed the expert, the consulting expert to draw

9    the sample population in a certain way and that was way that

10   the sampling expert drew the population.  What Quicken is

11   asking for is why counsel instructed the effort -- the expert

12   to identify the loans in that -- to identify that category of

13   loans as a sampling population.  That was counsels' choice made

14   as a litigating decision and that's core work product that

15   Quicken is asking the government to disclose.  This was not a

16   decision made by an expert, this was a decision made by

17   counsel.

18        THE COURT:  So you're saying the government's never

19   going to try to justify why it chose that 60-day criterion?

20        MR. BUFFONE:  I don't think that we -- I don't know

21   why it's, when we would need to justify why we chose that

22   sample population.

23        THE COURT:  I don't know if you would.  I'm just

24   saying are conceding now on the record the government's never

25   going to try to justify why it picked that criterion?

1        MR. BUFFONE:  I, I don't know I can go definitive

2   your Honor because I need to think about if it would ever

3   become relevant, but I don't believe that it would be relevant,

4   your Honor.

5        THE COURT:  Well, can you have it both ways?  Can you

6   say we're not going to tell why we picked this, but we're going

7   to at some point try to justify why that's a good criterion for

8   use in sampling?

9        MR. BUFFONE:  I don't -- it doesn't -- I guess your

10  Honor the question is is it a good criterion for use in

11  sampling?  It doesn't go into the reliability of the sample.

12  You define a sampling universe, you pull a sample from that and

13  you try and extrapolate back to the universe.  We're not trying

14  to extrapolate broader than the universe and so the

15  justification for why the sample is a good sample is based on

16  why did you pull those 350 from the sample universe and why is

17  it that you can extrapolate from those 350 back to the sample

18  universe and so the definition of the sample universe is just a

19  definition that we did not -- a consulting expert did not make,

20  that was made by counsel and so it's what is in the sample

21  universe and what is outside of the sample universe I think is

22  irrelevant to the issue of sampling.

23        THE COURT:  Okay.

24        MR. BUFFONE:  Furthermore, your Honor, the selection

25  of the 137 that were part the loan selection that's outside of

1    the loan section, it was again a determination made by counsel

2    based on why we thought on what counsel believed would be loans

3    that would help prove the United States' case and again that

4    would be asking, you know, like asking Quicken why they made a

5    discovery request and that's like why the United States made a

6    discovery request is because the United States made a

7    determination about that would be the most relevant information

8    to help prove the United States' case and that's simply asking

9    for the United States, the attorneys for the United States,

10   their mental impressions and why they selected those loans.

11            I just also want to briefly address that the United

12   States is not sure what Mr. Morganroth is talking about when

13   he's talking about the United States is trying to limit Quicken

14   Loans' discovery to just the loans that are in the sample.

15   Quicken loans has asked for broad discovery and did the loans

16   that HUD has reviewed related to Quicken Loans as well broad

17   discovery into loans underwritten by other lenders.  We have

18   provided that discovery about loans underwritten by Quicken

19   Loans and we've provided them with information about all of the

20   reviews that HUD has done of the loans underwritten by Quicken

21   Loans and have not tried to narrow that to just the sample

22   loans.  We certainly have pushed back on discovery into other

23   lenders and also direction from the Court have been providing

24   some discovery into other lenders, but as it relates to Quicken

25   Loans, we have not been trying to limit their discovery based

1    on these loans and said that they can't select other loans that

2    they would like discovery into that Quicken Loans underwrote.

3         THE COURT:  Well, regarding the 137 loans, is the

4    government saying that those are not part of the sample from

5    which the government would be trying to extrapolate to a

6    broader population?

7         MR. BUFFONE:  So some of those loans are in the

8    sample universe and so they would be within the sample universe

9    that the government is extrapolating to, but they are not part

10   of the sampled loans so they are not part of the sampled

11   population, that is the loans that would be used to extrapolate

12   to the entire universe, but many of those loans do fall within

13   the universe.

14        THE COURT:  All right.  Well, what you had said at an

15   earlier hearing I though was that you were going to try to

16   prove certain corroborating actions by looking at the 137

17   loans.  Is that -- first of all did I get that right?

18        MR. BUFFONE:  Yes.  Your Honor, I think it's

19   two-fold.  I mean, this also goes to the next issue about the

20   issue of disclosures, but the United States has said that it

21   intends to prove its case in part through sampling.  Quicken

22   Loans has retained its right to challenge sampling and

23   challenge the sampling is the proper way to prove the case and

24   while we believe that sampling is completely proper here, as

25   long as Quicken maintains an objection, the United States needs

1    to litigate this case with the understanding that that's one of

2    Quicken's defenses that sampling should not be allowed to be

3    used and so the United States is retaining its right to prove

4    its case both through sampling and not through sampling.

5         THE COURT:  So if for whatever reason your sampling

6    case falters, are you saying then that the government wants to

7    try to prove improprieties with regards to these 137 loans and

8    prove up damages with those specific loans?

