# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action No. |
| Plaintiff, | 2:16-cv-14050 (MAG) (RSW) |
| v. | District Judge: |
|  | Hon. Mark A. Goldsmith |
| QUICKEN LOANS INC., |  |
| Defendant. | Magistrate Judge: |
|  | Hon. R. Steven Whalen |

**QUICKEN LOANS INC.'S MOTION TO STRIKE, IN PART,
THE UNITED STATES' LOAN SELECTION FINDINGS**

Pursuant to this Court's order granting leave to file this motion (ECF 70), Defendant Quicken Loans hereby moves to strike, in part, the government's Loan Selection Findings (ECF 67). Specifically, Quicken Loans moves to strike from those "findings" the alleged defects that do not fall within the four underwriting practices for which representative example claims were pled in the Complaint, and to which the Court limited this case in its Order partially granting Quicken Loans' Motion to Dismiss (ECF 25). Those four practices are (1) permitting "value appeals," (2) miscalculating borrower income, (3) making management exceptions, and (4) ignoring "red flags." Pursuant to Local Rule 7.1(a), undersigned counsel certifies that he personally spoke to counsel for Plaintiff, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief, and that counsel for Plaintiff expressly denied concurrence.

A proposed order is also submitted herewith for the Court's consideration.

Dated:  October 10, 2017          Respectfully submitted,

                                  QUICKEN LOANS INC.

                                  By its attorneys,
                                  /s/ Jeffrey B. Morganroth
Thomas M. Hefferon                Jeffrey B. Morganroth
Sabrina M. Rose-Smith             MORGANROTH &
W. Kyle Tayman                    MORGANROTH, PLLC
GOODWIN PROCTER LLP               344 North Old Woodward Avenue
901 New York Avenue, NW           Suite 200
Washington, DC 20001              Birmingham, MI 48009
Tel.: 202.346.4000                Tel.: 248.864.4000
Fax: 202.346.4444                 Fax: 248.864.4001
thefferon@goodwinlaw.com          jmorganroth@morganrothlaw.com
srose-smith@goodwinlaw.com        P41670
ktayman@goodwinlaw.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Civil Action No. |
|  | ) | 2:16-cv-14050 (MAG) (RSW) |
| Plaintiff, | ) |  |
|  | ) | District Judge: |
| v. | ) | Hon. Mark A. Goldsmith |
|  | ) |  |
| QUICKEN LOANS INC., | ) | Magistrate Judge: |
|  | ) | Hon. R. Steven Whalen |
| Defendant. | ) |  |
|  | ) |  |

**MEMORANDUM OF LAW IN SUPPORT OF
QUICKEN LOANS INC.'S MOTION TO STRIKE, IN PART,
THE UNITED STATES' LOAN SELECTION FINDINGS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

ISSUE PRESENTED ........................................................................ iii

PRINCIPAL CONTROLLING AUTHORITIES.................................. iv

STATEMENT OF FACTS ...................................................................4

ARGUMENT ......................................................................................7

I.    As This Court Has Already Held, the Government's Claims in This Case Are Limited to the Four Practices.....................................................8

II.   This Court Should Strike the Loans and Findings That Are Not Part of the Four Practices .............................................................................10

      A.    This Court Should Strike the Loans and Findings Based on Purported Appraisal Practices Other Than Permitting Value Appeals .........................................................................10

      B.    The Court Should Strike the Loans and Findings Based on Purported Non-Appraisal Practices Other Than Miscalculating Borrower Income, Making Management Exceptions, and Ignoring Red Flags .............................................................................12

III.  The Government's New Assertion of Violations Arising From Unpled Practices Is Inexcusable....................................................................17

IV.   If the Government Were Allowed to Raise the Dozens of Unpled Practices, Discovery Would Vastly Expand and the Case Schedule Would Have to Be Greatly Extended....................................................................18

CONCLUSION ..................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States ex rel. Atkins v. McInteer,*
  470 F.3d 1350 (11th Cir. 2006) ..........................................................................9

*United States ex rel. Bledsoe v. Cmty. Health Servs., Inc.,*
  501 F.3d 493 (6th Cir. 2007) ....................................................................*passim*

*United States ex rel. Chesbrough v. VPA, P.C.,*
  655 F.3d 461 (6th Cir. 2011) ............................................................... iv, 9

