UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action No. 2:16-cv-14050 (MAG) (RSW) |
| Plaintiff, | |
| v. | District Judge: Hon. Mark A. Goldsmith |
| QUICKEN LOANS INC., | Magistrate Judge: Hon. R. Steven Whalen |
| Defendant. | |

**QUICKEN LOANS INC.'S MOTION AND MEMORANDUM TO COMPEL ACCESS TO HUD'S LOAN REVIEW SYSTEM**

Pursuant to the Court's July 13, 2018 Order (ECF No. 127), Quicken Loans Inc. files this motion to compel access to HUD's system of loan-level audits (the "URS database"). Quicken Loans respectfully requests an immediate hearing on the matter in light of upcoming depositions of HUD witnesses, which are scheduled to begin tomorrow (Tuesday, July 24) and will occur through next week. Pursuant to Local Rule 7.1(a), Quicken Loans conferred with counsel for Plaintiff who refused to concur to the relief sought in this motion.

The Government has frustrated Quicken Loans' ability to defend itself in this case by obstructing Quicken Loans' ability to access, understand, and use information that is critical to test the Government's burden to prove that the alleged Loan Findings (ECF No. 67) are false and material under the False Claims Act. As this Court is aware, as part of the FHA program, HUD reviews the underwriting decisions made on certain loans after closing. Government witnesses and documents have universally confirmed that if an underwriting error is found and is material, then HUD will rate the loan as "unacceptable" during its review and pursue indemnification for that error. In contrast, where no errors are found or the errors are judged immaterial to the insurability of the loan, HUD will not pursue indemnification, as is the case for many loans. HUD stores comprehensive records of these loan-level audit decisions for all FHA loans across all FHA lenders in its Underwriter Review System ("URS") database.

The evidence contained in the URS database bears strongly on the falsity and materiality elements of the FCA. As to falsity, the URS database records, *inter alia*, instances where HUD decided that lenders properly interpreted contested guidelines. The URS database also lies at the heart of the FCA's "demanding" and "rigorous" materiality requirement, *Universal Health Services Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), which will require the Government to prove that the allegedly-violated guidelines identified in the Loan Findings "are so central . . . that the [government] would not have paid these claims had it known of these violations." *Id.* at 2004. Providing compelling evidence that the Government's alleged Loan Findings are not material, the URS database contains evidence showing that HUD regularly identified identical underwriting errors or guideline violations but declined to pursue indemnification.

Given the importance of this evidence, the Government has attempted to obscure it. The Government's production of extracts from the URS database consists of a single, massive data dump in a format that is not reasonably useable because the data for a single loan is disaggregated across multiple spreadsheets and dozens of rows and columns. Quicken Loans, therefore, has tried to use the tools available in discovery to understand the extract more fully, but those efforts have been blocked by the Government at every turn. Quicken Loans asked HUD witnesses about what certain information in the extract meant, but because the

2

extract was produced in a format unrecognizable to the witnesses, the witnesses were unable to answer those questions. However, the Government's previous submission to this Court confirmed that the URS database as used by HUD "displays" the data in a user-friendly format where all the information about a single loan is collected in a simple to understand webpage format. ECF 118 at 3; ECF 118-6. Quicken Loans has been denied access to these webpages.

The Government should not be heard to oppose this request because, in pursuing access to Quicken Loans' systems, the Government has conceded that it produced the URS data in "degraded" form and failed to comply with Rule 34 under its own standards of what the rule requires. It has unabashedly represented to the Court that Quicken Loans flouted its discovery obligations by producing a data extract, while maintaining that its own data extract produced in the same format complies with Rule 34. That inconsistency cannot be allowed to stand. What is good for the goose is good for the gander.

The reason behind the Government's refusal to provide reciprocal access to URS is obvious: Based on the tiny fraction of source files produced by the Government to date, the URS database houses a trove of exculpatory evidence showing that HUD accepted loans as insurable with the very same alleged errors and guideline violations the Government is now asserting in this case are material. Exs. A-C. The only source for this information other than the URS database is the

3

underlying audit files themselves. But the Government will only produce 0.2% of the actual files and, as the Court will recall, claimed that it would take "an entire year, in addition to $339,880 in costs" to produce those files. ECF No. 35 at 4. Therefore, the sensible and most practicable solution to avoid those burdens is to provide Quicken Loans with access to the URS database. This is consistent with the Government's statements to the Court that live, supervised access to URS is "a workable solution" to this dispute. Ex. D, at 141.

Quicken Loans respectfully requests that the Court order the Government to provide Quicken Loans with 60 hours of supervised access to two terminals with the URS database under the same parameters specified by the Court in its Orders of July 13, 2018 (ECF 127) and July 19, 2018 (ECF 129), which is far less time than the Court authorized the Government to access Quicken Loans' systems.