9         MR. BUFFONE:  I think that we would see how we could

10   prove our case and what specific loans we could prove our case

11   with.  It would be very difficult, but the United States, you

12   know, while Quicken is trying to have it both ways.  If they

13   want to hold out the right the challenge sampling and say that

14   sampling should not be used while saying the United States

15   should not be able to prove its case were we to prevail on our

16   defenses.  We certainly think that that sampling is proper

17   here, that sampling is the best way to prove our case.  It will

18   be incredibly difficult to prove our case without sampling, but

19   we will be able to, you know, we are working to try and work in

20   the alternative and be able to prove our case were that to fall

21   through and some limited circumstances with other loans we

22   could use outside of sampling and so that goes to both what the

23   137 is and, you know, evidence that we're looking at for

24   outside the 137, outside the sampling population, but we think

25   that's both relevant to knowledge of Quicken and Quicken Loans'

1   knowledge in underwriting loans as it goes to the sampling

2   extrapolation as well as the United States being able to prove

3   its case in the alternative were Quicken to prevail on the

4   defenses that we don't think have merit and be able to prevail

5   in this case without sampling.

6          THE COURT:  All right.  Let me move on to item six,

7   damages.  Mr. Morganroth?

8          MR. MORGANROTH:  Yes, your Honor.  In your May 26th,

9   2017 order, the Court set a June 30th, 2017 deadline for the

10  parties to supplement initial disclosures.  The government

11  didn't supplement its initial disclosures.  Quicken Loans did

12  supplement.  The government's initial disclosures violate Rule

13  26 requirement to provide a computation in exact -- I'm sorry,

14  computation as to each category of damages claimed.  That

15  hasn't been done and the case law makes clear that if a party

16  learns of additional information that renders their damages

17  computations incomplete, must supplement its disclosures to

18  include that information.

19         Things have changed in this case apparently.  One

20  thing that has changed is the total loan population that's at

21  issue.  It's decreased from the 3,885 in the Complaint, from

22  the 4,632 that were in a list in the third set of requests for

23  production of documents that the government furnished to now

24  2,835 loans that were part of the July 7th, 2017 disclosure.

25  The problem here is that the government has all the information

1     necessary to providing a computation of their damages and we're

2     entitled to know that.  Supposed to know that at the beginning

3     of the case and we're also supposed to be able to get the

4     information if there are any changes.  Not only did, were we

5     not provided that information at the beginning of the case, but

6     we're not provided the information now even though things have

7     changed.

8          The government knows the number of loans that are at

9     issue, it's that 2,835 that they've listed in their July 7th

10    disclosure.  They know the amount of claims that have been paid

11    on those loans as well as the sample loans.  They know the

12    amount of any recoveries that HUD has obtained through its sale

13    of foreclosed properties or the sale of notes on those loans

14    and by now they should also know the percent of loans that they

15    claim are deficient in their sample.  They have all the

16    information to provide a computation, yet they have refused to

17    do that and one of the problems in this case is that there's

18    been just this hide the ball from the beginning and the case is

19    supposed to be a search for truth.  It's not supposed to be a

20    sporting event or a game of sport and if your Honor recalls,

21    the government first led us to believe there are 487 loans in

22    their sample.  We subsequently learned just because your Honor

23    was pressing them that there were 350.

24          Next, the government refused to disclose their

25    methodology.  We had to bring a motion and your Honor had to

1    order that and now we still have, we still have issues with

2    that because the government doesn't want to tell us their

3    justification for picking their sample population, the entire

4    population that's supposedly at issue in the case.  When we

5    found out that there were only 350 loans in the sample, the

6    government refused to tell us which 350 out the 487?

7              On top of that, your Honor, the government has

8    refused to tell us which loans they believe are deficient and

9    the reasons why and your Honor has entered an order that they,

10   the government has to do that by September 1st and that gets to

11   the issue of what Mr. Buffone was just speaking to.  The

12   discovery that they're refusing to give us is we've asked them

13   on loans to tell us what is deficient and the reasons why and

14   the answer that's come back is we're not going to tell you

15   because we're going to prove this on sampling, the only thing

16   that we'll tell you is ultimately which loans we believe are

17   deficient and the reasons why on the sample, no other loans,

18   just the sample, yet they feel that they're free to pick 137

19   other loans and try to prove their case with those and ask us

20   for all sorts of specialized discovery on that, but we're not

21   entitled to pick any loans and ask them what they think is

22   deficient with that particular loan and the government can't

23   have this both ways.  They're either trying to prove this by

24   sampling or not.  At some point, you have to make that decision

25   and they've proceeded in this case on the basis that they're

1    going to try to prove this through a sample.

2          THE COURT:  Well, what I just heard is that they're

3    going to try to develop two tracks; one is a sampling track and

4    the other is this group of a 137 loans through which they would

5    try to prove damages for those loans that they believe are

6    faulty loans in some respects if it turns out their sampling

7    theory doesn't hold water, so is there something wrong with

8    them trying to prepare a case in both fashions?