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.,*
  719 F.3d 31 (1st Cir. 2013)..................................................................7

*United States ex rel. Spay v. CVS Caremark Corp.,*
  No. 09-4672, 2013 WL 4525226 (E.D. Pa. Aug. 27, 2013)...............................7

*United States v. Aurora Las Encinas, LLC,*
  No. 10-1031, 2012 WL 12897081 (C.D. Cal. Sept. 6, 2012)..........................7, 8

**Statutes & Rules**

31 U.S.C. § 3729 *et seq.* ("False Claims Act").................................................*passim*

Fed. R. Civ. P. 9 ...........................................................................7, 9, 17

Fed. R. Civ. P. 26 ................................................................................17

## ISSUE PRESENTED

Whether – under this Court's order granting in part Quicken Loans' motion to dismiss (the "MTD Order") (ECF 25), the Sixth Circuit's decision in *United States ex rel. Bledsoe v. Community Health Services, Inc.*, 501 F.3d 493 (6th Cir. 2007), and the case Scheduling Order (ECF 44) – this Court should strike the government's loan selection findings (ECF 67) that do not involve the four alleged underwriting practices for which actionable representative false claims were pled in the Complaint and to which the MTD Order limited this case.

## <u>PRINCIPAL CONTROLLING AUTHORITIES</u>

1) *United States ex rel. Bledsoe v. Community Health Services, Inc.*, 501 F.3d

    493 (6th Cir. 2007)

2) *United States ex rel. Chesbrough v. VPA, P.C.*, 655 F.3d 461 (6th Cir. 2011)

After an extensive three-year investigation, the United States brought this suit asserting that Quicken Loans violated the False Claims Act ("FCA") in making FHA loans. This suit was implausible from the start. Quicken Loans is the highest-quality large FHA lender by the government's own measures. It was not surprising, then, that the government's Complaint was limited in what it could allege (once the rhetoric was put to one side). The Complaint alleged that Quicken Loans engaged in four discrete alleged practices that supposedly resulted in "hundreds" of deficient loans (out of about 100,000 Quicken Loans made during the relevant period). The alleged practices were: (1) permitting appraisal "value appeals," (2) miscalculating borrower income, (3) making management exceptions, and (4) ignoring "red flags" (collectively, the "Four Practices"). Compl. ¶¶ 110-12, 201.

Ruling on Quicken Loans' motion to dismiss, this Court limited the case to allegations of loan defects caused by one of these Four Practices. ECF 25 at 8-10, 12-35. Recognizing that Quicken Loans must be given an opportunity to understand the details of the government's case in order to defend itself, this Court issued a case scheduling order compelling the government to disclose the loans that it contends "support its claims in this matter" and "the manner in which the loans do so." ECF 44, ¶ 4. However, when the government made those disclosures recently, they swept well beyond the boundaries of the Complaint and of this

1

Court's MTD Order.  Taking a kitchen-sink approach to its disclosures, the government listed loans based on dozens of additional purported underwriting practices or errors (referred to herein as the "Unpled Practices"), which supposedly gave rise to almost 3,000 other, unrelated defects spanning hundreds of loans. ECF 67.  For example, one loan file supposedly did not contain a septic tank inspection certificate, and a number of appraisals purportedly did not confirm that the valuation was consistent with "Google Streetview."  Obviously, these asserted defects are not what this suit is supposed to be about.

Even more troubling, when called upon to disclose "the manner" in which the loans support its claims, the government was only able to muster allegations concerning 35 "value appeals" (11 of which were actually rejected), three supposed instances of "ignoring red flags," and zero allegedly-improper management exceptions.  Even among the supposed instances of income miscalculation, many instead are largely if not entirely complaints about documents supposedly missing from the loan file.

Faced with the stark reality that the allegations of fraud in its Complaint have no actual support, the government has loaded its disclosures with every conceivable underwriting and appraisal defect it could muster, regardless of how trivial the supposed error might be.  This amounts to little more than an attempt to

resurrect its previously-espoused position that this case should not be bound by the scope of the practices and representative example claims alleged in the Complaint.