### I. HUD's URS Data Is Critically Important.

Under *Escobar*, an allegedly false statement is "material" only if the Government "would not have paid" the claim had it known of the alleged falsity. 136 S. Ct. at 2004. The focus of the materiality inquiry is whether, in practice, "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" at issue. *Id.* at 2003. Given this standard, Quicken Loans must be given a full and fair opportunity to examine and probe the extent to which the

4

Government treats the same contested requirements in the mine run of cases. *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (due process requires that there be an opportunity to present every available defense).

HUD reviews loan for insurability and possible remedies through the Post Endorsement Technical Review ("PETR") process. This was, and is, the primary mechanism through which HUD polices compliance with FHA guidelines. These reviews are "critical" to the success of the FHA program (Ex. E, HUD 4155.2, Ch. 9, Sec. B), and allow HUD to ensure lenders' underwriting processes are adequate and compliant with HUD guidelines. When HUD reviews a loan file, it determines both the existence and severity of any underwriting errors on the loan. If, as a result of the review process and subsequent communications with the lender, HUD determines that there was a "material violation of FHA origination requirements" that was knowable to the lender, FHA may demand that the lender indemnify HUD against any insurance claim. *Id.* § 203.255(g)(3) (emphasis added).

The URS database contains loan analyses and reviews on nearly 400,000 loans that HUD selected, reviewed, and rated through the PETR process from the lending time period. Ex. F (Supp. RFA Response #178). The URS is the only comprehensive record of the review(s) HUD performed on each loan, whether any underwriting deficiencies were identified, whether HUD concluded that those deficiencies were material to the insurability of the loan, whether HUD demanded

5

indemnification from the lender, and the rationale for each of these conclusions. The URS is thus critical evidence relevant to the FCA and especially the *Escobar* materiality standard.

Based on the scant few source files the Government produced, Quicken Loans has uncovered (with great and tedious effort) dozens of examples that definitively show that HUD accepted loans as insurable despite the fact that they contained the *very same alleged defects* the government is now asserting in this case are material to its decision to pay. *E.g.*, Ex. A (WVOE issue immaterial); Ex. B (compensating factors overcame negligible variation in income calculation); Ex. C (pension income documentation immaterial).

The URS database contains HUD's conclusions that even more of the issues alleged in the so-called Loan Findings are immaterial. For example, for three loans (263-4625964, 341-0895183, and 461-4541725), the Government alleges in the Loan Findings that "Quicken overstated the borrower's income due to improperly grossing up the borrower's social security income." ECF 67-2, at 23, 29, 40. The URS database, however, shows that in many instances, HUD did not consider errors regarding grossing up of social security income to be material. One entry reflects, "Per Cheryl E. it is OK to mitigate even though lender did not confirm the SS income was non-taxable to allow grossing it up. MAS^[.]" Ex. G at 2.

6

However, as described further below, uncovering this key evidence from the URS data dump is an unduly laborious process because the data is not in a readily usable form. Having access to the systems itself will allow Quicken Loans to obtain screenshots from the simple web format that the Government has already demonstrated exist, which will be easily understandable and allow for far more efficient and productive depositions and pretrial work. It also will avoid deposition witnesses who, by professing inability to understand HUD's own database extracts, avoid the facts. (Quicken Loans anticipates that if live access is allowed, counsel will be able to work out the details of any use of the database at depositions given the manner in which Quicken Loans' systems are being used simultaneously.)

Access to URS is also critical to the falsity and scienter elements under the FCA. The database shows that loans often went through multiple reviews with different HUD underwriters appearing to disagree on the meaning of specific guidelines, or disagreeing whether noncompliance with specific guidelines presented a material risk to the FHA. Exs. G-H. This is key evidence to support Quicken Loans' position that many of the underwriting guidelines at issue were subject to multiple, reasonable interpretations, and were interpreted inconsistently even within HUD.

Finally, access to the URS system will confirm Quicken Loans' superior underwriting quality compared to the average lender, which negates the false

allegations that Quicken Loans engaged in a scheme to defraud the Government. Indeed, the Government's own discovery responses concede that Quicken Loans was more than 2.5 times better than the average FHA lender as measured by HUD's indemnification decisions. Ex. F (Supp. RFA Responses #189-190).

## II. The URS Extract Was Produced in a Degraded Format.

Without the source files, or access to URS, Quicken Loans is left to cobble together piecemeal references concerning HUD's loan reviews from dozens of separate tabs and tens of thousands of rows of data, identified by non-descript codes, and confusing headings and titles. Exs. I-L. Yet, HUD and the Government have the ability to access a user-friendly version of the URS system that Quicken Loans, this Court, and the jury could more easily understand.