9          MR. MORGANROTH:  Well, yes, your Honor, there is.

10   There wouldn't be anything wrong with that if they didn't try

11   limit the discovery that we're allowed to conduct based on the

12   fact that they're going try to prove this case on sampling.

13         THE COURT:  Well, are they stopping you from learning

14   anything about the 137 loans?

15         MR. MORGANROTH:  Well, why do they get to pick what

16   other loans the parties can do the discovery on?

17         THE COURT:  Well, they're the plaintiff.  They're the

18   ones who are saying they've been damaged.  Their argument here

19   is in the alternative if the sampling doesn't work, we want to

20   pick 137 loans that we're saying Quicken had defrauded the

21   government through and you should be entitled under that theory

22   to take all the discovery you want regarding those 137 loans,

23   but what relevance would it be to take another loan that isn't

24   part of the sampling and is not part of the 137?  It's like the

25   bank robber who says let me tell you about all the banks I

1    didn't rob.  What difference does it make how many loans

2    Quicken didn't defraud the government on?  If the government is

3    trying to show that Quicken was behaving improperly with

4    respect to specific loans, isn't the focus then on what did

5    Quicken do or not do with regards to those loans?

6            MR. MORGANROTH:  Yes, your Honor and the answer to

7    that question depends on which of these theories they're

8    pursuing.  So if they're trying to pursue the case on sampling

9    on 350 loans, we certainly are in a position to show that if

10   they tried to come up with a defect rate and extrapolate

11   against the loan population, that that extrapolation couldn't

12   possibly make sense because we could show that this loan and

13   that loan and that loan had no deficiency in the loan

14   population.  We could prove that loans, you can't have that

15   defect rate extrapolated against the population because there

16   are so many loans in the population that have no defects at all

17   and a defendant isn't bound to the loans that are picked by a

18   plaintiff as being the only loans at issue in a case, to the

19   extent they're trying to extrapolate.  Now if, if the

20   government intends to pursue a theory that the case is only

21   about the 137 loans, then I agree with you.  I agree, your

22   Honor, that if it's only about the 137 loans, that no other

23   loans mean anything and we would focus our discovery just on

24   those 137 loans and they either prove that those loans are

25   deficient or not and to the extent they prove that some portion

1    of them are, they win damages.  To the extent they can't prove

2    any of them, they lose, but if you're going to take 137 loans

3    and then try to extrapolate them against some other population,

4    yes, we're entitled to then find out whether what they're

5    extrapolating against were really deficient and that's the

6    problem.  The government shouldn't be able to say we're going

7    to take 137 loans and we're going to extrapolate them against

8    2,835, but you can't learn anything about any of the other

9    2,835 and whether or not we really believe that loan was

10   deficient or what the damages would be if the loan was

11   deficient.

12          THE COURT:  Well to keep it straight, I think the

13   extrapolation theory is from the 350, isn't it?

14          MR. MORGANROTH:  Yes.  Well, that's why I was saying

15   if the case is only about 137 loans, I agree your Honor, no

16   other loans mean anything, we would focus the case on the 137

17   loans only and we'd ask for all the discovery, take all the

18   depositions about those 137.  If the case is about 350 loans

19   being extrapolated against 2,835 loans, then we're entitled to

20   discovery in terms of which loans they believe were really

21   deficient out of the 2,835, we're entitled to discovery in

22   terms of damages on each one of those that they say is

23   deficient, the reasons why and we're entitled to a damage

24   computation on these initial disclosures --

25          THE COURT:  Okay, well, right now we're talking about

1  a damage calculation.

2          MR. MORGANROTH:  Yeah.

3          THE COURT:  So you've kind of morphed into that

4  you're entitled, that Quicken is entitled to discovery on loans

5  beyond the 350 that are within the 2,835 universe, right?  Your

6  argument is what you were just talking about was going actually

7  beyond damages per se then and what had the government shown

8  yet.  You're asking, advocating the broader proposition which

9  is Quicken should be entitled to take discovery on all of the

10 2,835 loans.  Is that right?