But the Court correctly rejected that view, ruling instead that the case shall proceed only as to alleged FCA violations founded on one of the Four Practices. ECF 25 at 8-10.  The Sixth Circuit's opinion in *United States ex rel. Bledsoe v. Community Health Services, Inc.*, 501 F.3d 493 (6th Cir. 2007), on which this Court relied in its MTD Order (at 8-10,12), expressly holds that an FCA case must be limited to the practices for which actionable representative example false claims are pled in the complaint.  This Court's MTD and Scheduling Orders do not allow what the government is trying to do either.  ECF 25, 44.  Further, common sense, efficient case administration, and fairness all counsel strongly against letting the government circumvent the MTD Order and *Bledsoe*.

The Complaint here does not include representative example claims for the Unpled Practices, much less establish with particularity that such purported practices are actionable under the FCA (which they are not).  For that reason and the others above, these "findings" must be stricken as falling outside the scope of the litigation, as defined by the Court in its MTD Order.  Five years into this process (encompassing the investigation and this suit), the government should not be allowed to throw this case into chaos and further subject Quicken Loans' stellar reputation to even more unfair and untrue accusations.

3

Quicken Loans respectfully submits that this Court should strike the loans and "findings" that are not grounded in one of the Four Practices. As set forth below and in the Proposed Order, for clarity and convenience, Quicken Loans is submitting as Exhibits A and B hereto a version of the government's findings (ECF 67) with the offending findings highlighted and specifically requests that each of the highlighted findings be stricken.

## STATEMENT OF FACTS

As the Court has recognized, the government "had years to canvass information within its province and to take presuit discovery." ECF 44 at ¶ 4. This included a three-year investigation that examined over 380,000 pages of Quicken Loans documents, including hundreds of complete loan files and ESI from more than a dozen custodians, and culminated in eight hand-picked depositions. Following that investigation, the Complaint charged that Quicken Loans had "established certain underwriting processes" that resulted in "materially defective loans." ECF 1 at ¶ 109. As this Court recapped, the Complaint "provides ten specific examples of false claims that were submitted to HUD, all of which fall within one of the following four practices Quicken used to carry out its scheme: (i) permitting 'value appeals,' (ii) making 'management exceptions,' (iii) miscalculating borrower income, and (iv) manipulating data and ignoring red flags." ECF 25 at 10; *see* Compl. ¶¶ 110-12, 114-55, 166-74.

4

On March 19, 2017, after a hearing, this Court granted in part Quicken

Loans' Motion to Dismiss.  ECF 25.  The Court agreed with Quicken Loans that

the government can pursue claims only with respect to the practices for which

actionable representative example loans were pled in the Complaint.  The Court

explained that, under *Bledsoe*, "pleading a fraudulent scheme with particularity

alone is insufficient"; "[r]ather, the plaintiff must plead a specific example of a

false claim with particularity."  *Id*. at 8-9.  Thus, this Court "reject[ed] the Govern-

ment's contention that it d[id] not have to plead specific examples" of the alleged

practices.  *Id*. at 9 n.2; *compare* ECF 19 at 9 (government argued that its scheme

allegations "need not[] include representative examples"); MTD Hearing Tr. (ECF

24) at 51-53 (same).  This Court also held that, under *Bledsoe*:

> [T]he examples of specific false claims must be "characteristic
> examples that are illustrative of the class of all claims covered by the
> fraudulent scheme."  This means that the examples must be pled with
> specificity in "all material respects, including general time frame,
> substantive content, and relation to the allegedly fraudulent scheme,"
> such that "a materially similar set of claims would have been
> produced with a reasonable probability by a random draw from the
> total pool of all claims."

*Id*. at 9 (quoting *Bledsoe*, 501 F.3d at 511).  This Court reinforced this point by

stating that there was no need for it to address any other "allegedly noncompliant

conduct on behalf of Quicken regarding FHA program rules" for which the Com-

plaint contained no representative example loans.  *Id*. at 10 n.3.

"Having established the governing legal framework," the Court turned to "each of the [four] practices, as well as the representative examples," which "require[d] the Court to engage in a paragraph-by-paragraph analysis of the complaint." *Id*. at 12. Based on that detailed analysis, this Court dismissed the Complaint's allegations as to the practice of "Manipulating Data" but found that most of the allegations concerning the Four Practices at least stated a claim. *Id*. at 12-28.