The Government cannot be heard to complain about such access here because it has already conceded the inadequacy of its URS productions by acknowledging that "some [HUD] witnesses have been unable to testify about some parts of the URS extract" in its current form. Ex. D, at 140. Indeed, in at least two instances to date, HUD witnesses who use the URS regularly in their jobs have been unable to identify key information from HUD's data extracts. Exs. M-N. To use the Government's words:

> [Quicken Loans] is in the same position as if [the Government] had provided the data behind a website without access to the web code or a browser to view the website. [Quicken Loans] is able to glean some

information, but unable to fully understand the data as it is intended to be displayed.

ECF 92 at 11.

Furthermore, the Government is required under Rule 34(b)(2)(E)(ii) to produce the URS data and information "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms[.]" Given the statements by the Government in its prior motion, it has failed to provide the requested information with the same functionality and searchability as URS in its native form, thereby failing to meet its duties under its own reading of Rule 34. Even the case law previously cited by the Government supports the remedy sought here. *See* ECF 92, at 12 (citing *Rambus Inc. v. Hynix Semiconductor Inc.*, 2007 WL 9653194, at *4-5 (N.D. Cal. Sept. 25, 2007)). Just as in *Rambus*, it is indisputable that the manner in which URS was extracted and produced by the Government here is different than "the manner in which [URS] is ordinarily maintained" and thereby "makes it more difficult and burdensome for [Quicken Loans] to use the information." *Rambus*, 2007 WL 9653194, at *5.

The degraded and illogical format in which URS was produced presents many serious practical difficulties for Quicken Loans' preparation. For one, the loan comments tables (*see* Ex. I-K) and loan data tables (*see* Ex. L) are interspersed across separate extracts such that entries for singular loans are not linked or connected and therefore cannot be searched or analyzed in any integrated

9

way, as would be possible with live URS access. This inadequacy creates serious difficulties in terms of analyzing the database and identifying which of the entries are germane to the case. Only by piecemeal, manual searches across separate databases can Quicken Loans see the information about a single loan for loans originated by other lenders. Whether for its loans or others', the live URS database will allow for more efficient depositions of witnesses who will be asked about the guideline interpretations and inconsistencies which the URS database proves.

Quicken Loans is further entitled to access to URS in a non-degraded format because the Government has refused to produce the underlying PETR files referenced in URS for all but 1,000 loans originated by lenders other than Quicken Loans. Quicken Loans needs to be able to compile, understand, and analyze these examples of immateriality, and yet it cannot do so because the Government refuses to turn over the relevant PETR files or provide full access to URS.

Finally, there can be no debate about the burden of providing this access because the Government is already on record as saying that live, supervised access to URS is "a workable solution" to this dispute. Ex. D, at 141.

## III. Conclusion

For the forgoing reasons, Quicken Loans respectfully requests that the Court authorize 60 hours of two-terminal supervised access to HUD's URS database under the procedures otherwise specific by the Court in its Orders of July 13, 2018

(ECF 127) and July 19, 2018 (ECF 129).  Quicken Loans further requests an immediate hearing on these issues.

|  |  |
|---|---|
| Dated: July 23, 2018 | Respectfully submitted,<br>QUICKEN LOANS, by its attorneys,<br><br>*/s/ Jeffrey B. Morganroth* |
| Thomas M. Hefferon<br>Sabrina M. Rose-Smith<br>W. Kyle Tayman<br>**GOODWIN PROCTER LLP**<br>901 New York Ave., NW<br>Washington, DC 20001 | Jeffrey B. Morganroth<br>**MORGANROTH &**<br>**MORGANROTH, PLLC**<br>344 North Old Woodward Ave., Suite 200<br>Birmingham, MI 48009<br>Tel.:  248-864-4000<br>Fax.:  248-864-4001<br>jmorganroth@morganrothlaw.com<br>P41670 |

11

## **LOCAL RULE CERTIFICATIONS**

I, Jeffrey B. Morganroth, certify that Quicken Loans Inc.'s Motion to Compel Access to HUD's Loan Review System complies with the limitations set forth in the Court's July 13, 2018 Order, and Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts).

*/s/ Jeffrey B. Morganroth*
Jeffrey B. Morganroth

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2018, a copy of the foregoing was served by electronic means via the Court's CM/ECF System and email on all counsel registered to receive electronic notices.

                                                                        */s/ Jeffrey B. Morganroth*
                                                                        Jeffrey B. Morganroth