11         MR. MORGANROTH:  Well, what I was discussing your

12 Honor is just that we're entitled to know what this case is

13 about and that unfortunately there's been a game of sport and a

14 hiding of the ball on what this case is about.  Is this case

15 about 350 loans extrapolated against 2,835 loan population?  If

16 that's what this case is about, then we're entitled to know

17 what the damages are that the government is seeking on that

18 population.  They haven't told us that.  If the case is about a

19 different population, we're entitled to know that.  If it was

20 the 3,885 which was in the Complaint, we're entitled to know

21 that and what the damages they are seeking on that 3,885

22 population.  If it's the 4,600 that were in their document

23 requests, we're entitled to know that.  We're left here without

24 knowing what are the damage they're seeking, what is the loan

25 population.  We believe the loan population now is 2,835 based

1    on the disclosures, but we hear Mr. Buffone today saying well

2    it could be two different things and it might only been about

3    137 loans and if it's only about 137 loans, then we're entitled

4    to dual track initial disclosures, supplemented as to each of

5    those theories, under the theory of the 350, what are the

6    damages that you're seeking?  Under the theory that there are

7    137 loans at issue in this case, what are the damages that

8    you're seeking and we don't have that and that's not fair and

9    that's not what the rules are created to do here.  It's

10   supposed to give us that information at the beginning of the

11   case and then supplement it each time something changes

12   regarding damages in the case and we doesn't have it at the

13   beginning, we don't have it in the middle, we don't have it at

14   all.  We've got this defense that well we have an expert that's

15   going to provide this.  You don't need an expert.  We just went

16   through the metrics.  You don't need an expert to tell you what

17   the loan population is.  They've already selected that.  They

18   don't need an expert to tell you what the claimed amount was

19   that was paid on those loans and the sample or on the 137

20   loans.  That's a defined arena where all you do need is a

21   calculator and a piece of paper to look at what those were.

22   You don't need an expert to determine how much the recoveries

23   were.

24            THE COURT:  Okay.  I think I get your argument.  Let

25   me hear from Mr. Buffone on this issue of damages.

1           MR. BUFFONE:  Your Honor, I'll just clear a couple of
2     things up for the record.  The United States has disclosed what
3     are the loans that have gone to claim.  They've disclosed which
4     loans those are.  They've disclosed what the claims are on
5     those loans, the amount of the government paid out.  To the
6     extent that there were recoveries for those claims because they
7     also had a property conveyed to the United States, the United
8     States then sold, the United States disclosed what the
9     recoveries were for those loans.  They disclosed what their
10    ultimate loss was because of potential payments they made in
11    selling those properties so the United States has disclosed the
12    entire population.  They have disclosed for each particular
13    loan what the claim was.  They have disclosed for each
14    particular loan what the recovery was.  They've also, we've
15    also disclosed what our sampling population is.  We've
16    disclosed the justification for that sampling population.
17    We've disclosed how that sample was drawn, that it was a
18    simple, basic random sample where it was a simple extrapolation
19    of taking, of randomly calculating a number for each loan in
20    the sample population and selecting the first 350 that that
21    random number generator created.  We've disclosed the
22    justification for using a sample like that and some of the
23    literature that goes behind using a sample like that, so
24    Quicken has the information that it's requesting.  It has the
25    claim amount.  It has the claim population.  It has what that

1  claim amount is for each particular and specific loan.  It has

2  what the government's recovery was for each particular and

3  specific loan.  It has the sample population and it has how

4  that sample population was, umm, how that population, the

5  justification for that sample, so --

6          THE COURT:  What are the damages that the

7  government's asking for?

8          MR. BUFFONE:  I think, your Honor, that's where it

9  becomes expert testimony that we think comes best at expert

10  disclosures as that requires, one, the September 1 disclosure

11  about what are the student loans in the 350 that we are

12  alleging have deficiencies and that is, still, you know, while

13  we're certainly are advanced in that analysis, that's not

14  complete and won't be complete until September 1 when we make

15  that disclosure and then involves our sampling expert

16  extrapolating from the loans that we allege to be deficient to

17  that entire population.

18          THE COURT:  So at that point would you expert then be

19  able to give an opinion about the government's damages?

20          MR. BUFFONE:  I believe our expert would be able to,

21  umm, based on disclosures at that point, but then additional

22  discovery would come and, you know, that population may change

23  based on additional discovery with loans either dropping out or

24  potentially being added with new information that's learned.

25          THE COURT:  Well, sure, lots of things happen during

1    the life of a case, but you can't always say it's a moving

2    target so we never have to pin a party down.  Sometimes parties

3    do need to be pinned down and there's understanding that they

4    have to supplement if additional information comes along to

5    require modification of some previously-stated position, but

6    what I'm hearing from Quicken is that at some point and you're

7    telling me it's fairly soon, that the government should know

8    exactly how many loans out of the 350 sample the government

9    thinks show that Quicken defrauded the government, right?  You

10   think you should know, be able to tell us that by September 1,

11   right?

12          MR. BUFFONE:  We'll have an initial rough sense, your

13   Honor.  I mean, there's still lots of discovery that needs to

14   be taken on those loans.

15          THE COURT:  Okay.  So let's just make an assumption

16   that you'll know by then.  Let's say it's 35 loans out of the

17   350 so let's say there's a 10 percent fraud rate.  What does

18   the government then do in terms of calculating damages?  Does

19   it take -- well, you tell me.  What does it do with that

20   number?

21          MR. BUFFONE:  We have an expert consultant who we

22   would provide the -- you know, one, I think that number's going

23   to be higher, your Honor, but we provide that --

24          THE COURT:  Well, I just picked it.  I'm not even

25   suggesting there is any fraud rate, I'm just saying.  I just

1    picked a number so I could figure out what we're talking about

2    here.