On May 26, 2017, this Court entered its comprehensive Order Regarding Scheduling Matters. ECF 44 ("Scheduling Order"). This Court found that "an orderly process must be established" to address the problem that there are a "[g]reat number of loans that are of relevance" and that the government "has not identified" which loans are at issue and why. *Id*. at ¶ 4. Consequently, over the government's objection (ECF 30 at 16-18), this Court ordered the government to "serve and file a memorandum detailing which of the loans in the Loan Selection [*i.e.*, the 350 loans in the Loan Sample and an additional 137 loans] it contends support its claims in this matter." ECF 44 at ¶ 4. This Court also ordered the government to "set forth the manner in which the loans do so, including specifically, what guideline or rule is alleged to have been violated." *Id*.

On September 1, 2017, the government filed its "Loan Selection Findings" (ECF 67), which had two attachments. Attachment 1 (ECF 67-2) is entitled

"Violations of Non-Appraisal Related Guidelines or Rules" ("Non-Appraisal Findings"), awkwardly named by the government because it encompasses an unrelated hodgepodge of supposedly-violated rules, including ones related to income, credit, assets, home construction standards, documentation, and eligibility. Attachment 2 (ECF 67-3) is entitled "Violations of Appraisal-Related Guidelines or Rules" ("Appraisal Findings"), which cites a small number of value appeals but dozens of unrelated, technical appraisal standards.  Taken together, the Loan Selection Findings far exceed the permissible scope of this case by challenging over 60 supposed underwriting practices and over 3,000 supposed underwriting errors.

## ARGUMENT

In an FCA case, the court has the authority and the duty to confine the proceedings to the practices that were pled in the complaint and survived scrutiny under Rule 9(b).  *See Bledsoe*, 501 F.3d at 524 (holding that relator "may proceed with the allegations in paragraphs 64-67" as "those paragraphs survive Rule 9(b) scrutiny"); *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 719 F.3d 31, 38-39 (1st Cir. 2013) (district court properly limited proceedings to specific "practices" that had survived the "paragraph-by-paragraph review" "endorsed by the Sixth Circuit in *Bledsoe*"); *United States ex rel. Spay v. CVS Caremark Corp.*, No. 09-4672, 2013 WL 4525226, at *6 (E.D. Pa. Aug. 27, 2013); *United States v.*

*Aurora Las Encinas, LLC*, No. 10-1031, 2012 WL 12897081, at *5, 8 (C.D. Cal. Sept. 6, 2012). That authority and duty are squarely applicable here.

## I.    As This Court Has Already Held, the Government's Claims in This Case Are Limited to the Four Practices.

The MTD Order already limited the government's claims to the "four practices Quicken [allegedly] used to carry out its scheme." ECF 25 at 10. In doing so, this Court rejected the government's argument that it could proceed with respect to an alleged practice for which the Complaint lacked a representative example loan. *Id*. at 9 n.2 and 10 n.3. This Court also rejected the government's arguments (MTD Tr. (ECF 24) at 47:12-48:10, 49:18-51:13) that this Court should not parse the Complaint's sufficiency as to each of the pled practices, and that the loans cited in the Complaint instead should be regarded just as illustrative examples of an overarching and unbounded "practice" of violating any or all of the thousands of underwriting requirements. ECF 25 at 9-10 & nn. 2-3. This Court instead agreed with Quicken Loans that the question to be decided was whether the loans cited in the Complaint were "representative examples <u>of the four previously mentioned practices</u>." *Id*. at 10 n.3 (emphasis added).

This Court's detailed analysis of the Complaint underscored that limited focus. In a discussion that spanned 24 pages, the Court determined whether each of the example loans pled a false claim arising from the specific alleged practice, ultimately dismissing the allegation that Quicken Loans manipulated data because

the two examples pled for that supposed conduct did not state a claim. *Id*. at 28-31, 35, 51-52. The Court also dismissed the claim as to one of the example loans cited as allegedly involving income miscalculation. *Id*. at 25.

This approach and the Court's ruling were compelled by *Bledsoe*, which held that, to be "representative," an example must be the same "in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme." *Id*. at 9 (quoting *Bledsoe*, 501 F.3d at 511). Obviously, an example loan involving an alleged value appeal requested by Quicken Loans is not the same "in all material respects" as a loan where the appraiser supposedly neglected to check "Google Streetview." Likewise, an example loan involving alleged miscalculation of borrower income is not the same "in all material respects" as a loan involving a purported failure to verify the property's eligibility.