3              MR. BUFFONE:  Yeah, but I think we would provide the

4    specific loans to the, to our expert consultant and our expert

5    consultant would do statistical analysis to extrapolate that to

6    the entire population.

7              THE COURT:  And so is the entire population 2,835 or

8    is it 3,885?

9              MR. BUFFONE:  I believe it is the, umm, just hold on

10   a second, your Honor, so I can be specific here.

11             (Pause)

12             MR. BUFFONE:  That would be the 2,835 that that

13   extrapolation would apply to.

14             THE COURT:  All right and tell me how the

15   extrapolation would work.  Would it be just 10 percent of all

16   the dollars that the government paid out or loaned or what's

17   the number?  10 percent against what?

18             MR. BUFFONE:  I -- it would be an -- your Honor,

19   our -- we have an expert, a PhD statistician who would be doing

20   the analysis and so we would have to ask him to do it.  I think

21   it's a little more complicated than simply taking 10 percent of

22   the total population.  I mean, there's a margin of error that

23   would be involved that depends on how many loans that you have,

24   the size of the population.

25             THE COURT:  So shortly after September 1, you should

1    be able to know what the damage number is, right, because the

2    only thing right now that's stopping you is making a decision

3    about what percentage of the loans are allegedly fraudulent,

4    but in the meantime I assume your expert can give an opinion

5    about, once he or she knows that fraud rate, what then the

6    government's damages are, right?

7          MR. BUFFONE:  I think that once we do identify in the

8    September -- I think that based off the September 1 report, the

9    expert consultant could be able to run numbers to calculate an

10    initial damages figured if required, yes, your Honor.

11          THE COURT:  Okay.  Now what else do you want to tell

12    me on damages?  Anything else?

13          MR. BUFFONE:  Your Honor, I think just going back to

14    our prior discussion, I think that the United States still

15    should have the ability to, you know, while we believe the

16    decision on sampling should be easy, that your Honor should

17    rule that sampling is proper here and it will certainly greatly

18    harm our case not to be able to use sampling.  We need to be

19    able to potentially prove our case in the alternative and so we

20    still should have the right as we say in our initial

21    disclosures to use sampling, to prove our case in part through

22    sampling.

23          THE COURT:  All right.  So with regard to the

24    alternative case, the non-sampling theory of the government's

25    damages, would that be the 137 loans and all of the money lost

1    through those 137 loans?  Is that the alternative theory of

2    damages?

3          MR. BUFFONE:  Your Honor, I think we would work in

4    many different ways to try and see how we can specifically

5    identify loans where the government was defrauded, that it

6    would be impossible for us to review the entire population and

7    find all of them which is why we think that sampling is

8    justified here and it's proper here, but we would certainly try

9    and see what ways we could do to identify as many loans as

10   possible.  So I think it would be a combination of the 137, the

11   loans we identify in the 350 and loans that appear to have, be

12   fraudulent from other discovery we've taken such as loans where

13   value appeals were ordered outside the 350 or management

14   exceptions were granted to FHA underwriting requirements or we

15   come across other evidence that potentially shows that the

16   government was defrauded in a loan that went to claim.

17         THE COURT:  All right and you're going to be

18   disclosing all of that by September 1?

19         MR. BUFFONE:  As we understood it, your Honor, the

20   September 1 disclosure was for the loans, the 350, the sample

21   population.

22         THE COURT:  All right.

23         MR. BUFFONE:  It's, if your Honor --

24         (Pause)

25         THE COURT:  So in the government's view then, it's

1    not under any time table when it has to disclose what loans

2    beyond the 350 plus the 137, what loans it's claiming are

3    fraudulent beyond those?

4           MR. BUFFONE:  I mean, your Honor, I think that it's

5    a -- I think it's all a question of whether the Court comes

6    down on sampling as the United States is trying to see how it

7    would -- is trying to think about how it would prove the case

8    were the Court to rule against, that the United States is,

9    believes strongly that the Court will uphold sampling of, the

10   United States will prove its case primarily, if not entirely

11   through the sample, but the United States is thinking because

12   the Quicken, you know, I think that we would be engaged in all

13   practice, we weren't thinking about it that as Quicken's

14   asserting the defense that the United States cannot use

15   sampling, how would we be able to prove our case if we did not

16   use sampling.