The government's improper effort to expand this case far beyond the Four Practices violates the fundamental purposes underlying Rule 9(b). A central reason for Rule 9(b)'s heightened pleading requirement, which applies to FCA cases, is "to narrow" and whittle down "potentially wide ranging discovery to relevant matters." *United States ex rel. Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011); *accord United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006) ("The particularity requirement of Rule 9(b) . . . will

9

result in claims with discernable boundaries and manageable discovery limits.")
(quotations omitted). Courts in FCA cases thus limit discovery to the particular-
ized claims that survive Rule 9(b) scrutiny. *See* pages 7-8 *supra* (citing cases).

In short, allowing the government to inject a blizzard of Unpled Practices
into this litigation would make *Bledsoe* a dead letter and render meaningless the
Court's "paragraph-by-paragraph" assessment, in the MTD Order, of the practices
and example loans alleged in the Complaint.

## II.   This Court Should Strike the Loans and Findings That Are Not Part of the Four Practices.

The Court ordered the government to disclose "which of the loans in the
Loan Selection . . . support its claims in this matter" and "the manner in which the
loans do so." ECF 44 ¶ 4. The government's claims, however, are limited to the
Four Practices, and the Complaint does not plead any representative example false
claims for any of the Unpled Practices, still less show with particularity that these
unrelated practices are actionable under the FCA's stringent requirements. The
loans and findings that are not directly tied to the Four Practices therefore must be
stricken as violating the Scheduling Order, as well as the MTD Order and *Bledsoe*.

### A.   This Court Should Strike the Loans and Findings Based on Purported Appraisal Practices Other Than Permitting Value Appeals.

The only appraisal-related practice alleged in the Complaint, and sustained
in the MTD Order, involved permitting "value appeals." Compl. ¶¶ 128-43; ECF

25 at 12-19.  The Complaint defined a "value appeal" as occurring when, "[a]fter receiving an appraised value that was too low," "the value analyst would send a request to the appraiser . . . which requested a specific inflated value from the appraiser as a 'professional reconsideration.'"  Compl. ¶ 132; *see also id*. ¶¶ 139-42 (examples of loans with appeals).  No other practices or "representative examples" concerning appraisals are pled in the Complaint (or allowed by the MTD Order).  Indeed, in opposing the Motion to Dismiss, the government insisted that it was "not challenging the appraisers' … conclusions," but rather just the "value appeal process" which supposedly "improperly influenced the appraisers' opinions, in violation of FHA requirements."  ECF 19 at 15.

The Appraisal Findings vastly exceed these bounds.  They are 401 pages long, list 175 additional loans that did <u>not</u> have a value appeal, collectively point to dozens of other appraisal-related issues (42 by our count), and include a total of purported 2,352 appraisal-related errors.  Further, the 35 loans cited as having value appeals now are also being cited for a collective total of 400 additional purported errors.  For example, the findings include unpled issues such as:

1.    The appraisal report failed to identify unspecified physical characteristics consistent with "Google Street View" (asserted 54 times in the findings) and/or "aerial imagery" (134 times).

2.    The report "does not define the neighborhood boundaries by physical features or well defined natural barriers" (63 times).

11

3.    The report "does not summarize an analysis and/or provide an explan-
ation for not bracketing a relevant attribute of the subject using com-
parable data" (97 times).

4.    The report "does not identify what comparable data is given the most
weight in the indication of value" (119 times) or "did identify the
comparable given the most weight, but failed to adequately "summar-
ize and/or explain why" (55 times) or did not identify unspecified
"factual data" about comparables (195 times).

5.    The report "omits and/or does not analyze an adverse physical condi-
tion(s) and/or physical and/or functional deficiency(ies), or the
Appraisal Report identifies the inspection of the subject property does
not meet the FHA minimum requirements (e.g., the Appraisal Report
identifies the attic was not inspected)" (69 times).