17          THE COURT:  Well, you may not know where the Court

18   stands on sampling until very late in the game.  Many of the

19   cases that have occurred the issue of sampling have considered

20   that issue in connection with a motion for summary judgment

21   that gets filed sometimes late in the case and some of those

22   cases say that, you know, it'll be up to a jury to decide

23   whether the sampling methodology is appropriate or not

24   appropriate, so if you're looking for some early decision from

25   me, there's no guarantee that's going to happen.

```
 1          MR. BUFFONE:  Yes, your Honor.  We, you know, we do
 2   understand that and do understand that it is a risk that we are
 3   taking.
 4          THE COURT:  All right, but I want to go back to my
 5   question.  The order that I entered on May 26th did require the
 6   government to disclose which loans of the loan selection which
 7   is a total package of the 350 plus the 137, it was claiming
 8   supported its position here of False Claims Act violations or
 9   other actionable activity, so now I'm hearing that the
10   government may decide it's going to pick another loan and
11   another loan and another loan to show its damages under this
12   alternative theory, the non-sampling theory.  When, when is
13   that going to be disclosed?
14          MR. BUFFONE:  I -- and your Honor, I did misspeak in
15   saying that the September 1 is just the loan sample, just the
16   loan selection, you are correct.  I do not believe that that's
17   currently in the discovery plan, your Honor.
18          THE COURT:  I'm sorry, what?
19          MR. BUFFONE:  I said I don't believe that a
20   disclosure of that's currently within the discovery plan.
21          THE COURT:  Well when you say that, what do you mean
22   by that?  What's not in the discovery plan?
23          MR. BUFFONE:  Loans that the United States, if the
24   United States were to try and prove loans outside of the loan
25   selection that are outside that it does not intend to prove
```

1    through sampling in this case.

2          THE COURT:  All right, so when do you think you're

3    going to disclose that if it's not September 1?

4          MR. BUFFONE:  At a minimum, your Honor, I think we

5    would disclose that in expert reports as the loans that our

6    expert is asserting are have contain material deficiencies.

7          THE COURT:  Are you talking about July 2nd, 2018?

8          MR. BUFFONE:  Yes, your Honor.

9          THE COURT:  That's kind of late in the game, don't

10   you think?

11         MR. BUFFONE:  Umm, no, your Honor I think 'cause

12   there would be extensive discovery that's taken.  You know,

13   Quicken is not limiting its discovery of HUD just to the loans

14   and loan selection.  It's taking broad-based discovery into HUD

15   and HUD's rules and HUD's rules regarding the relevant issues

16   at issue in this case.

17         THE COURT:  All right.  What else do you want to tell

18   me?

19         MR. BUFFONE:  Your Honor, I think that under the case

20   law, the United States has provided Quicken the information it

21   needs to calculate damages and has provided sufficient

22   disclosures as it relates to damages, so that's met its duty.

23   Thank you, your Honor.

24         THE COURT:  Okay.  Mr. Morganroth, do you want to

25   address any of that?

```
 1              MR. MORGANROTH:  Yes, your Honor.  Rule 26 doesn't
 2    allow for a plaintiff just to say well we gave you a bunch of
 3    documents, you go figure it out.  You have to give a
 4    computation of each category of damages plus you have to
 5    produce the relevant documentation.  We may have the relevant
 6    documentation.  It's hard to tell because they won't give us a
 7    computation of each category of damage and if their -- if the
 8    government has a dual track on this case, then they have to do
 9    it for both tracks and you can't do it 2018 during expert
10    reports.  That's not what the rules were designed to do to
11    protect parties.  There has to be initial disclosures and they
12    have to be supplemented as things change in a case and things
13    have changed in this case.  We're now talking about sample
14    population of 2,000 or a total population of 2,835 which is
15    less than the 3,885 that were listed in the Complaint and we're
16    entitled to know what this case is about, especially because at
17    various times there have been discussions about having
18    mediation and how do we have effective discussions about
19    potential settlement or mediation if we don't even know what
20    the case could possibly be in terms of the amount of dollars
21    that's being sought?  Mr. Buffone says it's something they
22    can't do right now.  He certainly has acknowledged they can do
23    it by September 1st.  It's hard for us to, to swallow that the
24    government can't do this now.  In pre-litigation, there were
25    demands made by the government and they computed what they
```

1    thought the damages were on loans.  Now that's a different set

2    of loans and they had different theories than they have now,

3    but they were able to compute it and give us line verse, pages

4    of how they computed their damages which by coincidence would

5    have complied with Rule 26 if that was during the case and

6    those were the loans that they were pursuing and that's all

7    we're asking for in a Rule 26.  We're entitled to that.  We're

8    entitled to an even playing field to know what this case is

9    about; if it's sampling, which loans, what's the justification,

10   which loans that they claim are deficient and the reasons why

11   and that's all we want is to get our rights as a defendant to

12   be able to have a fair case.

13          THE COURT:  All right.  We're going to take a

14   15-minute break.  We'll come back at 3:25.

15          MR. MORGANROTH:  Thank you, your Honor.

16          (Recess taken at 3:12 p.m.)

17          (Reconvened at 3:33 p.m.)

18          THE CLERK OF THE COURT:  Please rise.  Court is back

19   in session.  You may be seated.