6.    The report did "not provide complete and consistent market condi-
tions conclusions" (64 times).

7.    The report did "not adjust comparable(s)" properly (24 times).

Contrary to the government's representation (on which the Court relied) that

it was not challenging the appraisals (*see* page 11 *supra*), all of these findings do

exactly that – and thus try to place at issue not just the 35 value-appeal loans but

175 other loans.  All of the Appraisal-Related Findings based on Unpled Practices

should be stricken.

B.    The Court Should Strike the Loans and Findings Based on Purported
Non-Appraisal Practices Other Than Miscalculating Borrower
Income, Making Management Exceptions, and Ignoring Red Flags.

Just like the Appraisal Findings, the Non-Appraisal Findings vastly exceed

the bounds set in the MTD Order:  besides miscalculating income, making a

management exception, or ignoring red flags, the government identifies (by our

12

count) 32 other supposed practices that purportedly resulted in 164 unrelated violations of a wide array of guidelines. The Non-Appraisal Findings list 71 loans that are <u>not</u> alleged to involve any of the Four Practices, and assert a collective total of 103 additional defects in those 71 loans that are unrelated to the Four Practices. Moreover, even for the loans that are alleged to have involved one of the Four Practices, the findings also identify a total of 61 purported additional defects relating to other, unrelated practices.

One major category of Unpled Practices concerns borrower qualifications other than income. For example, the government asserts that Quicken Loans failed to calculate or verify the borrower's or a spouse's liabilities, such as:

1. "Quicken understated the borrower's monthly debt obligation due to its failure to include all debts appearing on the borrower's credit report or obtain documentation that the debts are not owed." Loan 137-5102758.

2. "Documents in the loan file indicate the borrower was delinquent on Federal taxes. Quicken failed to ensure a satisfactory repayment plan between the borrower and the IRS." Loan 261-9586793.

3. "Quicken understated the borrower's monthly debt obligation due to its failure to determine the appropriate monthly payment on student loans carried by the borrower." Loan 387-0911591.

Separately, the Non-Appraisal Findings also criticize Quicken Loans' documentation and analysis of "assets." Examples include:

1. "Quicken failed to adequately source the funds required to close the loan due to its failure to document the borrower's gift per HUD requirements." Loan 381-8302623.

13

2.      "Quicken failed to adequately source large deposits into the borrow-er's bank account."  Loan 371-3892794.

3.      "Quicken accepted gift documentation that was handled or transmitted by or through an interested third party to the transaction, in violation of HUD requirements."  Loan 201-4408943.

And, the findings range farther afield to embrace supposed errors relating to other aspects of borrower eligibility, such as the borrower's history of making payments on an existing loan or how community property-state laws and requirements affected the determination of assets and liabilities.  Examples include:

1.      "Quicken failed to obtain the borrower's rental/housing payment history" (Loan 105-4283330) or "to document at least the last three mortgage payments due prior to closing."  Loan 161-2302675.

2.      "Quicken failed to obtain a credit report on the borrower's spouse and include any spousal debts in the monthly debt calculation, even though the subject property was located in a community property state."  Loan 042-8384630.

None of these types of purported errors involves any of the Four Practices.

The Non-Appraisal Findings also assert, for the first time, that Quicken Loans improperly determined the eligibility of certain properties for FHA insur-ance (apart from appraisal issues).  These unpled issues largely fall into two buckets.  First, the findings contend that Quicken Loans approved loans for homes that did not meet FHA's minimum property standards.  Examples are:

1.      "[T]he appraiser indicated the subject property had a septic system, and recommended a certificate inspector inspect the tank.  However,

14

Quicken failed to document that the septic tank was inspected." Loan 011-7134485.

2.   "Quicken failed to ensure the subject property—a condominium—was eligible for FHA mortgage insurance.  Specifically, Quicken did not ensure that no more than 10% of the properties [at the project] were insured by the FHA." Loan 263-4625964.

3.   "Quicken failed to resolve conflicting information indicating the borrower did not reside in the subject property." Loan 281-3327582.

4.   "The loan was ineligible for FHA insurance because the seller had purchased the subject home on 2/12/2009, less than 90 days prior to the date the sales contract was executed." Loan 201-4244392.

Second, the findings identify loans that supposedly exceeded the maximum allowable loan-to-value ratio ("LTV"), for any number of reasons:

1.   "Quicken failed to properly account for an inducement to purchase paid from the seller to the buyer that resulted in the transaction exceeding HUD's Loan to Value limits." Loan 221-4497855.