20          THE COURT:  One other point raised by the government

21   in its memorandum has to do with the attorney eyes only

22   designations.  You told me at the beginning of our hearing

23   today that there may be some progress on that front.  Let me

24   ask you, where do you stand now on that issue?

25          MR. MORGANROTH:  So the issue initially was about

1    8,000 documents and that was what was discussed during the

2    prior hearing and was the subject matter of the May 26th order.

3    There were 8,000 documents the government felt had some

4    sensitive information that warranted attorney eyes only

5    protection and your Honor embraced a solution allowing the

6    government to produce those materials to us, either redacted or

7    with designations of AEO so we could look at those documents

8    and then make a determination if we disagreed with any

9    protection being warranted and if, even if we didn't disagree,

10   whether we had problems mounting our defense and pursuing our

11   defense because we wouldn't be able to show that information to

12   and consult with our client on that, so the 8,000 documents

13   were produced, but a bigger issue arose because there's now

14   been 48,000 documents produced which virtually all of them were

15   designated AEO, so the problem was that in looking through,

16   there were only two categories, your Honor, indicated could be

17   designated AEO and that was pursuant to the government's

18   delineation of what they were worried about and one category

19   was information related to HUD's function as a regulator which

20   could allow Quicken Loans to reverse engineer certain ways in

21   which HUD overseas lenders and thus avoid enforcement.  That

22   was one category and the other one was proprietary information

23   of Quicken Loans' business competitors.  So to the extent that

24   there was any information, any documents that fell within these

25   two categories, those portions of the documents could be

1    designated AEO.  What happened was the government just

2    designated entire swaths of documents AEO even if there may

3    have been just one line that they were concerned about and some

4    documents didn't appear to have any information that fell in

5    either of these categories, it just mentioned a lender's name,

6    some other lender's name so we did have some meet and confers

7    on this and the problem is that some of the documents that were

8    marked AEO were publicly-available documents.  Other ones were

9    like the regulations themselves.  Some were, had the guideline

10   interpretations and that portion had nothing to do with AEO,

11   but it mentioned another lender's name so the whole document

12   was apparently designated AEO.  What the government explains to

13   us during these meet and confers is that's what they did.  They

14   didn't try to just designate the portion of any document, they

15   just designated the entire document and we had asked for them

16   to redesignate the document so there's just the portion and

17   then we could analyze whether or not we agreed with them and/or

18   whether that would impact our ability to defend the case 'cause

19   we couldn't consult with Quicken Loans.

20        The progress that we have made is it appears that the

21   government has conceded these examples we gave that were

22   over-designations and that it would essentially burden Quicken

23   Loans because we wouldn't be able to consult with our client

24   and that they would redesignate the second category, the

25   proprietary information of Quicken Loans' business competitors

1    as non-AEO.  They would not designate any of the documents AEO

2    if it had quote "proprietary information of Quicken Loans'

3    business competitors."  What they wanted to do instead is

4    modify the current protective order we have in terms of

5    confidentiality, having agreement that we can show it to anyone

6    at Quicken Loans, but we would limit it to only those that we

7    felt had a need to see it for the defense of this case and in

8    concept, we don't have a problem with that and that's what

9    we're already doing anyway with anything that's marked

10   confidential.  So it appears that that would resolve that

11   category, that they would redesignate and they wouldn't

12   designate anything in the future as AEO relating to the other

13   lender business competitors.

14           The second, the other category on we'll say the

15   enforcement regime and potentially allowing Quicken Loans to,

16   to reverse engineer and threaten their enforcement mechanism,

17   umm, I don't think we've reached the finish line, but I think

18   it's something that we could reach the finish line.  We don't

19   think it's unreasonable for the government to actually

20   designate a portion of a document if they think that that

21   portion falls within that category.  The original example on

22   this was data dictionaries which supposedly had a portion of

23   the data dictionaries that related to PETR reviews and

24   supposedly would give insight into what would triggers this

25   PETR review and they didn't want Quicken Loans to see that.

1    The government did produce those and did designate that

2    portion, only that portion of the data dictionary AEO and

3    that's the way we believe it would be appropriate if there's a

4    future document that would, the government thinks falls in that

5    category, to designate just that portion of the document and

6    then allowing us to see what they think is sensitive, the

7    lawyers, and if it's something that we really think we need to

8    share with our client, we would meet and confer with them and

9    explain why and try to resolve it.  The disconnect is that we

10   haven't gotten confirmation that the government would agree to

11   that process.  It seems like they want to still just mark

12   entire documents AEO even if there's just one line of that

13   document that might fall in that category.  That's problematic

14   to us and not only does it create problems 'cause we don't know

15   what portion they're really trying to designate as AEO, and but

16   it creates a burden.  It shifts the burden onto us to try to

17   figure that out and then all sorts of other information that

18   has, wouldn't be entitled to any kind of protection, we

19   wouldn't be able to share with our client so it would give us a

20   bigger job and an unfair job of trying to determine and meet

21   and confer with the government on all of this other information

22   that are in documents that wouldn't be subject to this

23   sensitive protection that they think applies, so the last we

24   left it, we heard that we didn't have a specific agreement on

25   this and we had asked for some examples of how they would go

1   about doing this with specific documents unrelated to the data

2   dictionary and I think Mr. Buffone said he would give us those

3   examples.