2.   "Quicken failed to consider the value of personal property items given by the seller to the borrower when calculating the Loan to Value and Maximum Mortgage Amount." Loan 321-2562708.

3.   "Quicken endorsed the loan for FHA mortgage insurance with a Loan to Value in excess of the 85% cap on identity of interest transactions. Here, the borrower was purchasing the property from an individual with whom he had a business relationship, and he had not been renting the home for at least six months." Loan 321-2917392.

All of these supposed defects, and the others like them, do not fall within any of the three non-value appeal practices alleged in the Complaint.  Quite obviously, they have nothing to do with the calculation of borrower income.  Nor do the asserted flaws implicate the alleged practice of making improper management

exceptions; indeed, not a single one of the Non-Appraisal Findings is attributed to the granting of an "exception."

These supposed defects also cannot be said to all fall within the alleged practice of ignoring red flags. As the MTD Order noted, the Complaint alleges that Quicken Loans "ignored obvious red flags that indicated a borrower would not be able to repay the mortgage." ECF 25 at 31 (quoting Compl. ¶ 166). The findings cite three loans that supposedly involved such a situation: Loans 201-3794887 ("red flags regarding the stability of the borrower's employment"), 381-8679047 ("red flags in the borrower's credit history . . . indicat[ing] that the borrower's credit was unacceptable"), and 492-8082888 ("inconsistencies . . . indicat[ing] potential misrepresentation regarding the income documentation").

The government nevertheless has implied in pre-motion discussions that it can use "ignoring red flags" as a catch-all category covering any defect in any loan. But the Scheduling Order required the government to "set forth the manner in which the loans" supported its claims (ECF 44), and the Loan Selection Findings do not cite "red flags" for any other loans. Such an interpretation of the "red flags" practice, moreover, would impermissibly allow the government to allege an all-encompassing scheme "to submit false claims to FHA." That is precisely the kind of scheme that the government disclaimed in its statements to the Court (ECF 19 at 7) and that is expressly foreclosed by *Bledsoe* and by the MTD Order. *See*

16

pages 7-9 *supra*.  These supposed defects – which are not identified in the Loan

Selection Findings as involving "red flags" – are not the same "in all material

respects, including general time frame, substantive content, and relation to the

allegedly fraudulent scheme" as those in the example loans pled in the Complaint

(MTD Order at 9), and hence are not properly part of this case.

## III.    The Government's New Assertion of Violations Arising From Unpled Practices Is Inexcusable.

The government's improper inclusion of Unpled Practices almost two and

one half years after the Complaint was filed is entirely unjustifiable given that the

government had all of the information needed to identify, and to plead in the

Complaint, any purportedly improper practices that it believed to be a basis for

FCA liability.  Not only did the government conduct an exhaustive three-year

investigation, but of the loans cited in the findings for Unpled Practices there are

more than a dozen whose complete files were produced during the pre-suit phase

and at least four more that FHA auditors reviewed years ago as part of the so-

called PETR quality control process.  Declaration of W. Kyle Tayman, Esq. (Exh.

C hereto) at ¶¶ 4-5, 7 (listing loans).

The government's attempt to greatly expand the litigation stands in inexcus-

able contrast to the Rule 26(f) report it filed (jointly with Quicken Loans) <u>after</u>

Quicken Loans had turned over the loan files for the 487 Loan Selection loans (by

August 2016) and <u>after</u> the MTD Order (in March 2017).  ECF 30.  In that report,

17

the government promised it "does not currently anticipate filing an amended com-

plaint." *Id.* at 3. Rather, the government was satisfied at that time to go forward

with a case based on the Four Practices it had pled and that this Court sustained

under Rule 9(b). The parties and this Court have too much invested in the direc-

tion the case thereafter took to allow the government to vastly expand this already-

sweeping case in violation of the MTD ruling and *Bledsoe*.

Holding the government to its Complaint will cause it no harm. There is no

FCA violation here – either as pled or arising out of the Unpled Practices. Quicken

Loans has made it clear that if it committed any material underwriting errors that

meet regulatory standards for a remedy, it will do the right thing and indemnify the

FHA fund through loan-level discussions in the administrative PETR process. *See*

Answer (ECF No. 28) at ¶ 27, First Aff. Defense.