4        The wording in this confidentiality, you know, the

5   protective order that would be modified, there were some

6   problems with that although it seems like we're going to be

7   able to work through those, so I think that summarizes where we

8   think we're at.  I don't know if Mr. Buffone has a different

9   point of view.

10        THE COURT:  Well, this is something you raised in the

11   Quicken memorandum so how do you suggest we proceed at this

12   point?

13        MR. MORGANROTH:  Well, I think at this point what

14   we're agreeable to is the procedure, applying the procedure

15   that your Honor had made part of the May 26th order which is it

16   would require re-designation of documents so that they're only

17   designating the portion that would fall within what they

18   believe is AEO protection which would then allow Quicken Loans'

19   attorneys to review that portion only and determine whether or

20   not we agree and if it's something that we felt we would need

21   to share with our client and consult with them about to be able

22   to pursue a meaningful defense.

23        The second thing is we would accept the government's

24   proposal that they would redesignate the production with

25   respect to the second category as just confidential, the

```
 1    proprietary information of Quicken Loans' business competitors
 2    and we would agree and confirm that we will only show those
 3    materials to Quicken Loans' representatives to the extent that
 4    we believe or feel that it, they would or should need to review
 5    those documents as part of the defense of this case.  We would
 6    need the, this 48,000 documents or so to be redesignated so
 7    that it's just not whole swaths of documents including
 8    publicly-available documents, the regulations, the
 9    interpretation of guidelines and so forth.  So that's what we
10    would ask at this point and that's what we're trying to work
11    towards with the government in terms of an agreement, so in the
12    future it would only be category one and in the future they
13    would only designate the portion of a document that they feel
14    belongs in category one and category two, this business
15    competitor category would only be a confidential designation
16    with our confirmation that we would limit who would receive it
17    and review it based on the need to know.
18            THE COURT:  All right.  Mr. Buffone, how do you
19    suggest we proceed?
20            MR. BUFFONE:  Your Honor, I think Mr. Morganroth went
21    over a lot of ground and characterized a lot of the
22    government's production as well as our conversations in ways
23    that we disagree with and I can certainly go into that to the
24    extent the Court needs to hear, but I think the bottom line
25    that Mr. Morganroth confirms is what we said in our motion that
```

1  or in our memorandum that the parties are discussing this, it

2  appears that we are close to a compromise, you know, some of

3  the offers that Mr. Morganroth was saying and some of their

4  requests were made this morning before the hearing so there's

5  certainly more discussions to be made.  We have not heard a

6  response to our draft stipulated protective order to deal with

7  some of the concerns that Quicken has, but I think that we ask

8  the Court for more time so the parties can continue this

9  discussion and resolve it without the Court's intervention, and

10  your Honor, if I may, on the previous discussions that we had

11  during the break, the United States thought further about what

12  the concerns your Honor raised and we -- the United States did

13  offer to Quicken and is willing to supplement its initial

14  disclosures with the calculation, initial calculation of

15  damages as it relates to the sample extrapolation by October 1,

16  a month after and so we put that to Quicken.  I don't think we

17  got a confirmation whether or not that's agreeable to them, but

18  I do put in the one stipulation that I have not had an

19  opportunity to consult with our expert to ensure that our

20  expert's not on vacation the entire month of September, but

21  barring any unforeseen circumstances with his, with that

22  availability, we'd be willing to supplement with our

23  extrapolation, with our initial damages figure as it relates to

24  the extrapolation of the sample by October 1, your Honor.

25           THE COURT:  All right.  Are there any other issues

```
1    that we need to take up at this point?
2            MR. BUFFONE:  None from the United States, your
3    Honor.
4            MR. MORGANROTH:  No, your Honor.
5            THE COURT:  All right.  I do want to meet the
6    attorneys back in our jury room so my clerk's going to take you
7    back there.  That concludes our hearing.  Thank you.
8            MR. MORGANROTH:  Thank you, your Honor.
9            MR. BUFFONE:  Thank you, your Honor.
10           (Hearing concluded at 3:47 p.m.)
11                       --    ---    --
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1               C E R T I F I C A T E

2

3

4

5

6

7          I, David B. Yarbrough, Official Court

8    Reporter, do hereby certify that the foregoing pages

9    comprise a true and accurate transcript of the

10   proceedings taken by me in this matter on Monday, July

11   31st, 2017.

12

13

14

15

16   8/2/2017              /s/ David B. Yarbrough

17   Date                  David B. Yarbrough,
                           (CSR, RPR, FCRR, RMR)
18                         231 W. Lafayette Blvd.
                           Detroit, MI  48226
19

20

21

22

23

24

25