## IV. If the Government Were Allowed to Raise the Dozens of Unpled Practices, Discovery Would Vastly Expand and the Case Schedule Would Have to Be Greatly Extended.

In this case, it is particularly important that the limitations on scope of the

government's allegations imposed by *Bledsoe*, the MTD Order, the Scheduling

Order, and the other considerations discussed above be enforced. Allowing the

Loan Selection Findings to stand unaltered would open the floodgates to extra-

ordinarily wide-ranging discovery and other proceedings far beyond where the

parties have been and what the schedule contemplates.

18

If the unrelated findings are not stricken, this case would become much more "sprawling" (in this Court's word, *see* ECF 70 at 2) than it already is. Instead of litigating over one appraisal practice (value appeals) that allegedly affected 35 loans, the parties would be litigating over dozens of unpled purported appraisal practices that supposedly gave rise to some 2,700 errors across over 210 loans. And instead of litigating three alleged non-appraisal underwriting practices, the parties would also be litigating the unpled supposed practices of miscalculating borrower liabilities and assets, mistaking borrower qualifications, making errors as to property characteristics, miscalculating property values, and a host of others.

Further, for each of the dozens of unpled supposed practices, a new Rule 12(b)(6) motion would need to be filed to determine whether the practice is even actionable. That in turn would be followed, if the practice survived such scrutiny, by additional discovery – and then subsequent motion or trial practice – to address, at least, (a) if the practice actually occurred, (b) if it violated any FHA requirement, (c) if any such violation was done with scienter, (d) if the supposed violation was material to a payment decision, and (e) if the purported violation caused the loan to default and unfairly cost HUD money. With few exceptions, the document and ESI discovery so far has been focused on the Four Practices. If the findings based on Unpled Practices are not excluded, Quicken Loans would – nearly 30 months into this lawsuit – need to start motion and discovery practice anew as to all of

19

those additional Unpled Practices. And the loans at issue would balloon. Under those circumstances, discovery could not possibly be completed by June 1, 2018, as the present schedule contemplates.

Quicken Loans has been the subject of an investigation that dates to 2012, and a suit that has been pending since May 2015. While Quicken Loans believes it did nothing wrong, it stands ready and eager to show the Court and jury that the facts back it up. The Court should hold the government to what it pled so that the parties can move forward, not backward, in this case.

## <u>CONCLUSION</u>

The Court should strike the loans and findings set forth in the Loan Selection Findings that are beyond the Four Practices, as highlighted on Exhibits A and B.

Dated: October 10, 2017

Respectfully submitted,

QUICKEN LOANS INC.

By its attorneys,
/s/ Jeffrey B. Morganroth

| | |
|---|---|
| Thomas M. Hefferon | Jeffrey B. Morganroth |
| Sabrina M. Rose-Smith | MORGANROTH & |
| W. Kyle Tayman | MORGANROTH, PLLC |
| GOODWIN PROCTER LLP | 344 North Old Woodward Avenue |
| 901 New York Avenue, NW | Suite 200 |
| Washington, DC 20001 | Birmingham, MI 48009 |
| Tel.: 202.346.4000 | Tel.: 248.864.4000 |
| Fax: 202.346.4444 | Fax: 248.864.4001 |
| thefferon@goodwinlaw.com | jmorganroth@morganrothlaw.com |
| srose-smith@goodwinlaw.com | P41670 |
| ktayman@goodwinlaw.com | |

## **<u>LOCAL RULE CERTIFICATION</u>**

I, Jeffrey B. Morganroth, certify that Quicken Loans' Motion to Strike, in
Part, the United States' Loan Selection Findings complies with Local Rule 5.1(a),
including: double-spaced (except for quoted materials and footnotes); at least one-
inch margins on the top, sides, and bottom; consecutive page numbering; and type
size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for
non-proportional fonts) or 14 point (for proportional fonts).  I also certify that it is
the appropriate length pursuant to the Court's September 26, 2017 order.  ECF No.
70.


/s/ Jeffrey B. Morganroth
Jeffrey B. Morganroth

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 10, 2017, a copy of the foregoing was filed through the CM/ECF system, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system.

<u>/s/Jeffrey B. Morganroth</u>

22